Timothy B. Mills
D.C. Bar No. 425209
Maggs & McDermott LLC
Attorneys at Law
910 17th Street N.W., Suite 800
Washington, D.C. 20006
(202) 457-8090 (Telephone)
(202) 478-5081 (Facsimile)
Email: TimothyBMills@aol.com

Tennant D. Magee, Sr.
Bar No. MD29271
Maggs & McDermott LLC
Attorneys at Law
800 Old Bridge Road
Brielle, New Jersey 08730
(732) 223-9870 (Telephone)
(732) 223-7837 (Facsimile)
Email: tdmagee@yahoo.com

*Attorneys for Plaintiff Sabre International Security*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SABRE INTERNATIONAL SECURITY** | ) | |
| | ) | |
| House 2, Street 7, Section 215 | ) | Civil Action No. _____ |
| International Zone, Baghdad, Iraq | ) | |
| | ) | **COMPLAINT** |
| **Plaintiff,** | ) | |
| v. | ) | **DEMAND FOR JURY** |
| | ) | **TRIAL** |
| **TORRES ADVANCED ENTERPRISE** | ) | |
| **SOLUTIONS, LLC** | ) | |
| | ) | |
| 2111 Wilson Blvd, Suite 7002 | ) | |
| Arlington, Virginia 22201 | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Plaintiff Sabre International Security alleges:

1

**THE PARTIES**

1.      Plaintiff Sabre International Security ("Sabre") is a limited company organized

and registered under the laws of the Republic of Iraq (Iraq Ministry of Trade License Number

17504) and is licensed by the Ministry of Interior ("MoI") of the Republic of Iraq to operate as a

Private Security Company ("PSC") in Iraq. Sabre's principal place of business is located at

House 2, Street 7, Section 215, International Zone, Baghdad, Republic of Iraq. Since at least

2007 and continuing to the present, Sabre's business has included and includes providing

contracted private security services in, among other places, Iraq in accordance with the MoI PSC

license (the "PSC License"), to various entities, including to the United States Government: (1)

from 27 September 2007 through 5 February 2010 as a prime contractor for the Theater-wide

Internal Security Services ("TWISS") Multiple Award Task Order Contract ("MATOC") number

W91GDW-07-D-4026 for Sabre to provide static security at various U.S. military installations in

Iraq (the "TWISS I Contract") as well as from 5 February 2010 (following a novation of the

TWISS I Contract to Torres as prime contractor) as a TWISS I subcontractor to Torres; and (2)

since 25 August 2009, a teaming member and subcontractor to Torres under the U.S.

Government successor TWISS security services MATOC Contract No. W91DGW-09-D-4030

for the Torres-Sabre team to provide static security at various U.S. Military installations in Iraq

(the "TWISS II Contract").

2.      Defendant Torres Advanced Enterprise Solutions LLC ("Torres"), is a limited

liability company organized and registered under the laws of Virginia. Torres' principal place of

business is located at 2111 Wilson Boulevard, Suite 200, Arlington, Virginia 22201. From 8

November 2007 through 5 February 2010, Torres was a subcontractor to Sabre on the TWISS I

Contract. As such, Torres provided Sabre with personnel who possessed U.S. security clearances

to fill those positions under the TWISS I Contract Task Orders that the U.S. Government required to be staffed with personnel who possessed current U.S. security clearances at the appropriate level.  As further alleged below, on 5 February 2010 Sabre, Torres, and the United States Government entered into a novation agreement by which Torres became the TWISS I prime contractor and Sabre became the only TWISS I subcontractor to Torres (the "TWISS I Novation").  As further alleged below, on 5 August 2009, Sabre and Torres entered into a Teaming Agreement during the competition for award of the TWISS II Contract for the purpose of qualifying to compete for and be awarded a TWISS II Contract as a single team (the "Team") and thereafter to exclusively compete together as a single team be awarded  U.S. Government TWISS II task orders for the provision of defined TWISS II security security services on various U.S. military installations in Iraq (the "Teaming Agreement").  Also as further alleged below, on 25 August 2009, Torres received an award from the U.S. Government of the TWISS II Contract, in its capacity as leading member of the Team and, thus, prime contractor.

## INTRODUCTORY STATEMENT

3.      This is an action arising under and from the TWISS I Contract and the TWISS II Contract for, *inter alia*, preliminary and final equitable relief.  Sabre seeks a preliminary injunction and imposition of a constructive trust – to partially remedy breach of trust obligations owed by Torres to Sabre under the Teaming Agreement to account for and hold contract payments made by the U.S. Government to Torres in trust solely for payment to Team member Sabre, in return for Sabre financing and performing approximately 85% of the TWISS II Contract and task orders by the U.S. Government to the Team under the TWISS II Contract (the "TWISS II Task Orders"). Furthermore, Sabre seeks an order and judgment of specific performance of Torres' unperformed obligations arising under the Asset Purchase Agreement

("APA") dated 30 December 2009 (which closed on 5 February 2010 upon Sabre, Torres and the

U.S. Government's entering into the TWISS I Novation) including: (a) the obligation under the

further assurances clause of the APA for Torres, after novation, to issue TWISS I subtask orders

to Sabre in accordance with the understanding and agreements reached by Torres and Sabre

when entering into the APA; and (b) for Torres to pay Sabre for TWISS I work performed by

Sabre post-novation.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because Sabre is

a resident of a foreign country and the defendant is a limited liability company with its principal

place of business in the State of Virginia.  The amount in controversy, without interest, costs, or

attorneys' fees, exceeds the jurisdictional threshold of $75,000.00 specified by 28 U.S.C. § 1332.

The Court also has jurisdiction over this action under 28 U.S.C. § 2201 (Declaratory Judgment

Act).

5.      Venue is proper in this District. Torres has irrevocably consented to the

jurisdiction and venue of this Court by entering into the Teaming Agreement and the APA which

provide that each shall be controlled/governed and construed in accordance with the laws of the

District of Columbia and that Torres and Sabre each shall submit to the venue of any court of

competent jurisdiction located in the District of Columbia.

## FACTUAL ALLEGATIONS

### I. TWISS I Factual Allegations

6.      On 27 September 2007, the United States Government awarded to Sabre one of

several TWISS I Multiple Award Task Order Contracts for status security services to be

performed and provided to U.S. military installations in Iraq. Sabre competed for award of the

4

TWISS I Contract on the basis that Torres, a subcontractor to Sabre, would provide personnel with valid U.S. Government security clearances for those TWISS I positions identified by the U.S. Government on TWISS I Task Order Proposal Requests ("TOPRs") as requiring personnel holding valid U.S. Government security clearances.

7.      On November 8, 2007 Sabre, as TWISS I Contract prime contractor ("prime"), entered into a subcontract agreement with Torres as subcontractor ("sub") to Sabre for the TWISS I Contract work to be performed by Torres (the "Sabre-Torres TWISS I Subcontract"). The Sabre-Torres TWISS I Subcontract provided that Sabre would issue subtask orders to Torres under the Sabre-Torres TWISS I Subcontract at firm fixed prices only for those personnel to be provided by Torres to Sabre so that Sabre could meet the need of the U.S. Government under TWISS I Task Orders awarded to Sabre for those certain personnel whose positions required valid U.S. Government security clearances.

8.      Prior to 30 December 2009, Sabre competed for and the U.S. Government awarded Sabre the following TWISS I Task Orders:

      A.      TWISS I Task Order No. 1, for U.S. military installation Hammer;

      B.      TWISS I Task Order No. 2, for U.S. military installation Husaniyah;

      C.      TWISS I Task Order No. 3, for U.S. military installation Paliwoda;

      D.      TWISS I Task Order No. 4, for Explosive Detection Dogs in the International Zone, Baghdad, Iraq;

      E.      TWISS I Task Order No. 5, for U.S. military installation Kalsu;

      F.      TWISS I Task Order No. 8, for U.S. military installation Justice;

      G.      TWISS I Task Order No. 10, for U.S. military installation War Eagle;

      H.      TWISS I Task Order No. 11, for U.S. military installation Caldwell;

I.      TWISS I Task Order No. 12, for U.S. military installation Phoenix;

J.      TWISS I Task Order No. 14, for U.S. military installation Shocker;

K.      TWISS I Task Order No. 15, for U.S. military installation Basra; and

L.      TWISS I Task Order No. 16, for U.S. military installation Shaiba.

9.      Sabre issued firm, fixed price subtask orders to Torres under the Torres TWISS I Subcontract for each of the foregoing TWISS I Task Orders that the U.S. Government awarded to Sabre ("Sabre-Torres TWISS I Subtask Orders").

10.     The Sabre-Torres TWISS I Subtask Orders each established the sole compensation that Torres was entitled to from Sabre for the work covered by each TWISS I Subtask Order.

11.     In 2009, the U.S. Government changed its policy concerning the means by which TWISS I primes were to fulfill the U.S. Government's requirement for a TWISS I prime-sub combination to possess a United States Defense Department Industrial Security Program Facility Security Clearance ("FCL").  The U.S. Government determined that each TWISS I prime (including Sabre) itself must possess an FCL at the Secret level ("Secret FCL") and if the TWISS I prime could not qualify for an FCL at the Secrete level, the Defense Security Service ("DSS") would revoke the authority of personnel with valid personnel security clearances ("PCLs") to be given access to classified information under the TWISS I Contract. Sabre, as a non-U.S. company, was not eligible to be granted and therefore did not possess an FCL.  DSS threatened to revoke the authority of Torres personnel subcontracted by Torres to Sabre under the Sabre-Torres TWISS I Subcontract and assigned to TWISS I Task Order positions (including those of site managers and deputy site managers) to have access to classified information. As such, Sabre

and Torres faced potential U.S. Government termination of all TWISS I Task Orders, including the Sabre-Torres TWISS I Subtask Order work.

12.     To comply with the changed U.S. Government requirement for FCLs for TWISS I prime contractors and to avoid potential termination of all TWISS I Task Orders, senior management of Sabre and senior management of Torres decided and proceeded to enter into the APA for the purpose of the U.S. Government recognizing Torres as the TWISS I prime contractor through the process of novation from Sabre to Torres (under the provisions of the Federal Acquisition Regulation) of the Sabre TWISS I MATOC and TWISS I Task Orders.

13.     Consequently, in late December 2010 Torres and Sabre concluded the APA over a several day period ending on 30 December 2009. The APA included as Annexes to the APA:

        A.      A form of subcontract between Torres and Sabre for TWISS I security services that was to take effect upon the U.S. Government's approval of the novation (the "APA Sabre Services Subcontract"); and

        B.      A form of equipment lease agreement between Sabre and Torres for lease from Sabre to Torres of all equipment necessary for performance of the TWISS I Task Orders that was to take effect upon the U.S. Government's approval of the novation (the "APA Sabre Lease Agreement").

14.     The agreements set forth in Paragraph 13 were premised on those understandings agreements reached between Torres Chief Executive Officer Jerry Torres and Sabre Chief Financial Officer Sumeet Mehta stated in paragraphs 15 through 18 of this Complaint.

15.     Torres and Sabre understood and agreed that Torres would pay nothing to Sabre for the APA, excepting continued payment to Sabre, post-novation, of Sabre's pre-novation cumulative total share of all TWISS I Task Order compensation, which would take the form of

all payments to become due and made under the APA Sabre Services Subcontract and the APA Sabre Leave Agrement.

16.     Torres and Sabre understood and agreed that, upon Torres becoming the TWISS I prime by way of the U.S. Government entering into a novation agreement under which Sabre would remain liable to the U.S. Government for all obligations under the TWISS I Contract and all TWISS I Task Orders, there would be no change to the respective obligations and benefits of Sabre and Torres that existed with respect to the TWISS I Contract and the TWISS I Task Ordres prior to the novation, including no change to the respective compensation received by Sabre and Torres under the TWISS I Contract and the Sabre-Torres TWISS I Subcontract.

