**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SABRE INTERNATIONAL SECURITY )<br><br>        Plaintiff,        )<br><br>    v.                      )<br><br>TORRES ADVANCED ENTERPRISE )<br>SOLUTIONS, INC.,            )<br><br>        Defendant.          )<br> | <br><br><br><br><br><br>Civil Action 11-806 (GK) |

**MEMORANDUM OPINION**

Plaintiff, Sabre International Security ("Sabre"), a private Iraqi security company, brings this action against Defendant, Torres Advanced Enterprise Solutions, Inc. ("Torres"), a Virginia limited liability company, for equitable relief, breach of contract, breach of fiduciary and trust obligations, unjust enrichment, and tortious interference with prospective economic advantage and business relations. This matter is presently before the Court on Torres' Motion for Dismissal of the Complaint and for Partial Summary Judgment ("Torres MTD") (May 27, 2011) [Dkt. No. 21]. Upon consideration of the Motion, Oppositions, Reply, and the entire record herein, and for the reasons set forth below, Torres' Motion is **granted in part and denied in part**.

**I. Background**

Sabre is a private security contractor providing security services around the world to various entities, including the U.S. Government. Complaint ("Compl.") ¶ 1. On September 27, 2007, Sabre won one of several U.S. Government Theater-wide Internal Security Services Multiple Task Order Contracts, number W91GDW-07-D-4026 ("TWISS I Contract") to provide security services to U.S. military installations in Iraq. Id. ¶ 6. On November 8, 2007, in connection with this Contract, Sabre entered into a subcontractor agreement with Torres ("2007 Subcontractor Agreement"). Id. ¶ 7. Pursuant to this Agreement, Torres agreed to provide personnel holding valid U.S. Government security clearances to work on Sabre's TWISS I projects. Id.

In 2009, the U.S. Government amended its policies for TWISS I contracts by requiring that prime contractors, like Sabre, possess a U.S. Defense Department Industrial Security Program Facility Security Clearance at the Secret Level ("Secret FCL"). Id. ¶ 11. Sabre, as a non-U.S. company, was not eligible for a Secret FCL. Id. Accordingly, to avoid termination of the TWISS I Contract, Sabre and Torres entered into a novation of the TWISS I Contract on December 30, 2009. Id. ¶¶ 12-13. Pursuant to the novation, known as the Asset Purchase Agreement ("APA"), Torres became the prime contractor and Sabre the subcontractor. Id.

According to Sabre, the APA included two additional agreements as annexes (or addendums): (1) "[a] form of subcontract between Torres and Sabre for TWISS I security services that was to take effect upon the U.S. Government's approval of the novation" (the "APA Sabre Services Subcontract"); and (2) "[a] form of equipment lease agreement between Sabre and Torres for lease from Sabre to Torres of all equipment necessary for performance of the TWISS I Task Orders that was to take effect upon the U.S. Government's approval of the novation" (the "APA Sabre Lease Agreement"). Id. ¶ 13.

Sabre alleges that, under these three "agreements," Sabre was entitled to payment of pre-novation rates and that Torres was obligated to "issue priced [] TWISS I Subtask Orders to Sabre promptly after the TWISS I Novation that would give effect to [this] understanding[]." Id. ¶¶ 41-42. On February 5, 2010, the U.S. Government approved the novation. Id. ¶ 3. According to Sabre, after the novation, Torres breached its contractual obligations by failing to pay Sabre's TWISS I invoices at the rates established under the APA and its accompanying annexes, and by failing to put the TWISS I Subtask Orders in place. Id. ¶¶ 228-29.

On August 6, 2009, Sabre and Torres entered into a Teaming Agreement to bid on one of several Government Theater-wide Internal Security Services Multiple Task Order Contracts, number W91DGW-09-D-4030 ("TWISS II Contract"), which would replace existing TWISS I

contracts. Id. ¶¶ 53, 61. To be eligible for a TWISS II Contract, the prime contractor was required to hold a Secret FCL as well as a Private Security Company ("PSC") License from the Iraqi Ministry of the Interior. Id. ¶¶ 58-59. Under the Teaming Agreement, Torres, which held a Secret FCL, was designated as the prime contractor and Sabre, which held a PSC License, but did not hold a Secret FCL License, was designated as the subcontractor. Id. ¶ 61.

The Sabre-Torres team ("Team") then bid for a TWISS II Contract, which they won on August 25, 2009. Id. ¶¶ 62, 86. In accordance with TWISS II Contract procedures, the Team then competed for several TWISS II Task Order Requests ("TWISS II TORs"), which the Government issued for each military base that required security services. Id. ¶¶ 90, 106. The Team competed for these TWISS II TORs by submitting Task Order Proposals ("TWISS II Task Order Proposals") to the U.S. Government, and was ultimately successful in obtaining several TWISS II TORs. Id. ¶¶ 91, 106, 108.

