## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SABRE INTERNATIONAL SECURITY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| TORRES ADVANCED ENTERPRISE ) | |
| SOLUTIONS, INC., ) | **Civil Action 11-806 (GK)** |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

### MEMORANDUM OPINION

Plaintiff, Sabre International Security ("Sabre"), a private Iraqi security company, brings this action against Defendant, Torres Advanced Enterprise Solutions, Inc. ("Torres"), a Virginia limited liability company, for breach of contract, breach of fiduciary and trust obligations, unjust enrichment, and tortious interference with prospective economic advantage and business relations. This matter is presently before the Court on Sabre's Motion to Dismiss Torres' Counterclaims("Sabre's Motion to Dismiss") (December 20, 2011). Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons set forth below, Sabre's Motion is **granted in part and denied in part.**

**I.    Background**

    **A.    Factual Background**

    Sabre is a private security contractor providing security services around the world to various entities, including the U.S. Government. Complaint ("Compl.") ¶ 1. On September 27, 2007, Sabre won one of several U.S. Government Theater-wide Internal Security Services Multiple Task Order Contracts, number W91GDW-07-D-4026 ("TWISS I Contract"), to provide security services to U.S. military installations in Iraq. Id. ¶ 6. On November 8, 2007, in connection with this Contract, Sabre entered into a subcontractor agreement with Torres ("2007 Subcontractor Agreement"). Id. ¶ 7. Pursuant to this Agreement, Torres agreed to provide personnel holding valid U.S. Government security clearances to work on Sabre's TWISS I projects. Id.

    In 2009, the U.S. Government amended its policies for TWISS I contracts by requiring that prime contractors, like Sabre, possess a U.S. Defense Department Industrial Security Program Facility Security Clearance at the Secret Level ("Secret FCL"). Id. ¶ 11. Sabre, as a non-U.S. company, was not eligible for a Secret FCL. Id. Accordingly, to avoid termination of the TWISS I Contract, Sabre and Torres entered into a novation of the TWISS I Contract on December 30, 2009. Id. ¶¶ 12-13. Pursuant to the novation, known as the Asset Purchase Agreement ("APA"), Torres became the prime contractor and Sabre the subcontractor. Id.

According to Sabre, the APA included two additional agreements as annexes (or addendums): (1) "[a] form of subcontract between Torres and Sabre for TWISS I security services that was to take effect upon the U.S. Government's approval of the novation" (the "APA Sabre Services Subcontract"); and (2) "[a] form of equipment lease agreement between Sabre and Torres for lease from Sabre to Torres of all equipment necessary for performance of the TWISS I Task Orders that was to take effect upon the U.S. Government's approval of the novation" (the "APA Sabre Lease Agreement"). Id. ¶ 13.

Sabre alleges that, under these three "agreements," Sabre was entitled to payment of pre-novation rates and that Torres was obligated to "issue priced [] TWISS I Subtask Orders to Sabre promptly after the TWISS I Novation that would give effect to [this] understanding[]." Id. ¶¶ 41-42. On February 5, 2010, the U.S. Government approved the novation. Id. ¶ 3. According to Sabre, after the novation, Torres breached its contractual obligations by failing to pay Sabre's TWISS I invoices at the rates established under the APA and its accompanying annexes, and by failing to put the TWISS I Subtask Orders in place. Id. ¶¶ 228-29.

On August 6, 2009, Sabre and Torres entered into a Teaming Agreement to bid on one of several Government Theater-wide Internal Security Services Multiple Task Order Contracts, number W91DGW-09-D-4030 ("TWISS II Contract"), which would replace existing TWISS I

contracts. Id. ¶¶ 53, 61. To be eligible for a TWISS II Contract, the prime contractor was required to hold a Secret FCL as well as a Private Security Company ("PSC") License from the Iraqi Ministry of the Interior. Id. ¶¶ 58-59. Under the Teaming Agreement, Torres, which held a Secret FCL, was designated as the Leading Member and Sabre, which held a PSC License, but did not hold a Secret FCL License, was designated as a Member. Id. ¶ 61.