17.     Torres and Sabre understood and agreed that Sabre and Torres were obligated under the further assurances clause of the APA to give effect to the understandings and obligations related to and arising under APA, including but not limited to the understandings and agreement alleged in Paragraphs 12 through 16 of this Complaint, by executing written agreements after the Sabre and Torres signed the APA on 30 December 2009.

18.     Torres and Sabre understood and agreed that on and after the U.S. Government approving novation of the TWISS I Contract and TWISS I Task Orders from Sabre to Torres, and Torres thus becoming the prime:

A.     Sabre would invoice Torres for the same amount that Sabre was receiving for each of the TWISS I Task Orders as when Sabre was the prime;

B.     Torres then would invoice the U.S. Government for the full amount of each TWISS I Task Order;

C.      Upon Torres receiving payment from the U.S. Government, Torres would

pay Sabre the amount of each of Sabre's TWISS I Task Order invoices within two (2) days of the

U.S. Government's payment to Torres; and

D.      Torres would retain the balance of the U.S. Government payment as

Torres' full compensation for Torres' work on each TWISS I Task Order on and after the 5

February 2010 novation date.

19.     In accordance with the APA "Further Assurances Clause," Torres and Sabre

mutually agreed to:

A.      Use all commercially reasonable efforts to consummate the transactions in

the APA;

B.      Cooperate with each other to ensure the orderly transition of the acquired

assets and assumed liabilities from Sabre to Torres;

C.      Use commercially reasonable efforts to cause the closing and novation of

the agreement to occur; and

D.      Take any further action reasonably necessary to carry out the purposes of

the agreement, as any other party may reasonably request and at the sole costs and expense of the

requesting party.

20.     Under Section 8.51 of the APA Sabre Services Subcontract, Sabre has the right to

commence and maintain an action against Torres in this Court for equitable relief, including

specific performance, arising out of or relating to Torres' breach of the APA Sabre Services

Subcontract.

21.     The APA Sabre Services Subcontract established certain obligations of the

Parties.

22.     The APA Sabre Services Subcontract states that it applies solely to the TWISS I Contract.

23.     With respect to the services each party would provide, the APA Sabre Services Subcontract provides that Sabre would provide the equipment, materials, property and travel necessary to perform the services at the times and in the manner required by the TWISS I Contract, including the TWISS I Task Orders.

24.     The APA Sabre Services Subcontract provides, subject to the further assurances clause as alleged above, that the APA Sabre Services Subcontract is to be performed on a firm, fixed price basis, which compensates Sabre for its services based on a firm fixed price per contract line item, including overhead, general and administrative expenses, taxes and profits, and that services shall be ordered by individual Subtask Orders, and Torres shall not be responsible for any other charges.

25.     The APA Sabre Services Subcontract provides that, subject to the further assurances clause alleged above, work and funding for the APA Sabre Services Subcontract:

A.      Shall be authorized by Torres through issuance of individual Subtask Orders by Torres to Sabre;

B.      The cumulative amount of all Subtask Orders issued comprises the funds authorized to cover the Torres Subcontract;

C.      Each Subtask Order is individually funded and not shared between Subtask Orders;

D.      Torres is not obligated to compensate Sabre for any services performed or expenses incurred under any Subtask Order in excess of the funded value of such Subtask Order.

26.     The APA Sabre Services Subcontract creates an exclusive relationship between Torres and Sabre with respect to the awarding by Torres to Sabre and performance by Sabre of any work coming within the Sabre's defined scope of work for Subtask Orders under the TWISS I Contract and TWISS I Task Orders.

27.     With respect to payment under the APA Sabre Services Sabre is to submit invoices to Torres for all services by the fifth (5th) day following the last calendar day of the preceding month in a form approved by Torres for review and for acceptance by Torres and/or the U.S. Government.

28.     Under the APA Sabre Services Subcontract should any event arise of errors or non-acceptance by Torres of Sabre services:

A.      Such errors or Torres non-acceptance of services are to be deemed disputed and the amount thereof shall be deducted from and will not be included in Sabre's invoice for the applicable month; and

B.      Torres shall further remit payment to Sabre for any undisputed amounts approved by, and received from the Government within two (2) business days after the same is paid to Torres by the Government.

29.     With respect to disputes arising from the APA Sabre Services Subcontract, the parties agreed that the agreement be governed by and construed in accordance with the laws of the District of Columbia.  With the exception of: (a) matters set forth in Paragraph 8.5.2 of the APA Services Subcontract; and (b) actions in this Court for equitable relief contemplated by paragraph 8.5.1 of the APA Sabre Services Subcontract, all disputes under the agreement or any Subtask Order issued shall be settled by arbitration in Washington, D.C., in accordance with the commercial arbitration rules then in effect of the American Arbitration Association.

30.     The APA Sabre Services Subcontract states that the parties consent to the exclusive jurisdiction of the courts of the District of Columbia or the U.S. federal courts located therein for injunctive, specific enforcement or other relief in aid of the arbitration proceedings or to enforce judgment of the award in such arbitration proceeding, but not otherwise.

31.     The APA Sabre Services Subcontract further states that nothing precludes equitable or other judicial relief to enforce the provisions of the agreement or to preserve the status quo pending the resolution of any dispute under the agreement.

32.     The APA Sabre Lease Agreement establishes certain additional obligations, rights and responsibilities of Sabre and Torres.

33.     Pursuant to the APA Sabre Lease Agreement, Torres is to lease to from Sabre all vehicles, weapons, communications equipment, facilities and other equipment including special security equipment necessary for performance of the TWISS I Contract and TWISS I Task Orders.

34.     The APA Sabre Lease Agreement is to terminate upon either the termination or expiration of the TWISS I Contract and all of the TWISS I Task Orders.

35.     The APA Sabre Lease Agreement provides that Sabre, as Lessor, is to bear the entire risk of loss and damage to the equipment from any and every cause except for any loss or damage arising out of the negligence or willful misconduct of Torres as Lessee.

36.     Pursuant to the APA Sabre Lease Agreement, in the event of loss or damage arising out of the negligence or willful misconduct of Torres as Lessee, Torres will be liable to Sabre for the cost of repair to restore the item or the fair market value of the item.

37.     Upon the termination or expiration of the APA Sabre Lease Agreement, Torres, as Lessee, is to return the equipment to Sabre as Lessor in good repair and condition.

38.     If either party fails to observe, keep or perform any provision of the APA Sabre Lease Agreement, the agreement states that the non-failing party, within ten days after receipt of notice from the other party of such failure, will be able to do any or all of the following:

A.     Sue for and recover all rents, and other damages, then accrued or thereafter accruing;

B.     Terminate the APA Sabre Lease Agreement;

C.     In the event of default by Torres as Lessee, then Sabre may recover possession of the equipment from Torres as Lessee without resort to judicial remedies; and

D.     Pursue any other remedy at law or in equity.

39.     Sabre and Torres agreed that the APA Sabre Lease Agreement would be construed and enforced according to the laws of the Republic of Iraq.

40.     Subject to the further assurances clause alleged above, the APA obligated Torres to issue quantified TWISS I subtask orders to Sabre for Sabre's post-novation work as a TWISS I subcontractor from 5 February 2010 onward and to pay Sabre's monthly invoices to Torres.

41.     The understanding and agreements reached between Sabre and Torres upon which the APA, the APA Sabre Services Subcontract and the APA Sabre Lease Agreement were premised were that the total compensation to be paid by Torres to Sabre for TWISS I work performed by Sabre post-novation would be exactly the same amount as the pre-novation yield to Sabre under TWISS I Task Orders, namely, the amount paid to Sabre by the U.S. Government minus the amount due to Torres under the pre-novation Sabre-Torres Subcontract for TWISS I work performed by Torres.

42.     The APA further assurances clause obligated Torres to issue priced Torres TWISS I Subtask Orders to Sabre promptly after the TWISS I Novation that would give effect to

the understandings reached by the Parties stated in Paragraph 42, immediately above, and then to pay Sabre, based on Sabre invoices to Torres for the work performed by Sabre under the Torres TWISS I Subtask Orders, at the same rate of yield that Sabre received prior to the TWISS I novation.

43.     Sabre has repeatedly demanded that Torres issue each such Torres TWISS I Subtask Order; to date Torres has not done so.

44.     Torres has represented to Sabre that it cannot pay Sabre's post-novation invoices for TWISS I work performed by Sabre on and after the novation because Torres has not put subtask orders in place.

45.     Sabre has properly invoiced Torres for all post-novation TWISS I work that Sabre has performed.  Torres has made only partial payments to Sabre, without dispute and without providing explanation for not paying such Sabre invoices in full.

46.     During the period that Sabre was the TWISS I prime, Sabre performed all of its obligations to the U.S. Government arising out of the TWISS I Task Orders; the U.S. Government accepted the work as meeting all requirements of the TWISS I Task Orders by authorized U.S. Government representatives issuing to Sabre signed acceptance of work documents known as DD Forms 250 ("DD 250s") for each TWISS I Task Order for each month of services performed. Upon Sabre presenting the DD 250s to the U.S. Government payment office, Sabre was paid the monthly price for each of the following TWISS I Task Orders:

A.     TWISS I Task Order No. 1, pertaining to U.S. Military Installation Hammer;

B.     TWISS I Task Order No. 2, pertaining to U.S. Military Installation Husaniyah;

C.     TWISS I Task Order No. 3, pertaining to U.S. Military Installation Paliwoda;

D.      TWISS I Task Order No. 4, pertaining to the provision of explosive detection dogs in the International Zone;

E.      TWISS I Task Order No. 5, pertaining to U.S. Military Installation Kalsu;

F.      TWISS I Task Order No. 8, pertaining to U.S. Military Installation Justice;

G.      TWISS I Task Order No. 10, pertaining to U.S. Military Installation War Eagle;

H.      TWISS I Task Order No. 11, pertaining to U.S. Military Installation Caldwell;

I.      TWISS I Task Order No. 12, pertaining to U.S. Military Installation Phoenix;

J.      TWISS I Task Order No. 14, pertaining to U.S. Military Installation Shocker;

K.      TWISS I Task Order No. 15, pertaining to U.S. Military Installation Basra; and

L.      TWISS I Task Order No. 16, pertaining to U.S. Military Installation Shaiba.

47.     Subsequent to the 5 February 2010 TWISS I Novation:

A.      The scope and extent of Sabre's obligations and responsibilities under the TWISS I Contract and TWISS I Task Orders did not change;

B.      The scope and extent of the TWISS I work performed by Sabre under the TWISS each of the TWISS I Task Orders stated in Paragraph 46 of this Complaint, above, did not change; and

C.      Sabre performed satisfactorily all such obligations, responsibilities and work.

48.     Following the 5 February 2010 TWISS I Novation, the U.S. Government has issued DD 250s to Torres and thereby has accepted all TWISS I Task Order work, including all TWISS I Subtask Order work performed by Sabre.

49.     Torres invoiced all TWISS I Task Order work performed by Sabre on and after 5 February 2010 on the strength of the U.S. Government DD 250s issued to Torres for such work.

50.     The U.S. Government has paid Torres for all TWISS I Task Order work performed by Sabre on and after 5 February 2010 on the strength of the U.S. Government DD 250s issued to Torres for such work and Torres' monthly invoices to the U.S. Government for such work.

51.     On information and belief, all TWISS I Task Orders have been closed out. Torres has presented final TWISS I Task Order invoices to the U.S. Government that include amounts dues to Sabre for TWISS I subtask order work performed by Sabre; the U.S. Government has made final payment against Torres' final TWISS I Task Order invoices.

52.     Sabre has performed all acts required of it under the APA, the APA Sabre Services Subcontract and the APA Sabre Equipment Lease, or has offered to perform all of the obligations required of it under the APA but has been rebuffed by Torres.