On April 29, 2011, Sabre filed its Complaint. On May 27, 2011, Torres filed its Motion for Dismissal of the Complaint and for Partial Summary Judgment. On July 25, 2011, Sabre filed its Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss the Complaint ("Sabre Opp'n to MTD") [Dkt. No. 30]. On July 26, 2011, Sabre filed its Opposition to Defendant's Rule 56 Motion for Partial Summary Judgment ("Sabre Opp'n to SMJ") [Dkt. No. 32]. On August 19, 2011, Torres filed its Reply in Support of its Motion

for Dismissal of the Complaint and for Partial Summary Judgment ("Torres Reply")[Dkt. No. 34].

## II. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal quotations omitted) (citing Twombly, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the pleaded factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1940 (citing Twombly, 550 U.S. at 556). In deciding a Rule 12(b)(6) motion, the court may consider any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record. EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563. Under the standard set forth in Twombly, a "court deciding a motion to

dismiss must . . . assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet, 525 F.3d at 17 (citations and internal quotations omitted). See also Tooley v. Napolitano, 586 F.3d 1006, 1007 (D.C. Cir. 2009) (declining to reject or address the government's argument that Iqbal invalidated Aktieselskabet).

Under Federal Rule of Civil Procedure 56, summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c), as amended Dec. 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, that there is no "genuine" factual dispute and, second, if there is, that it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

As the Supreme Court stated in Celotex Corp. v. Catrett, "the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. 317, 322 (1986). The Supreme Court has further explained,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L.Ed.2d 538 . . . (1986) (footnote omitted). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'"

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Liberty Lobby, 477 U.S. at 247-48) (emphasis in original).

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255.

## III. Analysis

In its Complaint, Sabre brings two categories of claims. The first set relates to the TWISS I Contract and seeks equitable relief for Torres' alleged failure to pay Sabre's TWISS I invoices and to issue TWISS I Subtask Orders in accordance with the APA ("TWISS I claims"). See Compl., Counts 11-14. The second set relates to the TWISS II Contract and involves various claims relating to Torres' alleged breach of the Teaming Agreement, as well as claims for unjust enrichment and tortious interference with prospective economic advantage and with business relations ("TWISS II claims"). See id., Counts 1-10.[1] Pursuant to Rule 12(b)(6), Torres moves for dismissal of Sabre's TWISS I claims and seeks

---

[1] In Count 7, Sabre raises a claim for breach of the implied covenant of good faith and fair dealing with regards to the Teaming Agreement. Torres has not raised an explicit objection to this claim, although some of its challenges to Sabre's other TWISS II claims could be construed as implicit objections to Count 7. Since these objections to the TWISS II claims fail, the Court has no need to determine whether Torres has properly challenged Count 7. In Count 5, Sabre raises an unrelated breach of contract claim for Torres' alleged failure to pay Sabre for security services provided to the Torres Villa in Baghdad, Iraq(Count 5). Torres offers no objection to this claim.

12(b)(6) dismissal and/or summary judgment of Sabre's TWISS II claims.[2]

**A. The TWISS I Claims (Counts 11-14)**

With regard to the TWISS I claims, Sabre requests the following relief: (1) that Torres specifically perform the APA, the APA Sabre Services Subcontract, and the APA Sabre Lease Agreement by issuing TWISS I Subtask Orders to Sabre and producing a true and complete accounting (Counts 11-12); (2) a declaration of Sabre's rights under the APA, the APA Sabre Services Subcontract, and the APA Sabre Lease Agreement (Count 13); and (3) a preliminary injunction prohibiting Torres from destroying, concealing, or altering any TWISS I-related documents, and appointment of a qualified, independent auditor to examine all of Torres' books and records pertaining to the APA, including Sabre's invoices to Torres and Torres' TWISS I communications and invoices to the U.S. Government, to determine the unpaid amounts owed to Sabre (Count 14).

Torres moves to dismiss these claims on two grounds. First, Torres argues that Sabre has no contractual right under the APA, APA Sabre Services Subcontract, or the APA Sabre Lease Agreement to

---

[2] With regard to the TWISS II claims, Torres fails to clearly indicate at a number of points in its papers whether it is seeking Rule 12(b)(6) dismissal, Rule 56 summary judgment, or both. Torres MTD 1, 17; Torres Reply 2.  Obviously, the legal standard to be applied under these two Rules is very different, and Torres often conflates the two.

the pre-novation payments it claims under the TWISS I invoices. Torres MTD 12-17. Second, Torres argues that Sabre is not entitled to equitable relief because it has adequate remedies at law. Id. at 29 & nn. 10-11.