The Sabre-Torres team ("Team") then bid for a TWISS II Contract, which they won on August 25, 2009. Id. ¶¶ 62, 86. In accordance with TWISS II Contract procedures, the Team then competed for several TWISS II Task Order Requests ("TWISS II TORs"), which the Government issued for each military base that required security services. Id. ¶¶ 90, 106. The Team competed for these TWISS II TORs by submitting Task Order Proposals ("TWISS II Task Order Proposals") to the U.S. Government, and was ultimately successful in obtaining several TWISS II TORs. Id. ¶¶ 91, 106, 108.

According to Torres, in May 2010, Sabre breached the Teaming Agreement by failing to provide timely substantive responses to Torres' questions for additional information, which Torres needed to prepare a competitive task order proposal for Forward Operating Base ("FOB") Adder.  Torres Answer and Counterclaims ¶¶ 20-25, 46 ("Torres Counterclaims") [Dkt. No. 42].  Torres alleges that, on May 21, 2010, Torres notified Sabre that it was in breach of the Teaming Agreement. Id ¶ 26. According to Torres, Sabre did not

respond to the notice or attempt to cure its breach, and therefore, the Teaming Agreement terminated effective June 20, 2010. Id. ¶ 27. Torres also alleges that Sabre deliberately decided to no-bid certain FOB task order requests. Id. ¶ 48. Torres further alleges that, instead of attempting to resolve the dispute in accordance with the conflict-resolution provisions of the Teaming Agreement, Sabre complained directly to the Defense Contract Management Agency ("DCMA"), causing reputational harm to Torres, which had an adverse impact on Torres' ability to compete for other government contracts. Id. ¶¶ 52-57.

### B. Procedural Background

On April 29, 2011, Sabre filed its Complaint. On May 27, 2011, Torres filed its Motion for Dismissal of the Complaint and for Partial Summary Judgment [Dkt. No. 21]. On July 25, 2011, Sabre filed its Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss the Complaint [Dkt. No. 30]. On July 26, 2011, Sabre filed its Opposition to Defendant's Rule 56 Motion for Partial Summary Judgment [Dkt. No. 32]. On August 19, 2011, Torres filed its Reply in Support of its Motion for Dismissal of the Complaint and for Partial Summary Judgment [Dkt. No. 34]. On October 27, 2011, the Court granted in part and denied in part Torres' Motion for Dismissal of the Complaint and for Partial Summary Judgment [Dkt. No. 39].

On November 15, 2011, Torres filed its Answer and Counterclaims [Dkt. No. 42]. On December 20, 2011, Sabre filed its Motion to Dismiss Sabre's Counterclaims [Dkt. No. 45]. On January 9, 2012, Torres filed its Opposition to Sabre's Motion to Dismiss its Counterclaims ("Torres' Opposition") [Dkt. No. 48]. On January 27, 2012, Sabre filed its Reply in Support of its Motion to Dismiss Torres' Counterclaims ("Sabre's Reply") [Dkt. No. 51].

## II. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal quotations omitted) (citing Twombly, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the pleaded factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1940 (citing Twombly, 550 U.S. at 556). In deciding a Rule 12(b)(6) motion, the court may consider any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record. EEOC v. St.

<u>Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Twombly</u>, 550 U.S. at 563. Under the standard set forth in <u>Twombly</u>, a "court deciding a motion to dismiss must . . . assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." <u>Aktieselskabet</u>, 525 F.3d at 17 (citations and internal quotations omitted). <u>See also</u> <u>Tooley v. Napolitano</u>, 586 F.3d 1006, 1007 (D.C. Cir. 2009) (declining to reject or address the government's argument that <u>Iqbal</u> invalidated <u>Aktieselskabet</u>).

## III. Analysis

### A. The Plain Language of the Teaming Agreement Does Not Support Dismissal of Torres' Counterclaims

Sabre argues that Torres' counterclaims for breach of contract and tortious interference fail as a matter of law because Torres has not exhausted mandatory alternative dispute resolution ("ADR") as provided in Section 7 of the Teaming Agreement.[1]  Sabre contends that the plain language of "Section 7.0 is so broad and inclusive as to clearly and unambiguously establish satisfaction of the requirements of Section 7.0 as a condition precedent to any party

---

[1] Sabre notes, and Torres concedes, that Torres did not plead factual allegations in its Answer and Counterclaims that Torres engaged in ADR pursuant to Section 7.

to the Teaming Agreement commencing formal litigation as to 'any dispute or disagreement between the Members (Torres and Sabre) concerning, arising out of or related to the [Teaming] Agreement.'" Sabre's Motion to Dismiss at 20-21 (quoting Teaming Agreement § 7.1 [Dkt. No. 22-2]). Sabre concludes that because Torres has not complied with Section 7's ADR requirement, it is barred from proceeding on its counterclaims in this Court.