## II. TWISS II Factual Allegations

53.     In February 2009, the U.S. Government, acting through the Joint Contracting Command-Iraq/Afghanistan ("JCC-I/A"), issued competitive Request for Proposals No. W91GDW-09-R-4011 contemplating award of MATOCs that ultimately would replace the existing TWISS I Contracts and existing TWISS I Task Orders upon the expiration of the TWISS I Task Orders' fixed periods of performance (the "TWISS II RFP"). Among other things, the TWISS II RFP, as amended by Questions and Answers (Q&A) published by JCC-I/A, stated that:

A.     A certain limited number of TWISS II positions must be filled by personnel with U.S. security clearances at the designated levels;

B.     An offeror submitting a proposal in response to the RFP must possess a Secret FCL; and

C.      An offeror could meet the requirement of possession of a Secret FCL, even if the company that would become the prime contractor did not possess a Secret FCL, by two companies forming a joint venture for purposes of bidding and, if successful, performing the TWISS II contract competition as a Joint Venture, provided that one of the companies in the Joint Venture possessed a Secret FCL.

54.      To meet the Secret FCL requirement of the TWISS II RFP, Sabre formed a Joint Venture with Torres ("JV") by entering into a formal written JV agreement for purposes of bidding, and, if successful, performing the TWISS II Contract (the "TWISS II JV Agreement").

55.      The TWISS II JV Agreement provided that Sabre would lead the JV in the TWISS II proposal effort, and, if a TWISS II contract was awarded to the JV, then Sabre would lead the JV with respect to TWISS II contract administration and performance.

56.      Under the TWISS II JV Agreement, Torres was to provide only those personnel necessary to fill those TWISS II positions for which the U.S. Government had imposed a requirement that persons holding the positions must possess a valid United States Department of Defense Personnel Security Clearance ("PCL").  Under the TWISS II JV Agreement, Torres' sole and exclusive entitlement to compensation for providing such personnel for any TWISS II task orders awarded to the Sabre-Torres JV would be the monthly per-position price quoted by Torres to Sabre and accepted by Sabre during the process of Sabre preparing any TWISS II Task Order proposals requested by the U.S. Government.

57.      Sabre prepared and submitted a proposal to JCC-I/A in response to the TWISS II RFP.

58.      Prior to JCC-I/A making an award decision for TWISS II contracts, the U.S. Government changed its policy concerning the requirements for TWISS II prime contractors

with respect to the possession of FCLs, determining that each TWISS II Prime Contractor must possess a Secret FCL at the Secret level or be disqualified from award of a TWISS II contract. At the same time, the TWISS II RFP continued to require that the successful TWISS II offerors who became TWISS II primes also must possess a valid PSC License issued by the Ministry of Interior of the Government of Iraq ("MoI").

59.     JCC-I/A clarified that an offeror could meet those requirements if:

A.     The prime contract offeror possessed an FCL (which Torres did); and

B.     Any prime contract offeror that did not possess a valid PSC License from the MoI (which Torres did not) formally teamed, pursuant to a written teaming agreement, with a Private Security Company that possessed a valid PSC License from the MoI.

60.     JCC-I/A offered the Sabre-Torres JV and all other TWISS II offerors the opportunity to revise and submit a best and final offer to meet the new requirements.

61.     Sabre and Torres jointly decided to revise the TWISS II proposal to propose as a team, pursuant to a formal written teaming agreement, instead of proposing as a JV, with Torres as the leading member of the team and prime if the team was successful in being awarded a TWISS II Contract, and Sabre as team member and sub if the team was successful in being awarded a TWISS II Contract. To give effect to the decision and to govern the relationship, responsibilities and obligations of Sabre and Torres during the life of any TWISS II Contract awarded in response to the proposal submitted by the Sabre-Torres team, on August 6, 2009, Sabre and Torres entered into the TWISS II Teaming Agreement.

62.     The Sabre-Torres team then submitted a TWISS II final proposal in response to the amended TWISS II RFP.  The final proposal identified the Sabre-Torres team as the entity that would perform any TWISS II contract awarded as a result of the TWISS II RFP and any

TWISS II Task Orders awarded in response to TWISS II Task Order Proposals issued by JCC-I/A (or any successor to JCC-I/A). The Teaming Agreement was included as a material part of the Sabre-Torres team's final proposal submitted in response to the final amended TWISS II RFP defining for the Government how the Sabre-Torres team would meet the requirements of the final amended TWISS II RFP and would perform any TWISS II Contract and any TWISS II Task Orders awarded as a consequence of TWISS II Task Order Proposals submitted by Torres on behalf of the Sabre-Torres team.  The proposal also identified Torres as the prime and Sabre as the sub for all TWISS II work.

63. The Teaming Agreement provided that:

A. The team of Sabre and Torres ("Team") would compete exclusively together for all TWISS II Task orders by submitting Team competitive proposals for TWISS II Task Orders in response to TWISS II Task Order Requests ("TWISS II TORs") issued by JCC-I/A (of the successor of JCC-I/A); and

B. Only the Team's Management Committee had the power and authority to issue calls to both Torres and Sabre for TWISS II TOR proposals and to determine the Team's competitive strategies for TWISS II Task Order competitions.

64. As the "Leading Member" of the Team, Torres would assume management and performance of the Team's affairs with respect to contract administration, site management, and obligations arising from the Department of Defense's ("DOD") requirements for personnel security clearances for classified work in accordance with the TWISS II Teaming Agreement.

65. Sabre, as "Member" of the Team, would take the lead in management and performance of the entire balance of the Team's affairs not designated in Teaming Agreement ¶

1.2(C) with respect to any contract resulting from the TWISS II RFP and any TWISS II Task Order Requests.

66.     As Leading Member, Torres bound itself to that set of undertakings on behalf of the Members of the Team set forth at Paragraph 5.1 of the Teaming Agreement.

67.     Paragraph 5.1 of the Teaming Agreement restricts Torres to contractually binding the Team and requires Torres to coordinate its decisions with Sabre for the TWISS II MATOC Proposal and TWISS II Task Orders resulting from TWISS II TOR Proposals.

68.     Torres was and is required to form a Team Management Committee ("Management Committee") with Sabre for purposes of managing and administering the TWISS II program. Paragraphs 4.3(A) and 4.3(G) of the Teaming Agreement provide that the Management Committee shall consist of one representative designated by Torres and one representative designated by Sabre, that the Management Committee will be chaired by the Torres representative.

69.     The Management Committee would assume the responsibilities stated in Teaming Agreement ¶ 4.3(G).

70.     With respect to decisions for the TWISS II Contract proposal and the any TWISS II TORs, Torres agreed that Torres and Sabre would make mutual decisions with regard to the TWISS MATOC Proposal and any proposal submitted by the Team in response thereto, in accordance with Teaming Agreement Paragraph 4.2.

71.     Pursuant to Paragraph II(A) of Schedule I of the Teaming Agreement, Torres, in its capacity as Leading Member of the Team, is obligated to issue Team Requests for TWISS II RFPs to Sabre for Sabre's respective TWISS II scope of work upon receipt of the TWISS RFP and each TWISS TOR.

72.     Pursuant Paragraph II(C) of Schedule I of the Teaming Agreement, Torres, in its capacity as Leading Member of the Team, acting in consultation and cooperation with Sabre, will negotiate and conclude with Sabre the agreement concerning each such TWISS II Task Order Proposal.

73.     Pursuant to the Paragraph 5.1(F) of the Teaming Agreement, Torres is required to offer to Sabre appropriate Team Subtask Orders for the TWISS MATOC and any TWISS TO(s) awarded to the Team in substantially the form set out in Schedule 1 of the Teaming Agreement and on such price terms that previously have been offered to the Team by the Members and accepted by the Management Committee of the Team prior to the submission of either the TWISS MATOC Proposal or a TWISS TOR Proposal, as appropriate.

**A.     Leading Member (Torres) Scope of Work.**

In accordance with Teaming Agreement Paragraph 1.2.C., the Leading Member Scope of Work shall consist of the following.

A.     Leading Member shall provide qualified personnel to fill all those positions specified in either the TWISS RFP and/or any TWISS TORs that require personnel to hold currently valid US Secret Personnel Security Clearances ("Secret PCLs"). The qualifications for such personnel shall be those set forth in the TWISS PWS and/or the PWS for each particular TWISS TOR (hereinafter referred to as the "Lead Member TWISS Work");

B.     Leading Member shall provide qualified personnel to fulfill such additional obligations and responsibilities of Leading Member's scope of work defined in Paragraph 1.2.C, above, inclusive of: (1) contract administration; (2) site management; (3) oversight of the vetting and approval of the assignment of all personnel to any TWISS positions (such approval not to be unreasonably withheld); and (4) liaison with JCCI and all other agencies of the U.S. Government involved in all matters related to or arising from the RFP, any TWISS MATOC, any TWISS TOR and/or any TWISS TO, in consultation and to the maximum extent possible with concurrence of Member.

C.     Lead Member shall comply with all requirements of the TWISS RFP, any TWISS TOR and any TWISS MATOC and/or any TWISS TO awarded to the Team as to the Lead Member's TWISS Work.

**B.      Member (Sabre's) Scope of Work.**

In accordance with Teaming Agreement Paragraph 1.2.C., the Member's (Sabre) Scope of Work shall consist of the following.

A.      Member shall provide the Team with all personnel and provide all services required by the TWISS RFP, any TWISS TOR and any TWISS MATOC and/or any TWISS TOR awarded to the Team, excepting Leading Member's Scope of Work.

B.      Member shall comply with all requirements of the TWISS RFP, any TWISS TOR and any TWISS MATOC and/or any TWISS TO awarded to the Team as to the Torres Member TWISS Work.

74.      Pursuant to Teaming Agreement Paragraph 5.1(H), Torres is required to assign to Members responsibility for performance of such TWISS MATOC and TWISS TO work that is within the responsibility of the Member, as set forth in Schedule 1.

75.      With respect to financial responsibilities under the Teaming Agreement, Teaming Agreement Paragraph 5.1(J)(4) requires Torres to maintain bank and cash accounts as follows:

The Lead Member shall establish the TWISS bank operating account in Leading Member's name and (hereinafter the "Operating Account") and such other bank accounts as are desirable for operation and maintenance of the TWISS Contract and Task Orders (hereinafter, collectively referred to as the "Bank Accounts") at a sound and respected international financial institution that is mutually acceptable to the Members. All receipts of the TWISS Contract and Task Orders shall be deposited into the Operating Account.

76.      Teaming Agreement Paragraph 5.1(K) requires Torres, in its capacity as Leading Member of the Team, to maintain and retain all other books pertaining to the TWISS II Contract and Task Orders.

77.      Teaming Agreement Paragraph 5.1(J)(5) requires Torres, in its capacity as Leading Member of the Team, to pay all accounts payable of the Leading Member related to the TWISS II Contract and Task Orders and to make payments to Members within 15 working days from the receipt of payment from the Government under the terms of the Agreement.

78.     Teaming Agreement Paragraph 5.1(J)(2) obligates Torres, in its capacity as Leading Member of the Team, to produce quarterly financial statements and audited annual financial statements of the Team showing cumulative contract receipts and expenditures of the Team and distributing such statements to the Members within 30 days after the end of each operating Quarter.

79.     Teaming Agreement Paragraph 6.2 mandates that Torres, in its capacity as Leading Member of the Team, shall distribute the Member's compensation to the Member according to the understandings reached as to each prospective Task Order in the supplemental schedules of the Teaming Agreement.

80.     The financial provisions of the Teaming Agreement, including, but not limited to Teaming Agreement ¶¶ 5.1 and 6.2, created fiduciary duties and trust obligations on the part of Torres in its capacity as Leading Member of the Team.