### 1.   The APA, the APA Sabre Services Subcontract, and the APA Sabre Lease Agreement

Torres argues that the terms of the APA itself provide "no basis" for Sabre's claim to pre-novation payment rates, and that Sabre has failed to allege and cannot allege that the APA Sabre Services Subcontract and the APA Sabre Lease Agreement were ever executed by the parties.[3] In response, Sabre argues that Torres has challenged Sabre's entitlement to money damages, that this challenge is subject to the parties' arbitration agreement under

---

[3]As an alternative argument, Torres claims, separate and apart from its arguments about the APA and the two subcontracts, that the absence of TWISS I Subtask Orders demonstrates that the parties did not agree to pre-novation pricing-levels. Torres MTD 12-17. To support this argument, Torres argues that:

> [b]oth the unexecuted subcontract and the general practice in the industry contemplate that a subcontractor will send a proposal to the prime contractor (including the scope of work and the price to be charged for that work), that the prime contractor will then bid to the government to win the award of the task order, and that after it is awarded to the prime contractor, the prime evidences its acceptance of the subcontractor's bid through the issuance of a subtask order

Id. at 14.

Since all facts alleged by Plaintiff must be accepted as true under a Rule 12(b)(6) motion, this argument is of no help to Defendant, because it directly contests the accuracy of Plaintiff's allegations.

the APA, and that the Court should, therefore, refrain from considering Torres' arguments.[4] Sabre Opp'n to MTD 7-8.

Sabre's argument is inconsistent with its request for equitable relief. Whatever the merits of its arbitration claim,[5] Sabre's requested equitable remedies necessarily require this Court to determine whether Sabre was entitled to pre-novation payment rates under the APA, APA Sabre Services Subcontract, and the APA Sabre Lease Agreement. See, e.g., Compl. ¶ 229, Count 11 ("The failure of Torres to pay Sabre's post-novation invoices in full

---

[4] Paragraph 9.8 of the APA provides in relevant part that:

In case of any controversy or claim between [Sabre and Torres] . . . the following procedures shall be implemented:
> (a) The Parties shall first attempt in good faith to resolve such controversy or claim promptly by negotiation . . . .
> (b) If the negotiation process set forth [above], does not resolve such controversy or claim, then the Parties shall submit such controversy or claim for mediation . . . in accordance with the Commercial Mediation Procedures of the American Arbitration Association (the "AAA"). . . .
> (c) If such controversy or claim is not resolved within thirty (30) days from the date of submission of such controversy or claim to mediation (or such later date as the Parties may mutually agree in writing), such controversy or claim shall be referred to and finally and exclusively resolved by mandatory and binding arbitration. . . .

Ex. A to Torres MTD (May 27, 2011) [Dkt. No. 21-3].

[5] Sabre is currently pursuing arbitration before the AAA of its money damages claim against Torres. Sabre Opp'n to MTD 8 n.4. Torres has submitted its objections to arbitration to the AAA. Ex. 3 to Sabre Opp'n to MTD (July 25, 2011) [Dkt. No. 30-3].

constitutes a breach of the payment clauses of the APA and payment
commitment of Torres evidenced by the APA Sabre Services
Subcontract and APA Sabre Lease Agreement. . . . Sabre can only be
made whole if Torres is required to specifically perform the terms
of the APA, the APA Sabre Services Subcontract and the APA Sabre
Lease Agreement."). If Sabre wanted this issue settled in
arbitration, it should have either moved to stay its claim for
equitable relief until arbitration was concluded, or have excluded
its TWISS I claims from this lawsuit.

Turning to Torres' first argument, Torres is correct that the
express terms of the APA are silent as to whether Sabre was
entitled to pre-novation payment rates. With regard to its second
argument, Torres is also correct that the Complaint does not allege
that the parties executed the APA Sabre Services Subcontract and
the APA Sabre Lease Agreement. Torres MTD 13-14. However, in the
Complaint, Sabre has alleged that the APA Sabre Services Agreement
and the APA Sabre Lease Agreement "were included as Annexes to the
APA." Compl. ¶ 13. Taking all reasonable inferences in Sabre's
favor, Sabre has adequately alleged that the parties intended the
two subcontracts to be a part of their agreement under the APA.
"Under D.C. law, as is generally true, for an enforceable contract
to exist, there must be both (1) agreement as to all material
terms; and (2) intention of the parties to be bound."). See Jack

Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995).

Consequently, Sabre has adequately alleged the existence of a contractual basis for its claim to pre-novation payment rates.