Torres disputes Sabre's construction of Section 7 and argues that the plain language of the "unambiguous provision establishes that the requirement for informal dispute resolution is a condition precedent prior to the initiation of formal litigation." Torres Opposition at 7. Torres further argues that, "[e]ven if the meaning of Section 7 were not clear [] any ambiguity that Section 7 could be said to have would preclude dismissal under Rule 12(b)(6)" because under District of Columbia law, "Torres is entitled to a reasonable inference that Section 7 does not, and was not intended to, apply with respect to compulsory counterclaims asserted after one party has already turned to the courts for relief." Id. at 8.

In interpreting contractual terms, the Court must adhere to the objective law of contracts, "whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite undertaking, or

unless there is fraud, duress or mutual mistake." *Marra v. Papandreou*, 59 F. Supp. 2d 65, 76 (D.D.C.1 999), aff'd 216 F.3d 1119 (D.C. Cir. 2000); *see also Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C. 2002). Whether a contract is ambiguous is a question of law to be determined by the court. *Dist. No. 1-Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 274 (D.C. 2001); *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).

A contract is not ambiguous merely because the parties dispute its meaning or could have drafted clearer terms. *Dist. No. 1-Pac. Coast Dist.*, 782 A.2d at 274. Rather, a contract is ambiguous when it or its provisions are reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings. *Holland*, 456 A.2d at 815. Conversely, a contract is unambiguous when a court can ascertain the contract's meaning by merely looking at the contract. *Id.* If the language is unambiguous, "the court may interpret it as a matter of law." *America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1520 (D.C. Cir. 1991).

The Court concludes that the Teaming Agreement is unambiguous and that the plain language of Section 7 does not support dismissal of Torres' counterclaims. Section 7.1 of the Teaming Agreement states that, "[i]n the event of there being any dispute or disagreement between the Members to this Agreement concerning, arising out of or related to Agreement [] [it] shall be first

referred to non-binding alternative dispute resolution in the
manner set out in Subsections 7.1(A) and 7.2. . . ." Teaming
Agreement § 7.1 (emphasis added). Section 7.1 expressly provides
that Sections 7.1(A) and 7.2 will set out the specific manner in
which ADR is to be conducted. Section 7.2 goes on to unambiguously
state that "[p]rior to the initiation of formal litigation
procedures . . . the parties shall first attempt . . . to resolve
their dispute informally. . . ." Teaming Agreement § 7.2 (emphasis
added).

Section 7 of the Teaming Agreement clearly requires the
parties to pursue ADR only if formal litigation procedures have not
yet commenced, i.e., "prior to the initiation of formal litigation
procedures."[2] Obviously, the matter presently before the Court is
a "litigation procedure[]" within the meaning of Section 7 of the
Teaming Agreement. There is also no question that Torres'
counterclaims arise out of the same operative set of facts at issue
in Sabre's TWISS II claims against Torres, and that both Sabre's
claims and Torres' counterclaims implicate the Teaming Agreement.
Accordingly, Torres' counterclaims are not subject to Section 7's

---

[2] From a common-sense standpoint, the purpose of a pre-
litigation ADR clause would not be served by requiring the
defendant to pursue informal resolution of his counterclaims before
asserting those counterclaims in ongoing litigation. Generally, the
purpose of an ADR clause is to promote efficient resolution of
disputes by, if possible, avoiding the considerable costs of
litigation. Sabre's construction of the Teaming Agreement would
increase the cost of resolving this dispute by requiring piecemeal
litigation; a result that runs contrary to the purpose of ADR.

requirement for informal dispute resolution. Therefore, Sabre's Motion to Dismiss as to Torres' Counterclaim for Breach of Contract is **denied**.