81.     Pursuant to the Teaming Agreement, Torres is required to segregate and maintain in separate bank accounts designated solely and exclusively for TWISS II receipts all monies received from the U.S. Government as a consequence of performance by the Team of the TWISS II Contract and TWISS II Task Orders.

82.     Pursuant to the Teaming Agreement Torres is prohibited from co-mingling monies received from the U.S. Government as a consequence of performance by the Team of the TWISS II Contract with any monies received by Torres from any other source(s) inclusive of but not limited to payments received by Torres post-novation from the U.S. Government that constitute TWISS I Contract payments.

83.     Pursuant to the Teaming Agreement, Torres is required to hold in trust and not disburse to Torres or any third party any part of Sabre's share of the TWISS II monies received

from the U.S. Government as a consequence of performance by the Team of the TWISS II

Contract and TWISS II Task Orders.

84.    Pursuant to the Teaming Agreement, Torres is precluded from engaging in any

self-dealing as to any part of Sabre's share of the TWISS II monies received from the U.S.

Government as a consequence of performance by the Team of the TWISS II Contract and

TWISS II Task Orders.

85.    Pursuant to the Teaming Agreement, Torres is required to transmit Sabre's share

of the TWISS II monies received from the Government as a consequence of performance by the

Team of the TWISS II Contract and TWISS II Task Order to Sabre within fifteen (15) business

days of Torres' receipt of such monies from the U.S. Government.

85.    Pursuant to the "Further Assurances" Clause of the Teaming Agreement

(Teaming Agreement Paragraph 12.4), Torres agreed to do all acts and things reasonably

necessary or desirable to give full credit to the Teaming Agreement.

86.    On 25 August 2009, the U.S. Government awarded to Torres, as the prime

contractor and in Torres' capacity as Leading Member of the Team, the TWISS II Contract.

87.    The U.S. Government awarded several TWISS II Multiple Award Task Order

Contractors (MATOCs), one to Torres in its capacity as Leading Member of the Team and the

other TWISS II MATOCs to other companies who were competitors to Sabre.

88.    The term of the TWISS II MATOC was a 1-year base period from 1 September

2009 through 31 August 2010 and a 1-year option period from 1 September 2010 through 31

August 2011. The U.S. Government has exercised the option to extend the term of the TWISS II

MATOC through 31 August 2011. The ceiling price was $485,000,000.00 (four hundred eighty-

five million dollars).

89.     The TWISS II MATOC itself did not contract for any specific work.

90.     TWISS II MATOC required the U.S. Government to issue to each of the TWISS II MATOC awardees ("TWISS II Contractors") TWISS II Task Order Proposal Requests ("TOPRs") for each military installation in Iraq for which the U.S. Government required TWISS II services.

91.     Each TWISS II Contractor was permitted to compete for award of each TWISS II Task Order by submitting a task order proposal in response to each particular TWISS II TOPR.

92.     Nothing in the TWISS II Contract required any TWISS II Contractor to submit a Task Order Proposal in response to any TWISS II TOPR.

93.     The Teaming Agreement obligated Torres, in its capacity as the Leading Member of the Team, to perform certain actions or refrain from taking certain actions, as stated in Paragraphs 94 through 105, for the benefit of Sabre in Sabre's capacity as a Team Member, upon being awarded the TWISS II MATOC, each of which Torres breached.

94.     Torres breached the exclusive dealings provisions of the Teaming Agreement stated at Paragraph 63(A) of this Complaint by:

A.      Torres preparing and submitting TWISS II Task Order Proposals in response to TWISS II TOPRs issued by the U.S. Government without the involvement or consent of the Management Committee, and without the consent or participation of Sabre, and for Torres own account and sole benefit; and

B.      Upon the U.S. Government awarding TWISS II Task Orders to Torres resulting from the TWISS II Task Order proposals Torres developed and submitted for Torres' own account, Torres then performing such TWISS II Task Orders without any participation of Sabre, all as further alleged in this Complaint.

25

95.     Torres breached Teaming Agreement ¶ 1.2(D) of the Teaming Agreement by performing and managing Sabre's portion of the Team's affairs (that is, those not designated by Teaming Agreement ¶ 1.2(C) as being Torres' responsibility) with respect to the TWISS II Task Orders that Torres was awarded on the basis of TWISS II Task Order proposals that Torres had developed and submitted for Torres' own account with the permission or consent of the Management Committee, all as further alleged in this Complaint.

96.     Torres breached Teaming Agreement ¶ 5.1 by failing to coordinate with Sabre its decisions for the TWISS II Task Orders resulting from TWISS II TOPRs.

97.     Torres breached Teaming Agreement ¶ 4.3(A) by failing to form any Management Committee whatsoever with Sabre for purposes of managing and administering the Team's TWISS II program, and by failing to manage and administer the Team's TWISS II program.

98.     Torres breached Teaming Agreement ¶ 4.3(G) by precluding the Management Committee from exercising any of the responsibilities stated in Teaming Agreement ¶ 4.3(G).

99.     Torres breached Schedule I of the Teaming Agreement by:

        A.      Not issuing Team Requests for Proposals ("RFPs") to Sabre for Sabre's respective TWISS II scope of work upon receipt of the TWISS RFP and each TWISS TOR as defined in Teaming Agreement Schedule 1 at ¶ II(A), all as further alleged herein; and

        B.      Not negotiating and concluding, in consultation and in cooperation with Sabre, the agreement concerning each such TWISS II Task Order proposal, as required by Teaming Agreement Schedule 1, ¶ II (C).

100.    Torres breached Teaming Agreement ¶ 5.1(F) by not offering Sabre appropriate Team Subtask Orders for the TWISS II TO(s) awarded to the Team in substantially the form set

out in Schedule 1 of the Teaming Agreement and on such price terms that previously have been offered to the Team by the Members and accepted *de facto* by Torres prior to the submission of a TWISS TOR Proposal, all as further alleged herein.

101.    With respect to financial responsibilities, Torres breached Teaming Agreement ¶ 5.1(J)(4) and breached Torres' fiduciary and trust obligations to Sabre by:

A.    Not establishing a separate bank operating account for the TWISS II Contract and TWISS II Task Orders (the "TWISS II Operating Account") and such other bank accounts as are desirable solely for operation and maintenance of the TWISS II Contract and TWISS II Task Orders at a sound and respected international financial institution that is acceptable to Sabre (collectively "TWISS II Accounts"), and

B.    Not arranging to have all receipts of the TWISS II Contract and TWISS II Task Orders deposited into the TWISS II Operating Account; and

C.    Co-mingling TWISS II Contract and TWISS II Task Order receipts with funds from other sources in a non-TWISS II account.

102.    Further with respect to financial responsibilities, Torres breached Teaming Agreement ¶¶ 5.1(K) and 6.2, breached Torres' fiduciary and trust obligations to Sabre, and unjustly enriched itself through self-dealing with TWISS II Contract and TWISS II Task Order fund by distributing and paying to itself, without advising, informing, or obtaining the consent or approval of the Management Committee or Sabre, sums of money materially in excess of the accounts payable to Torres related to the TWISS II Contract and TWISS II Task Orders (such accounts payable consisting solely of the compensation due Torres according to the written pricing understandings reached between Torres and Sabre as to each TWISS II Task Order proposal).

103.     Further with respect to financial responsibilities, Torres breached Teaming Agreement ¶¶ 5.1(K) and 6.2 and breached Torres' fiduciary and trust obligations to Sabre by willfully and without cause failing to pay to Sabre, within 15 working days from the receipt of payment from the Government, Sabre's compensation according to the understandings reached between Sabre and Torres as to each prospective TWISS II Task Order, as further alleged herein.

104.     Further with respect to financial responsibilities, Torres breached Teaming Agreement ¶ 5.1(J)(2) and breached Torres' fiduciary and trust obligations to Sabre by failing and refusing to produce to Sabre any quarterly financial statements, failing to provide Sabre any audited annual financial statements of the Team showing cumulative contract receipts *and expenditures* of the Team, and failing to distribute such statements to the Members within 30 days after the end of each operating Quarter.

105.     Torres further breached ¶ 12.4 of the Teaming Agreement ("Further Assurances" clause) by, without cause, failing to do all acts and things reasonably necessary or desirable to give to Sabre full credit of the Teaming Agreement, as further alleged herein.

106.     Between 31 December 2009 and 25 September 2010, the U.S. Government issued to Torres, and Torres provided to Sabre, TWISS II TORs for at least the following TWISS II Task Order competitions:

        A.      Camp Shield;

        B.       FOB Husaniyah;

        C.      FOB Warrior;

        D.       FOB Loyalty;

        E.       FOB Kalsu;

        F.      FOB Hammer; and

G.     FOB Shocker.

107.  For each such TWISS II Task Order competition:

A.     Sabre provided to Torres detailed pricing proposals for Sabre's scope of work as defined in Schedule 1 of the Teaming Agreement ("Sabre TWISS II Scope of Work");

B.     Torres included Sabre's commitment to perform the Sabre TWISS II Scope of Work in the Team's TWISS II Task Order Proposal to the U.S. Government; and

C.     Torres, on behalf of the Team, submitted such TWISS II Task Order Proposals to the U.S. Government.

108.  Between 31 December 2009 and 25 September 2010, the U.S. Government awarded to Torres the following firm fixed-price TWISS II Task Orders on the basis of the TWISS II Task Order Proposals submitted by the Team:

A.     Camp Shield, awarded on 2 December 2009, with a period of performance of a 1-year base period commencing from 1 January 2010 through 31 December 2010 and two 6-month option periods, the first from 1 January 2011 through 30 June 2011 and the second from 1 July 2011 through 31 December 2011.  The U.S. Government has exercised the first option, extending the period of performance through 30 June 2011, and is expected to exercise the second option to extend the period of performance through 31 December 2011.

B.      FOB Husaniyah, awarded on 5 April 2010, with a period of performance of a 1-year base period commencing from 24 April 2010 through 23 April 2011 and an option period.  On information and belief, the U.S. Government has extended the period of performance through 15 June 2011.

C.     FOB Warrior, awarded on 8 April 2010, with a period of performance of a 1-year base period commencing from 1 May 2010 through 30 April 2011, and option periods.

The U.S. Government has extended the period of performance through 30 October 2011, and has the further right under the option to extend the period of performance through 30 April 2012.

        D.      FOB Loyalty, awarded on 27 April 2010, with a period of performance of a 1-year base period commencing from 3 June 2010 through 2 June 2011, and an option period. The U.S. military is expected to close the site on 2 June 2011, and, accordingly, it is expected that the period of performance will end on 2 June 2011.

        E.      FOB Kalsu, awarded on 17 June 2010, but performance under TWISS II was suspended during a bid protest by another competitor, and then, as a consequence of the protest decision, terminated for convenience and awarded to the competitor.

        F.      FOB Hammer, awarded on 21 August 2010, with a period of performance of a 6-month base period commencing from 29 April 2010 through 28 October 2010, and two 6-month option periods, the first from 29 October 2010 through 28 April 2011 and the second from 29 April 2011 through 28 October 2011.  The Government has exercised the options to extend the period of performance through 28 October 2011.

        G.      FOB Shocker, awarded on 18 August 2010, with a period of performance of a 1-year base period commencing from 25 September 2010 through 24 September 2011, and one 6-month option period commencing from 25 September 2011 through 24 March 2012. It is expected that the U.S. Government will exercise the option to extend the period of performance through 24 March 2012.

        109.    For each such TWISS II Task Order, Torres issued a Notice to Proceed ("NTP") to Sabre on the strength of Sabre's detailed pricing and technical proposal to Torres for which Torres took no exception.

110.    Without regard to whether Torres ever issued a subtask order to Sabre for any TWISS II Task Order, by issuing each such NTP Torres *de facto* accepted Sabre's proposal and became legally bound to pay Sabre for the Sabre TWISS II Scope of Work at the prices quoted by Sabre which Torres included in the TWISS II Task Order Proposal upon which the U.S. Government awarded Torres the respective TWISS II Task Order, without regard to of whether Torres ever issued a Subtask Order to Sabre.