### 2.   Adequate Remedy at Law

Torres argues that Sabre is not entitled to equitable relief on the TWISS I claims because "Sabre's claims are contract-based [and][,] as such, Sabre has a complete and adequate damages remedy that obviates any need for equitable relief." Torres MTD 29 & nn. 10-11. Sabre has failed to respond to this argument as it relates to the TWISS I claims and has, therefore, conceded the issue. CSX Transp., Inc v. Commercial Union Ins., Co., 82 F.3d 478, 482-83 (D.C. Cir. 1996); Maib v. FDIC, 771 F. Supp. 2d 14, 20 (D.D.C. 2011).

Consequently, Torres' motion to dismiss Counts 11-14 is **granted** because Sabre has an adequate remedy at law.

### B.   The TWISS II Claims

### 1.   Counts 1-2[6]

In Count 1, Sabre requests two forms of equitable relief: (1) a constructive trust, which is an equitable remedy that arises "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or

---

[6] Sabre has not sought equitable relief under Count 2.

property in the defendant's possession," <u>Great-West Life & Annuity Ins. Co v. Knudson</u>, 534 U.S. 204, 213, 122 S. Ct. 708 (2002); and (2) injunctive relief. In Count 2, Sabre seeks damages for Torres' failure to pay the full amount of Sabre's TWISS II invoices under the Teaming Agreement.

Torres raises two challenges to these Counts. First, Torres challenges Count 1 on the ground that Sabre has an adequate remedy at law and is not, therefore, entitled to equitable relief. Torres MTD 29-30. Second, Torres challenges both Counts 1 and 2 on the ground that Sabre has no right under the Teaming Agreement to receive the pricing levels reflected in its TWISS II invoices to Torres. <u>Id.</u> at 18-19.

### a. Count 1:  Equitable Relief

Under D.C. law, which governs the parties' claims under the Teaming Agreement,[7] it is "axiomatic that equitable relief will not be granted where the plaintiff has a complete and adequate remedy at law." <u>Kakaes v. George Washington Univ.</u>, 790 A.2d 581, 581 (D.C. 2002).

Torres argues that because Sabre's claims are "principally contract-based" Sabre has an adequate remedy at law and has no need for equitable relief. <u>Id.</u> at 29. In response, Sabre claims the "equitable remedies sought are necessary to prevent Torres'

---

[7] Teaming Agreement ¶ 3, Ex. 2 to Torres MTD (May 27, 2011)[Dkt. No. 22-2].

violation of fiduciary and trust obligations, to determine whether Sabre's monies have been deposited and how they have been used, and to ensure those monies are frozen to prevent Torres' use of them for its self-dealing and the financing of its direct competition with Sabre." Sabre Opp'n to MTD 10.

Sabre's claims for equitable relief are based on Torres' failure to pay Sabre under the Teaming Agreement. As demonstrated infra, the Court concludes that Sabre has stated a claim for breach of the Teaming Agreement.  If Sabre prevails on this claim, it will have a complete and adequate remedy at law. Plaintiff's request for a constructive trust may be satisfied by the money damages, including pre- and post-judgment interest, it seeks on its breach of contract claim. With regard to Plaintiff's request for injunctive relief, this extraordinary remedy, which is typically sought by separate motion to the Court, is awarded only upon a clear showing that Plaintiff is entitled to such relief.[8] Plaintiff has neither raised allegations that would support such a showing,

---

[8] In order to obtain a preliminary injunction, plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011).

nor has it pursued its earlier motion for injunctive relief against the Defendant.[9]

Consequently, the Court **grants** Torres' motion to dismiss Count 1.

### b.   Counts 1-2: TWISS II Invoices

Torres also argues that Counts 1 and 2 should be dismissed for failure to state a claim and/or summary judgment. Torres MTD 18-19.

### i.   Dismissal for Failure to State a Claim

Express contracts are those whose terms are stated by the parties. Richardson v. J.C. Flood Co., 190 A.2d 259, 261 (D.C. 1963). An implied-in-fact contract arises "from a mutual agreement and promise not set forth in words." Id. It is "founded upon a meeting of the minds, which, although not embodied in an express contract is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Barrett Refining Corp. v. United States, 242 F.3d 1055, 1059 (Fed. Cir. 2001) (quoting Baltimore & O.R. Co. v. United States, 261 U.S. 592, 597, 43 S. Ct. 425 (1923)).

To make out a claim for breach of an implied-in-fact contract, plaintiff must demonstrate "(1) that the services were carried out under such circumstances as to give the recipient reason to

---

[9] Although Plaintiff initially intended to seek a preliminary injunction, it has yet to request such relief from the Court. See Plaintiff's Unopposed Motion to Amend Scheduling Order (May 27, 2011) [Dkt. No. 20].

understand (a) that they were performed for him and not for some other person, and (b) that they were not rendered gratuitously, but with the expectation of compensation from the recipient." Bloomgarden v. Coyer, 479 F.2d 201, 208-09 (D.C. Cir. 1973).