### B. Torres Fails to State a Claim for Tortious Interference

Sabre argues that Torres' counterclaim for tortious interference with existing or prospective business relations is "fatally defective because the counterclaim[] fails to allege facts that, if proven, would establish Sabre['s] intentional interference with any such purported relationships." Sabre's Motion to Dismiss at 23. More specifically, Sabre contends that Torres' tortious interference claim is predicated entirely upon two alleged breaches of the Teaming Agreement by Sabre and that "the only inference that can be drawn from such factual allegations is that Torres is alleging that Sabre intended to breach the Teaming Agreement." Id.[3]

In response to Sabre's argument that Torres has not alleged facts that would support an inference that Sabre intentionally interfered with Torres' existing and prospective business relations, Torres contends that "Sabre ignores a fundamental premise for this Court's analysis under Rule 12(b)(6): the Court must assume that all allegations in the counterclaim are true, even

---

[3] Sabre also argues that Torres' counterclaim for tortious interference fails as a matter of law for other, independent reasons. Given the Court's conclusion, _infra_, that Torres' counterclaim for tortious interference fails as a matter of law because Torres failed to properly allege tortious intent, it is not necessary to address the merits of Sabre's additional arguments.

if doubtful in fact, and draw all reasonable inferences in favor of the non-moving party." Torres Opposition at 13. Torres argues that its allegations, taken as true, support an inference that Sabre acted improperly to interfere with Torres' existing and prospective business relationships.

To establish a claim for tortious interference with existing or prospective business relations under District of Columbia law, the alleging party must plead (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the alleged interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage. Bennett Enters., Inc. V. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995).

Sabre is correct that Torres' counterclaim for tortious interference is fatally defective. A thorough review of Torres' Answer and Counterclaims reveals no allegations sufficient to establish a legally-cognizable claim for tortious interference. Torres does adequately allege that it had a valid business relationship or expectancy with the Government, that Sabre had actual knowledge of Torres' relationship or expectancy, and that Sabre's complaints to the Government about Torres resulted in

damage to Torres.[4] However, Torres' allegations with respect to Sabre's intent cannot withstand Sabre's motion to dismiss. Torres alleges that "Sabre violated the Teaming Agreement when it complained to the Government about Torres" and that "Sabre intentionally breached the Teaming Agreement's provisions concerning conflict resolution and alternative dispute resolution." Id. ¶¶ 55, 57.

As a case relied upon by both Sabre and Torres demonstrates, in order to survive a motion to dismiss, a claimant must allege far more than a "general intent to interfere or knowledge that the conduct will injure [its] business dealings." Sheppard v. Dickson, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999). "'Motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case. . . .[C]onduct must be more egregious, for example, it must involve libel, slander physical coercion, fraud, misrepresentation, or disparagement.'" Id. (quoting Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 423 (D.D.C. 1998)).

_____

[4] Torres alleges that it had "several business relationships with different Government agencies and is constantly preparing new proposals for submission on various Government contract opportunities." Torres Counterclaim ¶ 53. Torres also alleges that Sabre had actual knowledge of Torres' existing and prospective business relationships with the Government and that Sabre had actual knowledge that Torres' reputation and past performance history are important for retaining existing contracts and competing for future contracts. Id ¶ 54. Torres further alleges that as a direct result of Sabre's conduct, Torres suffered damages. Id ¶ 57.

Even viewing Torres' allegations as true, they cannot be read to reasonably infer intent on the part of Sabre to tortiously interfere with Torres' business relationships or expectancies. Torres' Answer and Counterclaims is silent as to Sabre's intent to interfere with Torres' business relations, and does not cite any statements that constitute slander, libel, misrepresentations or disparagement. Torres alleges only that "Sabre complained to the Government about Torres" and intentionally breached the Teaming Agreement's ADR provision by alerting the Government to the parties' payment dispute. Torres Counterclaim ¶¶ 55, 57. Sabre is correct that, at most, Torres alleges that Sabre intended to breach the Teaming Agreement, which is insufficient for purposes of stating a claim for tortious interference.  Therefore, Sabre's Motion to Dismiss Torres' Counterclaim for Tortious Interference is **granted.**

## IV.   CONCLUSION

For all the reasons stated herein, Sabre's Motion to Dismiss Torres' Counterclaims is **granted in part and denied in part**. An Order will accompany this Memorandum Opinion.


April 30, 2012

/s/
Gladys Kessler
United States District Judge


**Copies via ECF to all counsel of record**

-14-