111.    In detrimental reliance on each such respective NTP, Sabre commenced performance of the Sabre TWISS II Scope of Work for each respective TWISS II Task Order, with Torres' full knowledge and consent. To date, Sabre has continued performance of each TWISS II Task Order.  In so doing, Sabre has expended tens of millions of dollars.

112.    Torres breached Schedule I, Section II.D. of the Teaming Agreement (Ordering Procedures) by issuing NTPs and requiring Sabre to perform Sabre's TWISS II Scope of Work for each respective TWISS II Task Order without first issuing a subtask order to Sabre for each respective TWISS II Task Order.  To date, Torres has not issued any formal subtask orders to Sabre for any TWISS II Task Order.

113.    Commencing in or about July 2010, Torres, in its capacity as Leading Member of the Team, received from the U.S. Government TWISS II TORs for at least two TWISS II task order competitions, including, but not limited to, TWISS II task order competitions for the following U.S. military installations in Iraq:

> A.    FOB Cruise Morris; and

> B.    FOB Gary Owen,

(collectively, the "Undisclosed TWISS II TOPRs").

114.    Torres did not disclose or provide or inform Sabre of any of the Undisclosed TWISS II TOPRs.

115.    Torres, in its capacity as Leading Member of the Team, made unilateral decisions, without advising or conferring or informing Sabre, to proceed to develop and submit to the U.S. Government TWISS II Task Order Proposals for each of the Undisclosed TWISS II TOPRs.

116.    Torres, in its capacity as Leading Member of the Team, did not issue any Team RFP to Sabre for Sabre's respective TWISS II scope of work upon receipt of any of the Undisclosed TWISS II TORPs.

117.    Torres, in its capacity as Leading Member of the Team, did not consult or cooperate with Sabre or negotiate or conclude with Sabre an agreement concerning any TWISS II Task Order Proposal submitted by Torres to the U.S. Government in response to any Undisclosed TWISS II TOPRs.

118.    Had Torres, in its capacity as Leading Member of the Team, issued a Team RFP to Sabre for Sabre's respective TWISS II scope of work upon Torres' receipt of each of the Undisclosed TWISS II TOPRs, Sabre would have negotiated and concluded an agreement with Torres concerning TWISS II Task Order Proposals by the Team for at least the FOB Cruise-Morris and FOB Gary Owen Undisclosed TWISS II TOPRs.

119.    Instead, Torres, acting for its own account and benefit in breach of its obligations under the Teaming Agreement as Leading Member of the Team, unilaterally developed and submitted to the U.S. Government a TWISS II Task Order Proposal in response to each Undisclosed TWISS II TOPRs.

120.    Torres committed fraud against the U.S. Government by failing to disclose to the U.S. Government as part of the TWISS II Task Order Proposals for FOB Cruise-Morris and FOB

Gary Owen that Torres was proposing without the participation of Sabre.  It was a material requirement of the TWISS II TORs for FOB Cruise-Morris and FOB Gary Owen that the offeror possess a valid PSC license from the Iraq MoI during the competition and at all times after the competition that work under the awarded TWISS II Task Order is to be performed.  Torres made a false statement by omission to the U.S. Government by not notifying the U.S. Government that:

       A.     Torres had excluded Sabre – the sole holder within the Team of the MoI PSC license – from the TWISS II Task Order Proposals for FOB Cruise-Morris and FOB Gary Owen; and

       B.     If awarded such TWISS II Task Orders, would exclude Sabre from any participation in the TWISS II Task Order work for FOB Cruise-Morris and FOB Gary Owen.

121.    On or about September 2010, the U.S. Government awarded Torres TWISS II Task Orders for FOB Cruise-Morris and FOB Gary Owen on the basis of the false statements made by Torres in its TWISS II Task Order Proposals for FOB Cruise-Morris and FOB Gary Owen.

122.    On and after the award of the TWISS II Task Orders for FOB Cruise-Morris and FOB Gary Owen to Torres, Torres further breached its obligations arising under the Teaming Agreement that mandate that Torres, as Leading Member of the Team, must offer to Sabre Team Subtask Orders for the TWISS II Task Orders for FOB Cruise-Morris and FOB Gary Owen.

123.    Torres further breach its obligation arising under the Teaming Agreement by commencing and continuing performance of the TWISS II Task Orders for FOB Cruise-Morris or FOB Gary Owen by circumventing Sabre and usurping Sabre's TWISS II Scope of Work.

Torres' motivation to do so is to unjustly enrich itself by taking for Torres' own self the profit that Sabre would have made on such work.

124.     For each of the TWISS II Task Orders, following Sabre's commencement of performance of Sabre's defined scope of work in accordance with the Torres NTP, Sabre performed and satisfied all contractual obligations to Torres, including any conditions precedent to Torres' payment of Sabre monthly invoices for TWISS II Task Order services performed by Sabre.

125.     Sabre's contractual performance obligations were defined by the portion of the U.S. Government Performance Work Statement ("PWS") for each TWISS II Task Order pertaining to the Sabre TWISS II Scope of Work defined in Teaming Agreement Schedule I.

126.     The U.S. Government accepted the work as meeting all requirements of the TWISS II Task Orders by authorized U.S. Government representatives issuing to Torres signed acceptance of work documents known as DD Forms 250 ("DD 250s") for each TWISS II Task Order for each month of services performed.

127.     Torres has invoiced all TWISS II Task Order work performed by Sabre on the strength of the U.S. Government DD 250s issued to Torres for such work.

128.     The U.S. Government has paid Torres for all TWISS II Task Order work performed by Sabre on the strength of the U.S. Government DD 250s issued to Torres for such work and Torres' monthly invoices to the U.S. Government for such work.

### III. Common Allegations Relating To Sabre's Equitable and Legal Claims (TWISS I and TWISS II)

129.     Commencing on or about May 2010, without cause, Torres ceased making full payments of Sabre's TWISS I and TWISS II Task Order monthly invoices.  Instead, commencing in May 2010, without cause or explanation Torres:

A.     Stopped making payments of a set of thirteen (13) Sabre invoices for a delinquency period of between approximately one to five months, ultimately paying such invoices on 2 November 2010 by check as alleged in paragraph 147 of this Complaint, above;

B.     Stopped making payments of an additional set of nine (9) Sabre invoices for a delinquency period of approximately one month, ultimately paying such invoices on 31 December 2010 by check as alleged in paragraph 150 of this Complaint, above; and

C.     Commencing in July 2010 and continuing to the present, ceased making payment on a set of 89 Sabre invoices for a delinquency period of between a minimum of 30 days for the most recent invoices up to eight months for the longest outstanding invoices, as detailed in the Excel spreadsheet bearing the filename "TWISS I and II Invoice Report 032611 SABRE-1" (the "TWISS I and II Invoice Report") that Sabre transmitted to Torres by email in connection with a further Sabre demand for payment.  The withholding of full payment of Sabre's monthly invoices constitutes a breach of the Teaming Agreement and a breach of Torres' fiduciary and trust obligations to Sabre.

130.   Prior to award of the TWISS II Contract, Torres had not been a competitor to Sabre in the Private Security industry in Iraq.  Prior to the award of the TWISS II Contract and during the performance of the TWISS II Contract up to 10 September 2010, Torres did not possess a Private Security Company ("PSC") License from the Government of Iraq MoI.

131.   In or about May 2010, near simultaneously with Torres breaching the Teaming Agreement and breaching Torres' fiduciary and trust obligations to Sabre, Torres made an internal corporate decision, which Torres concealed from Sabre, to become a direct competitor to Sabre in the Private Security Industry in Iraq and elsewhere.

132.    After making the internal corporate decision alleged in Paragraph 131 of this Complaint, Torres applied for and ultimately received a PSC license from the Government of Iraq MoI on 10 September 2010. Torres concealed from Sabre the fact that Torres had applied for and was in the process of receiving the PSC license.

133.    Torres sent Torres representatives to countries in Africa to meet with Sabre's Third Country National (TCN) labor suppliers through which Sabre had contracted to be provided qualified TCNs who would become TWISS II guards. Torres did so for the purpose of Torres developing the capability to become a TWISS II competitor to Sabre and engage in self-dealing with respect to TWISS II Task Orders, in breach of the obligations and responsibilities that the Teaming Agreement imposed on Torres as the Leading Member of the Team. Specifically, Torres circumvented Sabre by directly contracting for TCN guard force personnel and then assigning such TCN guard force personnel to TWISS II Task Order positions that were exclusively within Sabre's scope of work, and not paying Sabre profit that Sabre otherwise would have earned by staffing those same positions.

134.    Torres further breached the Teaming Agreement, including the obligations imposed on Torres as Leading Member of the Team, by acquiring equipment needed for the performance of TWISS II Task Orders that, by the terms of the Teaming Agreement, was to be provided exclusively by Sabre and for which Sabre would be compensated at a price that included profit to Sabre. Torres did not pay Sabre any of the profit that Sabre would have made by providing such equipment at prices that were established by Torres' prior acceptance of Sabre's pricing of TWISS II Task Order Proposals.

135.    Commencing in or about August 2010, Torres then withheld the partial payments of Sabre invoices that Torres had denominated as "advance payments" so as to attempt to

endanger Sabre's ability to pay its workforce from TWISS I and TWISS II Task Order cash flows for the work Sabre satisfactorily performed.

136.    Torres then interfered with Sabre's contractual and economic relations with the Sabre TWISS I and TWISS II TCN labor providers and the TCN workforce by failing to pay Sabre sufficient funds for Sabre to pay the TCN workforce and then Torres using and misappropriating TWISS I and TWISS II Contract payments that belonged to Sabre to pay the TCNs directly.

137.    On or about 1 September 2010, Torres interfered with Sabre's economic and contractual relationships with the providers to Sabre of Camp Shield TWISS II Task Order logistical support services by directly encouraging the Camp Shield logistics support services workforce, as a group, to *en masse* terminate their contractual relationship with Sabre and commence working directly for Torres.  Pursuant to the Teaming Agreement, such logistics support work was exclusively Sabre's. Torres did so for the purpose of circumventing Sabre, terminating payments to Sabre for the Camp Shield logistics support work, and to wrongfully appropriate the profits that Sabre was earning from the Camp Shield logistics support services work.

138.    As of 26 March 2011, Sabre has presented invoices to Torres for post-TWISS I Novation subtask order work totaling $8,922,179.56 and for TWISS II Subtask Order work totaling $36,551,218.29, as further detailed in the TWISS I and II Invoice Report.

139.    Out of the $8,922,179.56 invoiced by Sabre for TWISS I post-Novation subtask order work, Torres has paid to Sabre or appropriately applied credits against such invoices in the amounts set forth in the TWISS I and II Invoice Report.

140.    After applying such amounts, the total Torres delinquency to Sabre for TWISS I post-novation subtask order work performed and invoiced by Sabre is $632,670.41, as further detailed in the TWISS I and II Invoice Report.

141.    Out of the $36,551,218.29 invoiced by Sabre for TWISS II Subtask Order work, Torres has paid to Sabre or appropriately applied credits against such invoices in the amounts set forth in the TWISS I and II Invoice Report. After applying such amounts, the total Torres delinquency to Sabre for TWISS II Subtask Order work performed and invoiced by Sabre is $23,732,721.49, as further detailed in TWISS I and II Invoice Report.

142.    Torres' last partial payment of Sabre's invoices was made on 11 January 2011. Torres has made no invoice payments to Sabre since 11 January 2011.

143.    Sabre has demanded payment; Torres has not paid.  In addition, Torres has not made any claim against Sabre nor stated any reason for not paying.

144.    A complete summary of the Sabre invoices Torres has failed to pay, without cause, is set forth in the TWISS I and II Invoice Report.