Torres argues that Sabre "has not alleged that Torres accepted Sabre's bid for the performance of [the TWISS II] work, and therefore has not established the existence of an enforceable agreement that Torres would pay Sabre the pricing for that work that is reflected in Sabre's [TWISS II] invoice[s]." Torres MTD 18. In response, Sabre argues it has sufficiently alleged the existence of an enforceable agreement, under either an express or implied-in-fact theory of contract.[11] Sabre Opp'n to MTD 18-20.

In its Complaint, Sabre alleges that, between December 31, 2009 and September 25, 2010, the U.S. Government issued TWISS II TORs to Torres requesting pricing proposals for at least seven military bases,[12] and that Sabre provided Torres with its scope of work and its pricing terms for these projects ("Sabre's TWISS II Scope of Work"). Sabre also alleges that Torres included Sabre's

_____

[11] Sabre also argues that its allegations establish the existence of a contract under theories of estoppel and promissory estoppel. Sabre Opp'n to MTD 19. Because the Court concludes that Sabre's Complaint adequately alleges the existence of an implied-in-fact contract, there is no need to consider Sabre's additional theories.

[12] These military bases included: (1) Camp Shield; (2) Forward Operating Base ("FOB") Husaniyah; (3) FOB Warrior; (4) FOB Loyalty; (5) FOB Kalsu; (6) FOB Hammer; and (7) FOB Shocker. Compl. ¶ 106.

pricing proposals in its TWISS II Task Order Proposals to the U.S. Government. Id. On the basis of these TWISS II Task Order Proposals, the U.S. Government purportedly awarded Torres firm fixed price TWISS II Task Orders for seven military bases. Id.

Sabre alleges that, after receiving the TWISS II Task Orders, Torres issued Notices to Proceed to Sabre "on the strength of Sabre's detailed pricing and technical proposal to Torres for which Torres took no exception." Id. ¶ 109. Sabre goes on to claim that:

> [w]ithout regard to whether Torres ever issued a subtask order to Sabre for any TWISS II Task Order, by issuing each such [Notice to Proceed] Torres de facto accepted Sabre's proposal and became legally bound to pay Sabre for the Sabre TWISS II Scope of Work at the prices quoted by Sabre which Torres included in the TWISS II Task Order Proposal upon which the U.S. Government awarded Torres the respective TWISS II Task Order, without regard to [] whether Torres ever issued a Subtask Order to Sabre.
>
> In detrimental reliance on each such respective [Notice to Proceed], Sabre commenced performance of the Sabre TWISS II Scope of Work for each respective TWISS II Task Order, with Torres' full knowledge and consent. To date, Sabre has continued performance of each TWISS II Task Order. . . .

Id. ¶¶ 110-11.

By alleging that Sabre submitted its TWISS II Scope of Work to Torres, that Torres used this Scope of Work to submit proposals for TWISS II Task Orders, that Torres did not at any time object to Sabre's TWISS II Scope of Work, and that, once the Government awarded the TWISS II Task Orders to the Team, Sabre began work on the TWISS II Task Orders with Torres' knowledge and consent, Sabre

has adequately alleged the existence of an implied-in-fact contract.

Consequently, Torres' motion to dismiss Counts 1 and 2 is **denied.**

### ii.  Summary Judgment

Torres argues that summary judgment should be awarded on Counts 1 and 2 because the parties never, in fact, agreed to price terms for Sabre's TWISS II invoices. Id. at 18-19; Torres Reply 6.

First, Torres argues that the Notices to Proceed do not constitute an agreement between the parties on pricing because: (1) they were issued by the U.S. Government, and not by Torres; (2) they simply constituted notice that the TWISS II Task Orders had been awarded to Torres; and (3) they do not evidence acceptance by Torres of Sabre's proposed prices. Torres MTD 19. Even if Torres' description of the content of the Notices to Proceed is accurate,[13] there is a genuine issue of material fact as to the precise role the Notices to Proceed played in the parties' course of conduct.[14]

---

[13] Torres has submitted the Notices to Proceed in conjunction with its Motion Dismiss and for Partial Summary Judgment. See Ex. 5(a)-(g) to the Affidavit of Rebekah L. Dyer ("Dyer Affidavit") (May 27, 2011) [Dkt. Nos. 5-14]

[14] For example, in his affidavit, Sabre CEO Sumeet Mehta states that
> Torres issues a notice to Sabre to proceed . . . [which] consists of an email or other notice to Sabre that Torres has received the U.S. Government's notice to proceed, and is providing direction to Sabre  . . . that Sabre must commence work" and that "[t]his is the Torres 'Notice to

(continued...)