145.    Sabre has notified Torres in writing of Sabre's legal and equitable claims including the non-payment of invoices.  Such notices fulfill Sabre's obligations under Teaming Agreement ¶ 7.0 (Alternative Dispute Resolution Clause).

146.    Torres has breached Teaming Agreement ¶¶ 7.0 – 7.4, including but not limited to ¶ 7.2(C), by failing to respond to Sabre's demands to engage in the defined ADR procedures and by failing to provide to Sabre with all relevant non-privileged information related to the Torres acts alleged in this Complaint as breaches of the Teaming Agreement.

147.    On or about 31 October 2010, Torres published and subsequently delivered to Sabre a check, number 7823, in the amount of $1,947,705.74, drawn against a single Torres bank

account, purporting to represent an accord and full satisfaction of twelve (12) Sabre TWISS II

Subtask Order invoices and one (1) TWISS I APA Subtask Order invoice. The thirteen (13)

Sabre invoices to which check number 7823 referred totaled $2,008,601.55.

148.    Torres included the following text on the face of check number 7823:  "This

payment is being tendered in good faith in full satisfaction of your invoice(s). The above-

referenced invoices are subject to a bona fide dispute and will be discharged by you obtaining

this payment, pursuant to VA. Code Ann. § 8.3A-311."

149.    The Torres assertion in Paragraph 148 was made in bad faith and without legal

effect, specifically:

A.    Torres had not previously identified any bona fide dispute or asserted any

claim against Sabre with respect to any of the Task Orders to which the above-referenced

invoices pertain;

B.    Torres made no attempt to comply with the ADR procedures of the

Teaming Agreement or the TWISS I Asset Purchase Agreement; and

C.    Prior to negotiating the check, Sabre rejected Torres' bad faith contention

of accord and satisfaction and fully reserved all Sabre rights to full payment of the invoices

partially paid by Torres Check No. 8210 in a letter delivered to Torres.

150.     On or about 31 December 2010, Torres published and subsequently delivered to

Sabre a check, number 8210, in the amount of $1,472,968.67, drawn against a single Torres bank

account, purporting to represent an accord and full satisfaction of the seven (7) Sabre TWISS II

Subtask Order invoices and two TWISS I APA Subtask Order invoices. The nine (9) Sabre

invoices to which check number 8210 referred totaled $1,498,788.44.

151.    Torres included the following text on the face check number 8210: "This payment is being tendered in good faith in full satisfaction of your invoice(s). The above-referenced invoices are subject to a bona fide dispute and will be discharged by you obtaining this payment, pursuant to VA. Code Ann. § 8.3A-311."

152.    The Torres assertion in Paragraph 151 was made in bad faith and without legal effect, specifically:

A.    Torres had not previously identified any bona fide dispute or asserted any claim against Sabre with respect to any of the Task Orders to which the above-referenced invoices pertain;

B.    Torres made no attempt to comply with the ADR procedures of the Teaming Agreement or the TWISS I Asset Purchase Agreement; and

C.    Prior to negotiating the check, Sabre rejected Torres' bad faith contention of accord and satisfaction and fully reserved all Sabre rights to full payment of the partially paid invoices in a letter delivered to Torres.

153.    Since Torres' delivery of check no. 8210 to Sabre as alleged immediately above, Torres has made no payment of those outstanding Sabre invoices set forth in TWISS I and II Invoice Report. Torres' failure to pay Sabre's invoices is without cause and constitutes a breach of Torres' payment obligations to Sabre arising under the TWISS II Teaming Agreement and the TWISS I APA.

154.    Notwithstanding Torres' breaches of the Teaming Agreement, the APA and Torres' fiduciary and trust duties to Sabre (including, without limitation, the multi-million dollar breaches of payment obligations to Sabre), as a matter of forbearance Sabre has continued

satisfactory performance of all work related to TWISS I Task Orders and all TWISS II Task Orders that is within Sabre's scope of work.

155.    If Sabre were to stop work prior to receiving a judicial declaration that Torres' breach of the APA and Teaming Agreement excused Sabre from any further responsibility or obligation to perform Sabre's scope of work related to the TWISS I and TWISS II Task Orders had the potential to cause irreparable harm to Sabre by Torres wrongfully reporting to the U.S. Government that Sabre had breached its obligations in connection with providing internal security services at U.S. Government military reservations in Iraq, potentially resulting in the U.S. Government wrongfully taking adverse administrative and/or other negative action against Sabre, including, but not limited to poor past performance ratings that would detrimentally effect Sabre's ability to compete for U.S. Government contract work in the security field worldwide, suspension and/or debarment from all U.S. Government contracting.

156.    Sabre also has suffered irreparable harm as a direct consequence of Torres' continuing multi-million dollar breach of payment obligations to Sabre. Torres' failure to pay Sabre has drained Sabre of operating capital necessary for Sabre to continue and pursue other business opportunities in the Private Security market, including inside and outside of Iraq in which Torres has emerged as a major competitor to Sabre.

## CLAIMS FOR RELIEF

### Count One
**(TWISS II -- Breach of Contract; Breach of Fiduciary and Trust Obligations; Imposition of Constructive Trust; Preliminary and Permanent Injunctive Relief)**

157.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 156 as though fully set out herein.

158.     Torres has breached the Teaming Agreement as aforesaid, including the fiduciary and trust obligations imposed on Torres thereby in favor of Sabre.

159.     From the inception of the Teaming Agreement and continuing to the present, Torres purposefully failed to form the Management Committee and purposefully failed to commit to the Management Committee the administration of the business affairs of the Team (including the financial affairs of the Team) so that Torres could engage in self-dealing with respect to the TWISS II Contract and TWISS II Task Orders awarded for the benefit of the Team.

160.     From the inception of the Teaming Agreement and continuing to the present, Torres has failed to accurately maintain and retain its books pertaining to TWISS II Contract and TWISS II Task Orders.

161.     From the inception of the Teaming Agreement and continuing the present, Torres has failed to produce and provide quarterly financial statements and audited annual financial statements of the Team showing cumulative contract receipts and expenditures of the Team and distributing such statements to the Members within 30 days after the end of each operating Quarter.

162.     From the inception of the Teaming Agreement and continuing to the present, Torres did not establish a TWISS II Operating Account.

163.     From the inception of the receipt of TWISS II Task Order payments from the U.S. Government and continuing to the present, Torres did not deposit the TWISS II Contract payments in the TWISS II Operating Account (because, among other reasons, Torres never established the TWISS II Operating Account), and then co-mingled that portion of TWISS II Contract payment funds from the U.S. Government that were to be held in trust and paid to Sabre

with other funds, in breach of the Teaming Agreement and Torres' fiduciary and trust duties to Sabre.

164.    Without the knowledge or consent of the Management Committee (which was never formed), or the approval of Sabre, Torres engaged in self-dealing as to that portion of TWISS II Contract payment funds from the U.S. Government that were to be held in trust and paid to Sabre and breached the Teaming Agreement and Torres' fiduciary and trust duties to Sabre by diverting such funds to Torres' own use, including but not limited to, paying such funds to third parties to whom Torres had become indebted for purposes reasons other those permitted to Torres by the  Teaming Agreement, and Torres paying to itself Sabre monies to satisfy illegitimate Torres TWISS II accounts payable that exceeded the compensation due to Torres under the express and unambiguous terms of the Teaming Agreement.

165.    For the foregoing reasons alleged in this paragraph, and for other reasons that do not constitute good cause, including but not limited to the intent to harm Sabre competitively after Torres emerged as a major competitor to Sabre in the Private Security market in Iraq and elsewhere in the world, Torres did not pay Sabre's TWISS II invoices in full within 15 working days from receipt of payment from the U.S. Government.

166.     Sabre has made repeated written demands that Torres cease and desist and that Torres cure such breaches of the Teaming Agreement and Torres' breach of Torres' fiduciary and trust obligations to Sabre, including but not limited to a formal letter of demand on or about 21 November 2010 in which Sabre demanded payment be made by November 24, 2010.

167.    Torres' response consisted of Torres CEO and all other Torres executive officers cutting off all communication with Sabre as to all Sabre communications related to Torres'

breach of the Teaming Agreement and Torres' breach of its fiduciary and  trust obligations to Sabre.

## Count Two
### (TWISS II -- Breach of Contract: Torres Failure to Pay Sabre TWISS II Invoices)

168.     Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 167 as though fully set out herein.

169.     Torres' failure to fully pay each of Sabre's outstanding unsatisfied invoices for Sabre's work delivered in relation to the TWISS II Task Orders ("Delinquent Sabre Invoices") within fifteen (15) days of the date that Torres received payment from the U.S. Government for the work to which each such Delinquent Sabre Invoice pertains constitutes a breach of the Teaming Agreement.

170.     Sabre has fully performed and satisfied each Sabre contractual obligation to which each Delinquent Sabre Invoice pertains.

171.     Torres has no cause for withholding payment of any Delinquent Sabre Invoice.

## Count Three
### (TWISS II-- Breach of Contract and Declaratory Relief: Torres Violation of Management Provisions of the Teaming Agreement, to the Prejudice of Sabre (Camp Shield Mobilization))

172.     Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 171 as though fully set out herein.

173.     On 2 December 2009, the U.S. Government awarded the TWISS II Task Order for Camp Shield ("Camp Shield Task Order") to Torres as a consequence of a Task Order Proposal submitted to the U.S. Government by Sabre on behalf of the Team.

174.    The Camp Shield Task Order included a requirement that the Team mobilize the guard force in accordance with Camp Shield Task Order requirements by not later than 31 December 2009 (the "Camp Shield Mobilization Date").

175.    Torres had not previously mobilized a full guard force at any location.  However, as Leading Member of the Team, Torres was responsible for managing the mobilization with the assistance of Sabre.

176.    Torres did not adequately prepare for or execute the mobilization.

177.    As a consequence, a question arose on the part of the U.S. Government Contracting Officer with responsibility for the TWISS II MATOC whether Torres could mobilize the Camp Shield guard force by Camp Shield Mobilization Date.  At the same time the U.S. Government Contracting Officer imposed previously unknown constructive changes to the Camp Shield Task Order mobilization requirements upon Torres that, under applicable U.S. Government contracting law, entitled Torres (and, therefore, the Team) to an extension of the Camp Shield Mobilization Date sufficient to allow the Team to meet the new requirements.

178.    Sabre was experienced in dealing with U.S. Government TWISS contracting officials, and was ready, willing, and able to intervene with its expertise on behalf of the team so as to achieve an extension of the Camp Shield Mobilization Date without liability to the Team.

179.    Sabre expected Torres to establish and convene the TWISS II Management Committee in accordance with the requirements of the Teaming Agreement and immediately refer the issue to the Management Committee for action. Torres did not do so, in breach of the Teaming Agreement.

180.    The U.S. Government Contracting Officer wrongfully threatened default termination of the Camp Shield Task Order unless Torres, as the Prime Contractor, signed a bilateral Camp Shield Task Order that:

A.    Extended the term of the prior incumbent private security contractor by one month, with all costs for the extension to the account of Torres, to be recovered by the U.S. Government by offset against TWISS II payments; and

B.    Forfeited Torres' rights (and therefore the Team's rights) to dispute the Contracting Officer's action under the Disputes clause of the TWISS II MATOC.

181.    Instead of referring the matter to the Management Committee and thereby adopting a course of action that would have preserved the Team's right to appeal (and potential reversal on appeal of any assessment of liability), as Sabre would have demanded and obtained if informed of these events (which Sabre was not), Torres CEO Jerry Torres acted unilaterally, in breach of the Teaming Agreement, by executing such bilateral Camp Shield Task Order Modification on behalf of the Team, without consulting with or obtaining the approval of the Management Committee or Member Sabre on behalf of the team.