Second Torres argues that the absence of TWISS II Subtask Orders establishes that Torres did not accept Sabre's TWISS II pricing proposals. Torres Reply 6-7. Although it is undisputed that Torres did not issue Subtask Orders to Sabre, as required under the Teaming Agreement, there is a genuine issue of material fact as to whether Torres' failure to issue these Subtask Orders put Sabre on notice that Torres did not agree to its proposed pricing. See, generally, Dyer Affidavit; Mehta Affidavit.

For the foregoing reasons, the Court **denies** Torres' motions to dismiss and for summary judgment on Counts 1 and 2.

### 2.   Counts 3-4:  Violations of Management Provisions

In Count 3, Sabre alleges that Torres failed to convene the Management Committee after learning that the Government intended to take adverse action against the Team for delays relating to a TWISS II Task Order. Instead, Sabre alleges, Torres breached the Teaming Agreement by "unilaterally" acting to waive the Team's right to

---

[14](...continued)
Proceed' that is referenced in the Complaint (the "Torres NTP")[.] As a matter of course of conduct between the Members of the Team, the Torres' issuance of the Torres NTP in Torres' capacity as Leading Member of the Team, without communicating any disagreement, objection or dispute as to Sabre's pricing submitted to the Team constituted the Team's binding acceptance of the pricing.

Declaration of Sumeet Mehta in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss and for Partial Summary Judgment, ¶ 9(I) ("Mehta Affidavit") (July 26, 2011) [Dkt. No. 32-2].

dispute the Government's action and accepting the Government's $1.1 million penalty against the Team. Compl. ¶¶ 180-81.

In Count 4, Sabre alleges that Torres breached the "management provisions" of the Teaming Agreement by failing to adequately notify Sabre of Government inquiries into Sabre's request for an equitable adjustment.[15] Id. ¶ 191. Sabre had requested an equitable adjustment from the U.S. Government, in the amount of $400,000, because of costs incurred as a result of a Government stop work order on one of the Team's TWISS II Task Orders. Id. ¶ 190. Sabre also alleges that, after the Government denied Sabre's equitable adjustment request, Torres failed to respond to Sabre's demand that Torres appeal the denial. Id. ¶ 192.

Torres argues that Counts 3 and 4 should be dismissed for failure to state a claim because Sabre has failed to allege proximate cause.[16] Torres MTD 21. To plead proximate cause,

---

[15]   In Count 4 of the Complaint, Sabre alleges that Torres breached the "management provisions" of the Teaming Agreement, but does not specifically allege that Torres should have, but failed, to convene the Management Committee. Compl. ¶¶ 187-94. Nevertheless, Torres treats this Count as alleging that a Management Committee should have been convened. Sabre has not objected to this characterization and has, in fact, adopted it in its Opposition brief. Sabre Opp'n to MTD 27-29. Consequently, the Court shall treat Count 4 as alleging that Torres breached the Teaming Agreement by failing to convene the Management Committee.

[16] Torres also argues that Sabre has failed to state a claim under Count 3 and 4 because there was, in fact, no breach of the Teaming Agreement. Torres MTD 20. That argument addresses the merits of Sabre's claim, and, therefore, cannot be considered on a Rule 12(b)(6) motion.

plaintiff must allege "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 54 (D.D.C. 2009).

With regard to Count 3, Sabre alleges that, but for Torres' failure to convene the Management Committee and its decision to waive an appeal and accept the $1.1 million penalty, Sabre would have used its expertise to negotiate a better arrangement with the U.S. Government. Compl. ¶¶ 178-85. With regard to Count 4, Sabre alleges that but for Torres' failure to communicate the Government's queries about Sabre's equitable adjustment request and to appeal the request's denial, Sabre would have prevailed on its claim. Id. ¶¶ 190-94. In raising these claims, Sabre has adequately alleged the existence of proximate cause.

For the foregoing reason, the Court **denies** Torres' motion to dismiss Counts 3 and 4 for failure to state a claim. Torres has not requested summary judgment on these Counts.

### 3.   Count 6:   Declaratory Relief

In Count 6, Sabre requests a declaration of its rights and obligations under the Teaming Agreement. Torres argues that this request should be dismissed on summary judgment because the Teaming Agreement was terminated on June 20, 2010. Torres MTD 30. According to Torres, this termination stemmed from Sabre's breach of the Teaming Agreement by failing to respond to Torres' questions

regarding Sabre's proposed pricing on a TWISS II TOR. Dyer Affidavit ¶ 9. Sabre disputes Torres' claim that the Teaming Agreement has been terminated and argues that genuine issues of material fact preclude granting summary judgment on this issue. Sabre Opp'n to SMJ 7.