182.    On the strength of the bilateral Camp Shield Task Order modification, the U.S. Government assessed a debt against Torres (and, thus, the Team) in the amount of $1.1 million and satisfied the debt by offsetting $1.1 million in TWISS II contract payments against the debt.

183.    Sabre objected to Torres' unilateral action constituting breach of the Teaming Agreement.

184.    Thereafter, Torres CEO Jerry Torres unilaterally communicated to Sabre that Torres would unilaterally assess at least one-half of the $1.1 million against TWISS II Task Order payments due Sabre.

185.    But for Torres' unilateral action that compromised the Team's right to appeal, on appeal of the Contracting Officer's final decision, the Team ultimately would have been found not to be liable for all or any part of the $1.1 million assessment.

186.    An actual controversy exists between the parties as to the respective liability of Torres and Sabre for the $1.1 million liability.

**Count Four**
**(TWISS II -- Breach of Contract and Declaratory Relief: Torres**
**Violation of Management Provisions of the Teaming Agreement,**
**to the Prejudice of Sabre (FOB Warrior Stop Work Claim))**

187.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 186 as though fully set out herein.

188.    On 8 April 2010, the U.S. Government awarded the TWISS II Task Order for FOB Warrior ("FOB Warrior Task Order") to Torres as a consequence of a Task Order Proposal submitted to the U.S. Government on behalf of the Team.

189.    Subsequently, a TWISS II competitor for the FOB Warrior Task Order commenced a protest at the Government Accountability Officer of the award to Torres.

190.    As required by law, the U.S. Government issued a stop work order to the Team, through Torres, after Sabre had begun mobilization of the guard force, including flying members of the guard force from Africa.  Consequently, Sabre incurred substantial costs exceeding $400,000, complying with the stop work order.  Under the applicable equitable adjustment provisions of the TWISS II MATOC, Sabre is entitled to compensation for the costs.  However, as TWISS II MATOC Prime Contractor and Leading Member of the Team, Torres bears responsibility for adequately communicating the U.S. Government's requests for equitable adjustment claims and the U.S. Government's documentary requirements to Sabre, and to preserving, maintaining and utilizing the Contract Disputes Act right to appeal any adverse

determination of the Contracting Officer as to Sabre's equitable adjustment claim, in the event of dispute.

191.    In violation of the Teaming Agreement management provisions, Torres did not adequately advise Sabre of the U.S Government inquiries as to Sabre's equitable adjustment request and supporting documentation.  As a consequence, the U.S. Government Contracting Officer denied Sabre's equitable adjustment request.

192.    Sabre then made written demand of Torres that Torres preserve and act on Sabre's right under the Teaming Agreement and Torres' right under the Disputes clause of the TWISS II MATOC to seek reconsideration by the Contracting Officer and/or appeal the Contracting Officer's final adverse decision to either the Armed Services Board of Contract Appeals or the Court of Federal Claims. Torres never responded to the demand.  As a consequence, the right of appeal has expired.

193.    But for Torres' breach of Torres' obligations under the management provisions of the Teaming Agreement, Sabre would have prevailed on its request for equitable adjustment and subsequent dispute of the Contracting Officer's adverse final decision.

194.    Consequently, Torres is liable to Sabre in the amount of Sabre's stop work costs, in an amount exceeding $400,000 that will be proved at trial.

### Count Five
**(TWISS II -- On Account Stated; Breach of Contract: Failure to Pay for Monthly Security Services Provided by Sabre to Torres for the Torres Villa in Baghdad, Iraq)**

195.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 194 as though fully set out herein.

196.     In August 2009, Sabre and Torres entered into a written agreement by which Sabre was to provide defined security services for the Torres villa in Baghdad, Iraq, and  in return, Torres would pay Sabre $10,000 a month in cash.

197.     Sabre satisfactorily provided all such security services commencing on 1 August 2009 and continuing through August 2011.  Torres never voiced any objection or took any exception to any such services.

198.     For each month from August 2009 through November 2009, Torres paid Sabre $10,000 (ten thousand dollars) in cash for such services.

199.     Commencing in December 2009 and continuing through August 2011, Torres breached the written contract by ceasing all payments.  Consequently, $89,356.00 (eighty-nine thousand three hundred fifty-six dollars) is past due and delinquent.

200.     Sabre made demand for payment, and Torres denied the demand. As a basis for denying the demand, Torres asserted in writing that the written agreement had been amended by a telephone conversation between Torres CEO Jerry Torres and Sabre Chief Financial Officer Sumeet Mehta.  Torres failed to produce any record of any such conversation, whether contemporaneous or otherwise and no such conversation occurred at any time.

### Count Six
### (TWISS II -- Declaratory Relief: Breach of Contract)

201.     Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 200 as though fully set out herein.

202.     There is an actual and justiciable controversy relating to the legal rights and duties of Sabre and Torres under the Teaming Agreement as to whether Torres has breached the terms of the Agreement.

203.     Thus, Sabre seeks a declaration of Sabre's rights under the Teaming Agreement, including that:

A.     Torres has materially breached the Teaming Agreement; and

B.     As a consequence, Sabre no longer has any performance obligations under the Teaming Agreement, may cease work and may recover and withdraw all of its personnel and equipment from the TWISS II Task Order sites.

204.     Such a declaration is necessary to protect Sabre from uncertainty and insecurity, which is causing Sabre financial injury and harm.

205.     The requested declaration of Sabre's rights will entitle Sabre to cease performance and take control and possession of its property, and be in compliance with its contractual obligations.

<u>**Count Seven**</u>
**(TWISS II -- Breach of the Implied Covenant of Good Faith and Fair Dealing)**

206.     Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 205, which are incorporated by reference as though fully set out herein.

207.     Implied in every contract is a covenant of good faith and fair dealing.  This covenant prohibits either party from engaging in any act that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

208.     Torres has acknowledged its obligations under the Agreement, but has deliberately refused to perform according to the terms of the Agreement.  To the contrary, Torres has attempted to incur liability onto Sabre to its detriment by acting unilaterally and interfered with Sabre's business relationships with existing partners (Water Tight Systems) without Sabre's knowledge or consent.

209.    Sabre is informed and believes, and, based thereon, alleges that as a direct and foreseeable result of Torres's breach of the implied covenant of good faith and fair dealing, as alleged above, Sabre has been damaged in an amount to be proven at trial, but which is no less than the jurisdictional minimum of this Court.

## Count Eight
### (TWISS II -- Unjust Enrichment)

210.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 209 as though fully set out herein.

211.    Sabre is entitled to a full payment of the revenue received by Torres for work withheld from Sabre and procured by Torres to itself in violation of the Teaming Agreement. Such work includes, but is not limited to the positions and equipment that are defined as Sabre's Scope of Work in Teaming Agreement Schedule 1, Section I.B that Torres has filled with its own personnel and provided its own equipment at the following sites:

A.    Camp Shield as alleged above and as further alleged immediately following in this subparagraph.

(1)    During the performance of the TWISS II Camp Shield Task Order, the U.S. Government changed one requirement of the Camp Shield Task Order to require the use of RPK machines gun weapons (magazine fed) in lieu of PKM machine gun weapons (belt fed). Under Teaming Agreement Schedule 1, Section I.B, the provision of all equipment (including all weapons) is solely within Sabre's scope of work.

(2)    Teaming Agreement Paragraph 4.3(3)-(5) requires that the Management Committee provide for the day-to-day management and contract administration of the TWISS II MATOC and TWISS II Task Orders awarded to the Team, inclusive of the Camp Shield Task Order.  Included in "contract administration" is the consideration and response to

any U.S. Government change order request and/or change order.  Teaming Agreement Paragraph 5.1.E mandates that Torres, in its capacity as Leading Member, shall "[a]dminister any TWISS MATOC and any TWISS TOs [Task Orders] awarded to the Team pursuant to Leading Member's responsibilities defined in Paragraph 1.2.C, above."

(3)     Teaming Agreement Paragraph 5.1.H mandates that Torres, as Leading Member shall "[a]ssign to Member responsibility for performance of such TWISS MATOC and TWISS TO work that is within the responsibility of the Member, as set forth in Schedule 1 (hereinafter, Member's Work")."

(4)     Teaming Agreement Paragraph 4.2 mandates that "[t]he Leading Member shall, in the implementation of its responsibilities set forth in Subsection 4.1, above, ensure that there is agreement between the Members on . . . any TWISS TOR Proposal to be submitted by the Members."

(5)     Torres did not provide the U.S. Government change order request referenced in this paragraph of the Complaint to the Team Management Committee or to Sabre, nor did Torres make known to Sabre that replacement weapons would be required on the basis of change-order compensation from the U.S. Government that includes the cost of the changed weapons plus profit.

(6)     Torres unilaterally developed and submitted the change order proposal for the U.S. Government's changed weapons requirements, without Sabre's participation, and strictly for Torres' own benefit (the "Torres Unilateral Change Order Proposal"), in circumvention of Sabre's Scope of Work, for the purpose of Torres taking for itself the profit that Sabre would have earned by participating in the changed work.

(7)    After the U.S. Government accepted the Torres Unilateral Change Order Proposal, Torres then unilaterally provided the RPK weapons without any knowledge or participation of Sabre, in breach of the Teaming Agreement. Torres then kept for itself the profits from the changed work that Sabre would have earned had Torres not breached the Teaming Agreement.  By so doing, Torres has materially breached its Teaming Agreement obligations to Sabre and has unjustly enriched itself.

B.    FOB Cruise Morris; and

C.    FOB Gary Owen.

212.    Torres obtained these payments by withholding work from Sabre through its unilateral actions expressly prohibited by the Teaming Agreement.

213.    Torres has failed to remit to Sabre any of the payments for withholding work from Sabre.

214.    As a result, Torres has been unjustly enriched and has benefited at the direct expense of Sabre.

## Count Nine
### (TWISS II -- Tortious Interference with Prospective Economic Advantage)

215.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 214 as though fully set out herein.

216.    Sabre had a reasonable expectation of economic advantage from the TWISS II Task Orders.

217.    Torres knew of Sabre's expectation of economic advantage from the TWISS II Task Orders.

218.    Torres wrongfully and without justification interfered with Sabre's reasonable expectation of economic advantage or benefit from the TWISS II Task Orders.

219.    In the absence of the wrongful act of Torres, it is reasonably probable that Sabre would have realized its economic advantage or benefit.

220.    Sabre has sustained damages as a result of Torres' aforesaid wrongful acts.

**Count Ten**
**(TWISS II -- Tortious Interference with Business Relations)**

221.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 220 as though fully set out herein.

222.    Sabre is a Private Security Company in Iraq that has developed several business relationships that incurred economic benefit onto Sabre.

223.    Torres has detailed knowledge of these relationships.  Such detailed knowledge was entrusted to it by Sabre in order to further mutual business interests as outlined in the Agreement and to not use such knowledge to compete against Sabre.

224.    Except for the conduct of Torres, Sabre was reasonably certain to continue the business relationship.

225.    By the conduct set forth above, Torres has intentionally and unjustifiably interfered with Sabre's business relationships, causing Sabre damages and harm for which Torres is liable.

**Count Eleven**
**(TWISS I -- Breach of Contract)**

226.    Sabre hereby re-alleges and incorporates by references the allegations in Paragraphs 1 through 225 as though fully set out herein.

227.    Since the closing of the APA achieved by concluding the TWISS I Novation, Torres has failed to meet its obligations of the APA, including those pursuant to the APA Sabre Services Subcontract and the APA Sabre Lease Agreement.

228.    The failure of Torres to put TWISS I Subtask Orders in place constitutes a breach of the APA further assurances clause.

229.    The failure of Torres to pay Sabre's post-novation invoices in full constitutes a breach of the payment clauses of the APA and payment commitment of Torres evidenced by the APA Sabre Services Subcontract and APA Sabre Lease Agreement.

230.    Sabre has made a reasonable demand for Torres to pay the entitlements stated on the outstanding Sabre post-novation invoices to Torres for post-novation TWISS I work performed by Sabre.