It is clear that there is a material dispute as to whether the Teaming Agreement required production of Torres' requested information. Resolution of that factual dispute is necessary in order to decide whether the Teaming Agreement was terminated on June 20, 2010. See Mehta Affidavit ¶ 8(A).

For the foregoing reasons, Torres' motion for summary judgment on Count 6 must be **denied.** Torres has not requested Rule 12(b)(6) dismissal of this Count.

### 4. Count 8:  Unjust Enrichment

In Count 8, Sabre raises a claim for unjust enrichment. Under D.C. law, a plaintiff states a claim for unjust enrichment when: (1) the plaintiff confers a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. Armenian Assembly of Am., Inc. v. Cafesjian, 597 F. Supp. 2d 128, 134 (D.D.C. 2009)(citing to News World Commc'ns, Inc. v. Thompsen, 878 A.2d 1218 (D.C. 2005)).[17]

---

[17] "A claim of unjust enrichment may survive a motion to dismiss . . . when the validity of the contract is in doubt or
(continued...)

Torres argues that Sabre has failed to state a claim for unjust enrichment because the "Complaint does not allege that <u>Sabre</u> conferred a benefit on Torres in connection with the Camp Shield Task Order, FOB Cruz-Morris [Task Order] or [FOB] Gary Owen [Task Order], much less that Torres retained any such benefit under circumstances making retention unjust." Torres MTD 26 (emphasis in original).

Sabre responds that: (1) Torres has mistakenly limited the scope of Count 8 to the TWISS II TORs for Camp Shield, FOB Cruz-Morris and FOB Gary Owen, when in fact Sabre's claim for unjust enrichment also includes the other TWISS II TORs awarded to the Team; and (2) the Complaint adequately alleges that Sabre conferred a benefit on Torres with respect to the Camp Shield, FOB Cruz-Morris, and FOB Gary Owen Task Orders. Sabre Opp'n to MTD 35.

With regard to scope, Count 8 alleges that

> Sabre is entitled to a full payment of the revenue received by Torres for work withheld from Sabre and procured by Torres to itself in violation of the Teaming Agreement. Such work includes, but is not limited to the positions and equipment that are defined as Sabre's Scope of Work . . . that Torres has filled with its own personnel and provided its own equipment at the following site:
>
> A. Camp Shield
>                    . . . .
> B. FOB Cruise Morris

---

[17](...continued)
uncertain or where an express contract exists that does not govern exclusively the obligations or rights of the parties at issue." <u>Armenian Assembly of Am., Inc.</u>, 597. F. Supp. 2d at 135.

                    C. FOB Gary Owen[18]

Compl. ¶ 211.

     Count 8 also "hereby re-alleges and incorporates by reference

the allegations in Paragraphs 1 through 209 as though fully set out

herein." Id. ¶ 210. Taking all these allegations in the light most

favorable to Sabre, the Court concludes that Count 8 is not limited

to the Camp Shield, FOB Cruz-Morris, and FOB Gary Owen Task Orders.

Rather, Count 8 may reasonably be understood to include Sabre's

allegations about the other military installations for which the

Team was awarded TWISS II TORs. Id. ¶¶ 124-28.

     With regard to the Camp Shield, FOB Cruz-Morris, and FOB Gary

Owen Task Orders, Sabre alleges that Torres was able to obtain the

Task Orders for Camp Shield, FOB Cruz-Morris, and FOB Gary Owen

because Sabre possessed a valid PSC license from the Iraqi Ministry

of the Interior. Compl. ¶ 120. Without this license, Sabre alleges

Torres would have been unable to obtain Task Orders for these

projects. Id. Sabre also alleges that Torres breached the Teaming

Agreement by preventing Sabre from fully participating in these

projects and "by fail[ing] to remit to Sabre any of the payments

for withholding work from Sabre." Id. ¶¶ 212-13. Consequently,

_____

     [18]Torres also argues that the Court should award Torres summary
judgment on all claims based on Torres' failure to offer the FOB
Cruz-Morris and FOB Gary Owen TOR to Sabre because these TORs were
issued after the alleged termination of the Teaming Agreement.
Torres MTD 24. For the reasons discussed, supra, there are genuine
issues of material fact as to the Teaming Agreement's termination
which preclude summary judgment.

Sabre has adequately alleged that it conferred a benefit that was unjustly retained by Torres with respect to the Camp Shield, FOB Cruz-Morris, and FOB Gary Owen Task Orders.