231.    Torres has failed to make payments as due and has cut off all communication with Sabre.

232.    By its actions and inactions described herein, Torres is in default and has breached its obligations under the APA, the APA Sabre Services Subcontract and APA Sabre Lease Agreement.

233.    Sabre has suffered damages as a result of Torres's breaches of the APA, the APA Sabre Services Subcontract and APA Sabre Lease Agreement.

234.    Sabre has been damaged in an amount to be proven at trial, but believed to be no less than $23,732,721.49, plus pre-judgment interest.

235.    Sabre has no adequate remedy at law.  Sabre can only be made whole if Torres is required to specifically perform the terms of the APA, the APA Sabre Services Subcontract and the APA Sabre Lease Agreement.

## Count Twelve
### (TWISS I -- Breach of the Implied Covenant of Good Faith and Fair Dealing)

236.    Sabre hereby re-alleges and incorporates by reference the allegations in Paragraphs 1 through 235 as though fully set out herein.

237.     Implied in every contract is a covenant of good faith and fair dealing.  This covenant prohibits either party from engaging in any act that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

238.     Torres has acknowledged its obligations under the APA, the APA Sabre Services Subcontract and the APA Sabre Lease Agreement, but then has deliberately refused to perform such obligations.  Additionally, Torres has attempted to wrongfully harm Sabre, to Sabre's detriment, by attempting to deprive Sabre of Sabre's financial capacity to perform Sabre's portion of the work under the TWISS I Contract and TWISS I Task Orders on and after Torres senior management decided to become a competitor to Sabre in the private security market in Iraq and elsewhere in the world.

239.     Sabre is informed and believes and based thereon alleges that as a direct and foreseeable result of Torres's breach of the implied covenant of good faith and fair dealing, as alleged above, Sabre has been damaged in an amount to be proven at trial, but which is no less than the jurisdictional minimum of this Court.

240.     Sabre has no adequate remedy at law.  Sabre can only be made whole if Torres is required to specifically perform the terms of the APA, the APA Sabre Services Subcontract and the APA Sabre Lease Agreement.

### Count Thirteen
### (TWISS I -- Declaratory Relief)

241.     Sabre hereby re-alleges and re-incorporates by reference the allegations in Paragraphs 1 through 240 as though fully set out herein.

242.     There is an actual and justiciable controversy relating to the legal rights and duties of Sabre and Torres under the APA, the APA Sabre Services Subcontract and the APA Sabre Lease Agreement as to whether Torres has breached the terms of the APA, the APA Sabre

Services Subcontract and the APA Sabre Lease Agreement such that Sabre is relieved of any further obligations to perform any TWISS I-related work.

243.     Thus, Sabre seeks that a declaration of Sabre's rights under the APA, the APA Sabre Services Subcontract and the APA Sabre Lease Agreement is necessary to protect Sabre from uncertainty and insecurity, which is causing Sabre financial injury and harm.  The requested declaration of Plaintiff's rights will entitle Sabre to cease performance and take control and possession of its property, and be in compliance with its contractual obligations.

244.     Sabre has no adequate remedy at law.  Sabre can only be made whole if Torres is required to specifically perform the terms of the APA.

**Count Fourteen**
**(TWISS I -- Specific Performance of Further Assurances: An Accounting)**

245.     Sabre hereby re-alleges and re-incorporates by reference the allegations in Paragraphs 1 through 244 as though fully set out herein.

246.      In accordance with the APA further assurances clause, Sabre is entitled to an accounting by Torres of the amounts of the partial payments made by Torres to date that Torres has applied to Sabre's post-TWISS I Novation invoices to Torres, and any amounts that Torres asserts should be applied as offsets to such Sabre invoices.

247.     Torres has not provided Sabre with any such accounting.

248.     Torres' failure to do so constitutes a breach of the APA further assurances clause.

249.     Accordingly, Sabre seeks equitable specific performance in the form of appointment of an qualified independent auditor to examine all Torres books and records pertaining to the APA and TWISS I, the TWISS I Task Order work performed by Sabre, Sabre's invoices to Torres, Torres' TWISS I communications and invoicing to the U.S. Government to determine the amount of the partial payments that Torres has applied to the Sabre TWISS I

subtask order invoices, the rationale therefore, the amounts not in dispute and any amount in dispute.

## PRAYER FOR RELIEF

WHEREFORE, Sabre prays for that judgment be entered granting equitable and legal relief in its favor and against Torres as follows.

### On Count One
*(TWISS II -- Breach of Contract; Breach of Fiduciary and Trust Obligations; Imposition of Constructive Trust; Preliminary and Permanent Injunctive Relief)*

1. Imposition of a constructive trust on Torres with respect to the TWISS II Contract and TWISS II Task Orders, including, but not limited to, issuing a preliminary injunction and order of specific performance by which a trustee is appointed and directed to:

A. Take possession and control of all U.S. Government payments to Torres for the TWISS II Contract and TWISS II Task Orders, and thereafter administer such payments strictly in accordance with the Teaming Agreement, including making payment of forthcoming Sabre TWISS II Task Order invoices to Torres within fifteen (15) days of the date of receipt from the U.S. Government of payments for the work to which each such invoice pertains;

B. Take possess of all Torres bank accounts and funds pertaining to the TWISS II Contract and thereafter administering such accounts an funds strictly in accordance with the Teaming Agreement, including making prompt payment to Sabre within thirty (30) days of appointment of all outstanding Sabre TWISS II Subtask Order invoices to Torres;

C. Conduct a complete forensic accounting of all TWISS II accounts, including all receipts and expenditures made by Torres out of any TWISS II payments received from the U.S. Government, and report the results to the Court and Sabre, within 45 days of the Trustee's appointment as well as identify any funds that Torres has wrongfully appropriated in

violation of the Teaming Agreement and the fiduciary and trust obligations owed by Torres to Sabre, and the potential sources of recovery and disgorgement of such funds; and

D.      Specifically perform those provisions of the Teaming Agreement pertaining to the governance of the Team, including appointment of the Management Committee with the trustee serving as the head of the management committee with vote of equal weight to the vote of Torres and the vote of Sabre.

2.      Imposition of an injunction preliminarily and permanently enjoining Torres and Torres CEO Jerry Torres from breaching the fiduciary and trust obligations owed to Sabre under the Teaming Agreement, including but not limited to the legal duty to refrain from self dealing and using funds held in trust for Sabre for any purpose but to pay Sabre, in the absence of an order of this Court to the contrary.

## On Count Two
### *(TWISS II -- Breach of Contract: Torres Failure to Pay Sabre TWISS II Invoices)*

1.      Judgment against Torres in the amount of **$23,733,021.44 (twenty-three million, seven hundred thirty-three thousand twenty one dollars and forty-four cents)** for all Delinquent Sabre Invoices; and

2.      Pre-judgment interest on each Delinquent Sabre Invoice in an amount to be proven.

3.      Post-judgment interest at the statutory rate for all amounts of Delinquent Sabre Invoices that remain unsatisfied as of the date of entry of judgment and thereafter.

## On Count Three
### (TWISS II-- Breach of Contract and Declaratory Relief: Torres Violation of Management Provisions of the Teaming Agreement, to the Prejudice of Sabre (Camp Shield Mobilization))

1.      Judgment that Sabre bears no liability whatsoever for any of the $1.1 million liability assessed by the U.S. Government against Torres; and

2.      Judgment that Torres has no legal right to and shall not offset any part of the $1.1 million liability against any monies owed by Torres to Sabre, whether under the TWISS I APA, the TWISS II Teaming Agreement or otherwise.

## On Count Four
### (TWISS II -- Breach of Contract and Declaratory Relief: Torres Violation of Management Provisions of the Teaming Agreement, to the Prejudice of Sabre (FOB Warrior Stop Work Claim))

1.      Judgment that Torres breached obligations owed to Sabre under the Teaming Agreement.

2.      Judgment against Torres in the amount of the amount of at least $400,000, or such additional amount as Sabre proves at trial, consisting of the amount that Sabre would have recovered from the U.S. Government but for Torres' breach of obligations owed to Sabre under the Teaming Agreement.

## On Count Five
### (TWISS II -- On Account Stated; Breach of Contract: Failure to Pay for Monthly Security Services Provided by Sabre to Torres for the Torres Villa in Baghdad, Iraq)

1.      Judgment that Torres breached payment obligations owed to Sabre under the written agreement for security services for the Torres villa in Baghdad.

2.      Judgment against Torres in the amount of at least $89,356.00 (eighty-nine thousand three hundred fifty-six dollars) or such additional amount as Sabre proves at trial.

**On Count Six**
*(TWISS II -- Declaratory Relief: Breach of Contract)*

1.      Judgment that Torres has breached Torres' obligations to Sabre under the

Teaming Agreement.

2.      Judgment that Sabre no longer has any performance obligations under the

Teaming Agreement, may cease work and may recover and withdraw all of its personnel and

equipment from the TWISS II Task Order sites.

**On Count Seven**
*(TWISS II -- Breach of the Implied Covenant of Good Faith and Fair Dealing)*

1.      Judgment that Torres has breached Torres' obligations under the implied covenant

of good faith and faith dealing.

2.      Judgment that Torres is liable to Sabre in an amount subject to proof at trial.

**On Counts Eight through Ten**

***Count Eight***
***(TWISS II -- Unjust Enrichment)***
***Count Nine***
***(TWISS II -- Tortious Interference with Prospective Economic Advantage)***
***Count Ten***
***(TWISS II -- Tortious Interference with Business Relations)***

Judgment against Torres in the amount subject to proof at trial.

**On Count Elevens through Fourteen**

***Count Eleven***
***(TWISS I -- Breach of Contract)***

***Count Twelve***
***(TWISS I -- Breach of the Implied Covenant of Good Faith and Fair Dealing)***

***Count Thirteen***
***(TWISS I -- Declaratory Relief)***

***Count Fourteen***
***(TWISS I -- Specific Performance of Further Assurances: An Accounting)***

1.      Compelling specific performance by Torres to fulfill its obligations under the Further Assurances Clause of the APA—specifically to issue subtask orders to Sabre and to produce a true and complete accounting.

2.      Entering a Preliminary Injunction:

    A.      Preventing Defendant from directly or indirectly destroying, mutilating, concealing, altering, or disposing of any books, records, documents, or correspondence;

    B.      Appointing an examiner to conduct the accounting; and

    C.      Requiring Defendant to provide Plaintiff and the examiner with a full accounting of their funds, documents, and assets of all TWISS I Contract payments by the U.S. Government and Torres's retention, disbursements and or distributions related to those funds for Sabre's TWISS I Contract invoices through the 5 February 2010 closing of the APA upon the U.S. Government's approval on 5 February 2010 of the novation of the TWISS I Contract from Sabre to Torres, and subsequent to the novation through the close-out of each TWISS I Task Order.

3.      Declaring that Defendant's actions violated and breached the terms of the APA, the APA Sabre Services Contract and/or the APA Sabre Lease Agreement, and, therefore, Sabre has no continuing performance obligations to Torres with respect to the TWISS I Contract and the TWISS I Task Orders.

## On All Counts

1.      For costs incurred herein;

2.      For attorneys' fees as allowed by contract and/or law;

3.      For pre-judgment and post-judgment interest at the maximum legal rate;

4.      For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, plaintiff hereby demands a jury trial on all issues so triable.

DATED:        29 April 2011                    MAGGS & McDERMOTT LLC

By _____
Timothy B. Mills
D.C. Bar No. 425209
Maggs & McDermott LLC
Attorneys at Law
910 17th Street N.W., Suite 800
Washington, D.C. 20006
(202) 457-8090 (Telephone)
(202) 478-5081 (Facsimile)
Email: TimothyBMills@aol.com
*Attorneys for Plaintiff Sabre International Security*

63