For the foregoing reasons, the Court **denies** Torres' motion to dismiss Count 8. Torres has not requested summary judgment on this Count.

### 5.    Count 9:   Tortious Interference with Prospective Economic Advantage

In Count 9, Sabre alleges that Torres has tortiously interfered with its prospective economic advantage. To make out a claim for tortious interference under D.C. law, plaintiff must show: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach o[r] termination of the relationship or expectancy, and (4) resultant damage." Bennet Enters., Inc v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995). To survive a motion to dismiss, "a plaintiff must allege business expectancies not grounded in present contractual relationships, but which are commercially reasonable to expect." Democratic State Comm. of the District of Columbia v. Bebchick, 706 A.2d 569, 572 (D.C. 1998) (citation and internal quotations omitted).

Torres argues that Sabre has failed to state a claim for tortious interference with prospective economic advantage because: (1) for "task orders issued before the June 20, 2010, termination,

-26-

those expectations of prospective economic advantage were grounded in a then-existing contract – namely the Teaming Agreement;" (2) "to the extent Sabre had an expectation of economic benefit with respect to task orders issued after the June 20, 2010 termination for cause, Sabre's expectations were not commercially reasonable as a matter of law;" and (3) Sabre's allegations do not make "a strong showing of intent on Torres' part to disrupt its reasonable expectations." Torres MTD 27-28.

As reflected in the Complaint, Sabre's claim is based not on the Teaming Agreement, but on its expectation of successfully competing in the future for U.S. Government contracts in the private security field and of working with its current suppliers on those contracts. <u>Carr v. Brown</u>, 395 A.2d 79, 84 (D.C. 1978)(defining "expectancies" as "future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity to obtain customers").

For example, Sabre alleges that Torres made "an internal corporate decision, which Torres concealed from Sabre, to become a direct competitor to Sabre in the Private Security Industry in Iraq and elsewhere." Compl. ¶ 131. By making and implementing this decision, Sabre alleges that Torres interfered with its relationships with its labor and logistical support suppliers and withheld payments to Sabre so that Sabre could not pay these suppliers. <u>Id.</u> ¶¶ 132-33, 135-37. In light of these allegations,

which must be taken as true for purposes of a Motion to Dismiss, Sabre has also adequately alleged that Torres had a "strong intention" to interfere with Sabre's reasonable, expectations for the future. Sheppard v. Dickson, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999) ("Motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case . . . . [C]onduct must be more egregious, for example, it must involve, libel, slander, physical coercion, fraud, misrepresentation, or disparagement.") Consequently, Sabre has stated a claim for tortious interferences with prospective economic advantage.

For the foregoing reasons, the Court **denies** Torres' motion to dismiss Count 9. Torres has not requested summary judgment on this Count.

### 6.   Count 10:   Tortious Interference with Business Relations

In Count 10, Sabre alleges that Torres tortiously interfered with its business relations. The elements of a claim for tortious interference with business relations are identical to those of tortious interference with economic relations. Casco Marina Dev., LLC v. District of Columbia Redev. Land Agency, 834 A.2d 77, 84 (D.C. 2003).

Torres argues that Sabre has failed to state a claim for tortious interference with business relations because it has not

specifically identified the business relations with which Torres allegedly interfered. Torres MTD 28.

In fact, Sabre's Complaint contains specific allegations identifying these business relationships. In relevant part, Sabre alleges that Torres interfered with Sabre's business relationships with Third Country National ("TCN") labor suppliers in Africa that "Sabre had contracted [in order] to be provided [with] qualified TCNs who would become TWISS II guards," as well as with "Camp Shield TWISS II Task Order logistical support services by directly encouraging the Camp Shield logistics support services work forces, as a group, to en masse terminate their contractual relationship with Sabre . . . ." Compl. ¶¶ 133, 137. These allegations sufficiently identify the "third parties with which [Sabre] had a business relationship . . . ." <u>Williams v. Fed. Nat'l Mortg. Ass'n</u>, No. 05-1483, 2006 WL 177452, at *8 (D.D.C. June 26, 2006). Consequently, Sabre has adequately stated a claim for tortious interference with business relations.

For the foregoing reasons, the Court **denies** Torres' motion to dismiss Count 10. Torres has not requested summary judgment on this Count.

## IV.  CONCLUSION

For all the reasons stated herein, Torres' Motion to Dismiss and for Partial Summary Judgment is **granted as to Counts 1 and 11-**

**14 and denied as to all other Counts.** An Order will accompany this Memorandum Opinion.

October 27, 2011
                                   /s/
                                   Gladys Kessler
                                   United States District Judge

**Copies via ECF to all counsel of record**