|  |  |
|---|---|
| **SABRE INTERNATIONAL SECURITY,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Civil Action No. 11-806 (GK)** |
| : | |
| **TORRES ADVANCED ENTERPRISE** : | |
| **SOLUTIONS, LLC, et al.,** : | |
| : | |
| **Defendants.** : | |
| : | |

**MEMORANDUM OPINION**

Sabre International Security ("Sabre") has sued its former business partner, Torres Advanced Enterprise Solutions, LLC ("Torres") and Torres officers, Jerry Torres, Scott Torres, Rebekah Dyer, and Kathryn Jones (collectively, the "Individual Defendants"), for breach of contract, tortious interference with prospective economic advantage, fraud, and conversion of property.

This matter is before the Court on the Individual Defendants' Motions to Dismiss for Lack of Personal Jurisdiction [Dkt. Nos. 260 & 276]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 273 & 284] and Replies [Dkt. Nos. 275 & 292], and the entire record herein, and for the reasons set forth below, the Motions shall be **denied.**

## I.   BACKGROUND

### A.   Factual Overview[1]

Sabre is an Iraqi limited liability company with its principal place of business in Baghdad, Iraq.    Torres is an American limited liability company organized under the laws of Virginia with its principal place of business in Arlington, Virginia.    Both companies are private security contractors providing security services around the world to various entities, including the United States Government.

From 2007 until 2010, Sabre and Torres partnered to perform security services at United States military installations in Iraq pursuant to two Theater-Wide Internal Security Services ("TWISS") Multiple Award Task Order Contracts with the United States Government.[2]   This relationship was governed by a Teaming

---

[1]   The factual allegations are taken from the First Amended Complaint ("FAC") [Dkt. No. 242] and the facts alleged in the parties' briefs and accompanying exhibits.

[2]   Under the TWISS framework, the Government initially issued a competitive "Request for Proposals" which resulted in the award of Multiple Award Task Order Contracts ("MATOCs") to a number of contractors for a fixed period of performance.    See FAC ¶ 57. The Government did not, however, "procure any specific work in [a] TWISS [] MATOC itself."   Id. ¶ 94.   Instead, a TWISS MATOC simply required the Government to issue to each of the TWISS MATOC awardees ("TWISS Contractors") TWISS Task Order Proposal Requests ("TOPRs") for each military installation in Iraq for which it required TWISS services.    Id. ¶ 95.   Each TWISS Contractor was then permitted but not required to compete for a

Agreement, which designated Torres as the "prime contractor" and Sabre as the "subcontractor" vis a vis the United States Government. According to Sabre, the Teaming Agreement required, inter alia, that: (1) Sabre and Torres compete exclusively as a team for any TWISS proposal submitted to the Government; (2) both parties approve any such proposal prior to its submission; and (3) Torres, as prime contractor, offer Sabre any work awarded that fell within a defined "Scope of Work."

Sabre contends that, in the spring of 2010, the Individual Defendants made a secret internal decision to terminate the Teaming Agreement and enter into direct competition with Sabre. Pursuant to this decision, the Individual Defendants allegedly caused Torres to breach the Teaming Agreement by, among other things, (1) secretly reducing Sabre's prices in proposals submitted to the Government; (2) refusing to pay Sabre in accordance with previously agreed-upon pricing schemes; (3) bidding on new Task Orders without Sabre's consent or knowledge; and (4) usurping work that fell within Sabre's "Scope of Work." It is further alleged that each of the Individual Defendants fraudulently concealed these activities from Sabre.

---

TWISS Task Order by submitting a Task Order proposal in response to the TOPR. Id. ¶¶ 96-97.

### B. Procedural Background

On April 29, 2011, Sabre filed its original Complaint naming Torres as the sole defendant [Dkt. No. 1]. On July 5, 2013, Sabre moved to amend its Complaint to add a claim of fraud against the Individual Defendants, as well as seven new tort claims against Torres [Dkt. No. 197]. On October 3, 2013, the Court granted Sabre's Motion [Dkt. No. 240], and on October 10, 2013, Sabre filed its FAC [Dkt. No. 242].[3]

On December 2, 2013, specially appearing Defendant Jerry Torres filed his Motion to Dismiss the FAC for Lack of Personal Jurisdiction ("J. Torres Mot.") [Dkt. No. 260]. On December 30, 2013, Sabre filed its Opposition ("Opp'n to J. Torres Mot.") [Dkt. No. 273]. On January 9, 2014, Jerry Torres filed his Reply ("J. Torres Reply") [Dkt. No. 275].

On January 10, 2014, specially appearing Defendants Scott Torres, Dyer, and Jones filed their Motion to Dismiss the FAC for Lack of Personal Jurisdiction ("Jt. Mot.") [Dkt. No. 276]. On January 27, 2014, Sabre filed its Opposition ("Opp'n to Jt. Mot.") [Dkt. No.284]. On February 6, 2014, Scott Torres, Dyer, and Jones filed their Reply ("Jt. Reply") [Dkt. No. 292].

---

[3] On January 30, 2014, the Court granted Torres' Motion to Dismiss Counts 15-17 and 20-22 of the FAC, but denied its Motion to Dismiss Count 18 of the FAC. [Dkt. Nos. 287 & 288].

## II.  LEGAL STANDARDS

### A.  Standard of Review Under Rule 12(b)(2)

"To prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing of pertinent jurisdictional facts." United States v. Philip Morris Inc., 116 F. Supp. 2d 116, 121 (D.D.C. 2000) (citing Edmond v. U.S. Postal Serv. Gen. Counsel, 949 F.2d 415, 424 (D.C. Cir. 1991)).  The "[p]laintiff must allege specific facts on which personal jurisdiction can be based" and "cannot rely on conclusory allegations." Moore v. Motz, 437 F. Supp. 2d 88, 91 (D.D.C. 2006) (internal citations omitted).  Nor may the plaintiff aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant. See Rush v. Savchuk, 444 U.S. 320, 332 (1980) (rejecting aggregation of co-defendants' forum contacts because "the [jurisdictional requirements] must be met as to each defendant").

When considering personal jurisdiction, the Court is not limited to the allegations in the complaint, but "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." Philip Morris, 116 F. Supp. 2d at 120 n.4 (citations omitted); see also Novak-Canzeri v. Al Saud, 864 F. Supp. 203, 206 (D.D.C. 1994) ("[T]he Court

must accept Plaintiff's claims as true in ruling on a 12(b)(2) motion, unless they are directly contradicted by an affidavit[.]"). However, any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990).

### B. Standard Governing Personal Jurisdiction

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." Daimler AG v. Bauman, 134 S. Ct. 746, 753 (2014). "To establish personal jurisdiction over a non-resident, a court must engage in a two-part inquiry: [It] must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000) (citation omitted). "[A] State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant [only] if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice[.]'" Daimler, 134 S. Ct. at 754 (citing International Shoe Co. v. Washington, 326 U.S. 310 (1945)).

There are two variants of personal jurisdiction: general and specific. General jurisdiction is "'all purpose' adjudicatory authority to entertain a suit against a defendant without regard to the claim's relationship vel non to the defendant's forum-linked activity[.]" Kopff v. Battaglia, 425 F. Supp. 2d 76, 81 (D.D.C. 2006) (citing Steinberg v. Int'l Criminal Police Org., 672 F.2d 927, 928 (D.C. Cir. 1981)). The exercise of general jurisdiction is consistent with due process only if the defendant's "'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.'" Daimler, 134 S. Ct. at 761 (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)).

Specific jurisdiction is the power to "entertain controversies based on acts of a defendant that touch and concern the forum." Kopff, 425 F. Supp. 2d at 81. Courts in the District of Columbia "may exercise specific jurisdiction over a defendant if the plaintiff demonstrates that (1) the District of Columbia's long arm statute, D.C. Code § 13-423, authorizes jurisdiction, and (2) the exercise of jurisdiction comports with the federal requirement of constitutional due process." Nat'l Cmty. Reinv. Coal. v. NovaStar Fin., Inc., 631 F. Supp. 2d 1, 4 (D.D.C. 2009) (citation omitted). Due process

-7-

is satisfied if the defendant has "purposefully direct[ed] his [or her] activities toward forum residents . . . such that he [or she] should reasonably anticipate being haled into court there" or has "'purposefully avail[ed]" himself or herself "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 475 (1985) (citations omitted).

## III. Jurisdictional Facts

### A. Defendant Jerry Torres

Defendant Jerry Torres is Torres' Chief Executive Officer and sole shareholder. Opp'n to J. Torres Mot. at 1-2. He is a resident of the State of Florida, where he has lived for the past ten years. Decl. of Jerry Torres ("J. Torres Decl.") ¶ 2 [Dkt. No. 260]. He does not maintain an office in the District of Columbia. Id. ¶ 4. Other than for depositions taken in this case, he has not visited the District of Columbia in approximately four years. Id. ¶ 5.

Jerry Torres did not sign the Teaming Agreement on Torres' behalf. [Supplemental] Decl. of Jerry Torres ("J. Torres Supp. Decl.") ¶ 3.[4] Sabre alleges, however, that he "reviewed,

---

[4] The Teaming Agreement was signed on Torres' behalf by John R. Smith, Torres' Director of Operations. See Teaming Agreement

approved, signed and submitted" a TWISS proposal to the Government that included the Teaming Agreement. Opp'n to J. Torres Mot. at 1. Sabre further alleges that he had "extensive and direct" involvement in and influence over multiple aspects of Torres' performance under the Teaming Agreement. Id. at 9. For example, Jerry Torres allegedly directed Torres' former Chief Financial Officer Kathryn Jones and former Vice President Rebekah Dyer to reduce Sabre's prices in the team's TWISS proposals and supervised the submission of these proposals to the Government. See, e.g., FAC ¶¶ 99, 271, 273, 292. He also is alleged to have overseen the implementation of unauthorized reductions from Sabre's invoices and to have tightly controlled Torres' communications with Sabre personnel regarding such reductions. Id. ¶¶ 271, 304, 315. There is no indication, however, and Jerry Torres expressly denies, that any of his TWISS-related activities took place in the District of Columbia. J. Torres Decl. ¶ 6.

## B. Defendant Scott Torres

Scott Torres is Jerry Torres' brother. During the time period at issue, he served as a project manager, project coordinator, and program and security contracts manager for the

[Dkt. No. 22-2]. Smith is not named as a defendant in this case.

TWISS program. Decl. of Scott Torres ("S. Torres Decl.") ¶¶ 5 [Dkt. No. 276-2].

Scott Torres lives in the State of Kansas, where he has been a resident for more than 29 years. Id. ¶ 2. He has never worked or lived in the District of Columbia, and has "not personally transacted any business or committed any acts in the District of Columbia that would give rise to the allegations" in the FAC. Id. ¶¶ 8, 10. The last time he visited the District of Columbia was more than three years ago, for leisure purposes. Id. ¶ 9.

Scott Torres is not an owner, member or manager of Torres under its corporate documents and does not have authority to direct or control its corporate policies, procedures, or operations. Id. ¶¶ 6-7. In his capacity as a project manager, project coordinator, and program and security contracts manager for the TWISS program, he "recruited personnel, built pricing models and calculated manning requirements." Id. ¶ 9.

C.  **Defendant Kathryn Jones**

Kathryn Jones ("Jones") was Torres' Chief Financial Officer ("CFO") from January 2009, through January 2011, during which time she worked out of Torres' headquarters in Arlington, Virginia. Decl. of Kathryn Jones ("Jones Decl.") ¶ 6 [Dkt. No.

276-3]. She has been a resident of the Commonwealth of Virginia for more than fifteen years. Id. ¶ 2.

The parties disagree as to whether Jones had "authority to direct or control the creation of [Torres'] corporate policies, procedures or operations" in her capacity as CFO. Jones declares that she did not. Id. ¶ 8. Sabre claims she did. Opp'n to Jt. Mot. at 15. More specifically, Sabre contends that Jones "was one of only a few Torres personnel who Jerry Torres claimed had the authority to bind [Torres] by signing official documents." Id. Sabre further alleges that Jones had "extensive and direct" participation in the price reductions at the heart of this case as well as efforts to conceal such reductions from Sabre. Id. at 15-18. Sabre does not contend, however, that Jones performed these activities in the District of Columbia, and Jones has attested that she did "not personally transact[] any business or commit[] any acts in the District of Columbia that would give rise to the allegations" in the FAC. Jones Decl. ¶ 11.

Jones has never lived in the District of Columbia, although she visits occasionally for leisure purposes. Id. ¶¶ 9-10. From February 1, 2011, through November 18, 2013, she was employed in the District of Columbia as Vice President of Finance and Administration for TSymmetry, Inc. Id. ¶ 4. On

-11-

November 18, 2013, her employment for TSymmetry was terminated and, since then, she has been unemployed. Id. ¶¶ 4-5.

## D. Defendant Rebekah Dyer

Rebekah Dyer was employed by Torres from 2008 through 2013, most recently in the positions of Vice President and Chief Operating Officer ("COO"). Decl. of Rebekah Dyer ("Dyer Decl.") ¶¶ 6-7. She has resided in the Commonwealth of Virginia for the last fourteen years and, while employed by Torres, worked out of its headquarter offices in Virginia. Id. ¶¶ 2, 6.

The parties again disagree as to whether Dyer had the authority to direct or control Torres' corporate policies, procedures or operations. Dyer claims she did not, id. ¶ 9; Sabre claims she did. Opp'n to Jt. Mot. at 9-11. In particular, Sabre contends that Dyer collaborated with Jerry Torres in making key decisions; could bind Torres by signing official Government documents; and had "extensive and direct" involvement in the TWISS price reductions at issue as well as efforts to conceal them from Sabre. Id. at 9-13. There is no indication, however, that Dyer performed any of these activities in the District of Columbia. See Dyer Decl. ¶ 12.

Dyer is currently self-employed in Virginia and obtaining her Ph.D. from Georgetown University. Id. ¶ 5. She visits the District of Columbia approximately one time per week for school-

-12-

related reasons and also occasionally for leisure purposes.  Id.
¶¶ 5, 11.

**IV.  ANALYSIS**

Sabre's primary argument in support of jurisdiction over
the Individual Defendants is that the forum selection clause in
the Teaming Agreement, and Torres' other forum contacts, may be
"attributed" to them for purposes of assessing their minimum
contacts because they held high level positions within Torres'
corporate hierarchy and were closely involved in the events
giving rise to this lawsuit.  Sabre further claims that Jones is
subject to general jurisdiction based on her employment for
TSymmetry, Inc. in the District of Columbia.

### A.  The Court Does Not Have General Jurisdiction over Jones

Under District of Columbia law, courts can exercise general
personal jurisdiction over a "person domiciled in, organized
under the laws of, or maintaining his [or her] or its principal
place of business in, the District of Columbia[.]"  D.C. Code §
13-422.  Sabre contends that Jones' approximately three-year
employment with TSymmetry. Inc. in the District of Columbia
satisfies the "principal place of business" clause of Section
13-422 and thus gives rise to general jurisdiction over Jones.
Opp'n to Jt. Mot. at 5-7.  Jones counters that mere employment

-13-

in a subordinate capacity for another does not satisfy the "principal place of business" clause of Section 13-422 and thus cannot support general jurisdiction. Jt. Reply at 2-6.

The Court need not resolve whether employment satisfies Section 13-422 because there is a more basic defect to Sabre's theory. Sabre's case for general jurisdiction is based on the fact that Jones was employed for TSymmetry, Inc. at the time "the Complaint and First Amended Complaint were filed." Opp'n to Jt. Mot. at 5 (emphasis added). It is "uniformly held," however, that "jurisdiction is to be determined by examining the conduct of the defendants as of the time of service of the complaint." Brandir Int'l, Inc. v. Cascade Pac. Lumber Co., No. 84-1411, 1988 WL 78382, at *1 (S.D.N.Y. July 18, 1988) (emphasis added) (citations omitted); see, e.g., Wego Chem. & Mineral Corp. v. Magnablend Inc., 945 F. Supp. 2d 377, 386 (E.D.N.Y. 2013) ("[I]t is well-settled that . . . the Court looks to whether it could assert personal jurisdiction over the defendant at the time jurisdiction is sought to be asserted.") (citation omitted); Clark v. Meijer, Inc., 376 F. Supp. 2d 1077, 1085 (D.N.M. 2004) (same).

Jones' employment for TSymmetry, Inc. was terminated on November 18, 2013, due to a loss of business. Jones Decl. ¶ 5. Sabre did not send her waiver of service form until two days

-14-

later on November 20, 2013. See Waiver of the Service of Summons for Kathryn Jones [Dkt. No. 255]. Thus, Jones was not employed in the District of Columbia at the time Sabre sought to assert the Court's jurisdiction over her by serving her with the FAC. As Jones' District-based employment is the only basis on which Sabre argues that general jurisdiction is proper, and that employment had ceased when Sabre sought to invoke the Court's jurisdiction, the Court does not have general jurisdiction over Jones.

## B. The Court Does Not Have Jurisdiction over the Individual Defendants Under a "Minimum Contacts" Analysis

As to the remaining Individual Defendants, and as an alternative basis for jurisdiction over Jones, Sabre argues that jurisdiction is proper based on Torres' contacts with the District of Columbia, which Sabre seeks to impute to the Individual Defendants for purposes of the Court's minimum contacts analysis. Opp'n to J. Torres Mot. at 7-20; Opp'n to Jt. Mot. at 8-25.

The Supreme Court has held that an individual defendant's "contacts with [a forum] are not to be judged according to their employer's activities there." Calder v. Jones, 465 U.S. 783, 790 (1984); see also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984) ("Jurisdiction over an employee does not

-15-

automatically follow from jurisdiction over the corporation which employs him [or her.]") (citations omitted). While conceding this general principle, Sabre points to a handful of decisions in this District holding that the rule does not apply where an individual is "more than an employee" of a company and that it is proper, under certain circumstances, to exercise jurisdiction over high-level employees based on the forum contacts of their employers. See, e.g., Nat'l Cmty. Reinv. Coal., 631 F. Supp. 2d at 8 (holding that company contacts could be imputed to their founder and president because s/he exerted "significant influence" over their "policies, procedures, and operations"). Sabre invokes this doctrine as a basis to impute Torres' jurisdictional contacts to the Individual Defendants.

As previously mentioned, Torres is a Virginia limited liability company with its principal place of business in Virginia. Sabre has identified only three forum contacts of Torres, none of which, as discussed below, support jurisdiction over the Individual Defendants under a minimum contacts analysis.[5]

---

[5] Because the Court concludes that Torres' jurisdictional contacts are insufficient to satisfy the minimum contacts requirement in any event, it need not fully consider the applicability of the "more than an employee doctrine," which has its genesis in a single unreported Superior Court decision, Covington and Burling v. Int'l Marketing & Research, Inc., No.

### 1. **Torres' Work for the Farm Services Agency**

First, Sabre contends that in 2009, seven Torres employees worked in the District of Columbia. Opp'n to J. Torres Mot. at 7. Jerry Torres has clarified in a sworn declaration that these seven employees "worked in the United States Department of Agriculture South Building . . . under [an unrelated] contract with the Farm Services Agency ['FSA']" which provided that performance could occur "in up to 150 FSA county offices nationwide; FSA Headquarters in Washington D.C. and the location where [contracting officer's technical representative] resides." See J. Torres Supp. Decl. ¶ 2 & Ex. 2 at 2.

The District of Columbia-based work of the seven Torres employees was unrelated to the TWISS program and is, therefore, irrelevant to specific jurisdiction. Furthermore, a limited, contract-based arrangement for Torres employees to perform work at United States Government facilities nationwide, including in the District of Columbia, does not render Torres "at home" in the District of Columbia and is also insufficient to support general jurisdiction. Daimler, 134 S. Ct. at 761; see, e.g., Saudi v. Marine Atlantic, Ltd., 306 F. App'x 653, 655 (D.C. Cir.

01-4360, 2003 WL 21384825, at *6 (D.C. Super. Ct. Apr. 17, 2003), and has not been endorsed by either the Court of Appeals for the District of Columbia or our Court of Appeals for the D.C. Circuit.

2009) (company that had no office, bank account, property, or employees "permanently stationed" in forum could not be subject to general jurisdiction despite small amount of time employees spent there).

In sum, even if Torres' contract work for the FSA was "attributed" to the Individual Defendants for purposes of the minimum contacts analysis, it would not support either general or specific jurisdiction over them.

### 2. Torres' Retention of a District of Columbia Firm

Second, Sabre relies on the fact that Torres contracted with a law firm located in the District of Columbia to provide representation related to the TWISS program and that it did so "independent of and before this suit was filed." Opp'n to Jt. Mot. at 8; see also Opp'n to J. Torres Mot. at 7. Sabre has not, however, made any argument related to the nature of this contractual relationship or why it should give rise to personal jurisdiction over Torres under the District of Columbia's long arm statute and the Due Process Clause. As our Court of Appeals recently held, a nonresident's "mere retention of attorneys in the District of Columbia is insufficient" to establish jurisdiction, even where such retention relates to the subject matter of the case. Thompson Hine, LLP v. Taieb, 734 F.3d 1187, 1194 (D.C. Cir. 2013) (citations omitted). Consequently, even

-18-

if Torres' retention of a District of Columbia law firm to perform work related to this case was "attributed" to the Individual Defendants for purposes of the minimum contacts analysis, it too is insufficient to support general or specific jurisdiction over them.

## 3. The Forum Selection Clause

The third and final jurisdictional "contact" of Torres that Sabre seeks to impute to the Individual Defendants for purposes of the Court's minimum contacts analysis is the forum selection clause in the Teaming Agreement, which provides that:

Should any dispute arise under, relating to or concerning this Agreement, each party shall submit to the jurisdiction and venue of any court of competent jurisdiction located in the District of Columbia, United States of America, and shall not object to the exercise of jurisdiction and venue by any such court.

Teaming Agreement § 3.2 [Dkt. No. 22-2]. See Opp'n to J. Torres Mot. at 7; Opp'n to Jt. Mot. at 8.

Sabre has not cited any provision of the District of Columbia's long arm statute that authorizes jurisdiction over an individual employee or officer based on a forum selection clause executed by its employer. Nor has it cited a single case treating a forum selection clause as a jurisdictional contact for purposes of a minimum contacts analysis, much less one

-19-

attributing such a contact to a defendant under the "more than an employee" exception.

The reason for the apparent absence of any case law to support Sabre's theory is that a forum-selection clause is not typically treated as a forum "contact" but rather is "a distinct contract . . . between the parties to settle disputes in a particular forum[.]" Marra v. Papandreou, 216 F.3d 1119, 1123 (D.C. Cir. 2000) (emphasis added). As such, a forum selection clause is generally considered to be a consent to the exercise of personal jurisdiction in a particular forum and is governed by contract principles rather than the minimum contacts framework. See Holland Am. Line Inc. v. Wartsila N. Am., Inc., 485 F.3d 450, 458 (9th Cir. 2007) ("Under general contract principles, a forum selection clause may give rise to waiver of objections to personal jurisdiction[.]") (emphasis added); Hadley v. Shaffer, No. 99-144, 2003 WL 21960406, at *3 (D. Del. Aug. 12, 2003) (valid forum selection clause renders "an analysis of minimum contacts . . . unnecessary") (citations omitted). Consequently, the Court shall not consider the forum selection clause in its assessment of minimum contacts but shall consider it separately in determining whether the Individual Defendants have consented to the Court's exercise of jurisdiction.

In sum, even if the Court was to attribute Torres' jurisdictional contacts to the Individual Defendants under the so-called "more than an employee" doctrine, those contacts would still be insufficient to subject them to general or specific jurisdiction. Therefore, Sabre has not demonstrated that the Individual Defendants are subject to either general or specific jurisdiction under the "minimum contacts" framework.

## C. The Individual Defendants Are Deemed to Have Consented to Jurisdiction Under the Forum Selection Clause

Although there is no authority for attributing a forum selection clause to a nonparty for purposes of a minimum contacts analysis, there is ample authority for binding the Individual Defendants to the forum selection clause as a matter of contract law.

As a threshold matter, forum selection clauses are presumptively enforceable. Marra, 216 F.3d at 1124. The Individual Defendants do not argue that the clause is either unenforceable or inapplicable to this case. Instead, they rely solely on the fact that they were not parties to the Teaming Agreement and contend that "[t]here is no precedent for binding a non-signatory and non-party to a forum selection clause for purposes of establishing personal jurisdiction." J. Torres Reply at 8; see also Jt. Reply at 7.

Contrary to this assertion, the Second, Seventh, Ninth, and Eleventh Circuits have all agreed that, "where the alleged conduct of the nonparties is closely related to the contractual relationship, 'a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.'" Holland Am. Line Inc., 485 F.3d at 456 (citations omitted); accord Lipcon v. Underwriters at Lloyd's London, 148 F.3d 1285, 1299 (11th Cir. 1998). These courts have reasoned that "[w]ere it not for judicial willingness in appropriate circumstances to enforce forum selection clauses against [non-parties], such clauses often could easily be evaded." Adams v. Raintree Vacation Exch., LLC, 702 F.3d 436, 441 (7th Cir. 2012), cert. denied, 133 S. Ct. 2862 (2013); see also Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 722 (2d Cir. 2013) (noting that "[a] literal approach to interpreting forum selection clauses" could "undermine the contribution that  clauses have been praised for making to certainty in commercial transactions") (citations and quotation marks omitted).

In their Joint Reply, Scott Torres, Dyer, and Jones attempt to distinguish this case law by arguing that it only applies to third-party beneficiaries of a contract. Jt. Reply at 9. This too is incorrect. See, e.g., Hugel v. Corp. of Lloyd's, 999

F.2d 206, 209 n.7 (7th Cir. 1993) ("While it may be true that third-party beneficiaries of a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, . . . a third party beneficiary status is not required.") (citation omitted); Leviton Manufacturing Co. v. Reeve, 942 F. Supp. 2d 244, 258 (E.D.N.Y. 2013) ("The 'closely related' test is necessarily satisfied where the defendant is a third-party beneficiary of the agreement, but that situation is not required.").

Shaheen v. Smith, No. 12-1168, 2013 WL 5995619 (D.D.C. Nov. 13, 2013), a case from this District which the Individual Defendants cite for the broad proposition that a forum selection clause can never bind a non-party, is also inapposite. Shaheen did not consider the "closely related" test nor even whether a non-party can be bound by an otherwise applicable forum selection clause. Instead, it addressed the jurisdictional significance of a statement on the website of the plaintiff's law firm, Burke & Reedy, designating the District of Columbia as the proper venue "for any and all actions between the user of the website and Burke & Reedy." Id. at *3. The court held that this clause was "inapplicable in this matter" because "Burke & Reedy is not a party in this action" and "there is no indication" that the defendants had ever used its website. Id.

(emphasis added). Here, by contrast, there is no dispute that the forum selection clause is applicable "in this matter" and binding at least on Torres. The only question is whether the Individual Defendants are also bound by it. Shaheen does not speak to that question.

The Individual Defendants also are incorrect that "[n]o case within this district has applied th[e] 'closely related' test to confer personal jurisdiction over a non-party, non-signatory to a forum selection clause." J. Torres Reply at 10. In fact, at least two decisions issued in this District have expressly held that a non-party may be subject to a forum selection clause if he or she "is 'closely related to the dispute such that it becomes foreseeable that [he or she] will be bound.'" Marra v. Papandreou, 59 F. Supp. 2d 65, 77 (D.D.C. 1999) (Urbina, J.) (citations omitted), aff'd, 216 F.3d 1119 (D.C. Cir. 2000); see also Kotan v. Pizza Outlet, Inc., 400 F. Supp. 2d 44, 49 (D.D.C. 2005) (Lamberth, J.) (applying "closely related" test to bind non-parties to forum selection clause in franchise agreement).

Consequently, the Individual Defendants are subject to the forum selection clause in the Teaming Agreement if they were so "closely related to the contractual relationship" between Sabre

-24-

and Torres that it was foreseeable they would be bound by such clause. Holland Am. Line Inc., 485 F.3d at 456.

## 1. **Defendant Jerry Torres**

As discussed, Jerry Torres is Torres' CEO and sole shareholder. Sabre alleges that he "reviewed, approved, signed and submitted the TWISS II Contract proposal to the Government in August 2009, which included the" Teaming Agreement. Opp'n to J. Torres Mot. at 5. Sabre also points to evidence that Jerry Torres was extensively involved in determining the terms of the team's proposals to the Government, including the purported price reductions at issue. See Opp'n to J. Torres Mot. at 10-11 & Ex. 15; FAC ¶ 292. In addition, Sabre has made a strong prima facie case, which is supported by specific documentary and deposition evidence, that Jerry Torres personally tracked Sabre's accounts under the Teaming Agreement, controlled high level communications with Sabre personnel regarding payments to Sabre under the Agreement, and expressly sought to terminate the contractual relationship between Sabre and Torres. See FAC ¶¶ 271-73, 293, 304, 315, 316, 414; see also Opp'n to J. Torres Mot., Ex. 34 (email of Jerry Torres stating that "[r]ight now the priority is giving the complete boot to Sabre").

Based on this evidence, the Court concludes that Jerry Torres was so "closely related" to the Teaming Agreement and

this dispute that it was foreseeable he would be bound by the forum selection clause. As a result, he is deemed to have consented to the Court's jurisdiction.

### 2. Defendant Dyer

As discussed, Dyer was Torres' Vice President and is also alleged to have had extensive authority over the company as well as an intimate involvement in the events giving rise to this case. There is evidence that she: strategized with Jerry Torres and Jones regarding what they perceived as mark-ups in Sabre's pricing; directly oversaw the preparation of the Task Order proposals in which Sabre's prices were reduced; and attempted to conceal these reductions from Sabre. See FAC ¶¶ 273, 277, 301, 315, 373, 375. On November 29, 2010, she sent an internal email to Jerry Torres stating that "we need to get our ducks in a row and proceed smartly [regarding our dispute with Sabre]. They have no idea of the [price] [r]eductions we have made and think we are just arbitrarily shorting them." Opp'n to Jt. Mot., Ex. 31. Furthermore, when Sabre began to complain that its invoices had not been fully paid, Dyer and Jones met with Sabre personnel to discuss the issue and gave (allegedly false) assurances that full payment would be forthcoming. Id., Ex. 27.

Consequently, the Court concludes that Dyer was so "closely related" to the Teaming Agreement and this dispute that she

-26-

should reasonably have anticipated being bound by the forum selection clause. As a result, she too is deemed to have consented to the Court's jurisdiction.

### 3. Defendant Jones

As previously discussed, Jones was Torres' CFO during the relevant time period and also is alleged to have had substantial involvement in the events giving rise to this case. For example, Sabre alleges that she prepared or supervised the preparation of "internal spreadsheets showing . . . planned price reductions to Sabre's final prices" in the team's TWISS proposals. Opp'n to Jt. Mot. at 15; see also FAC ¶¶ 274, 276, 415, 416. She also is alleged to have been directly involved in the efforts of Jerry Torres and Dyer to conceal the price reductions from Sabre. See, e.g., Opp'n to Jt. Mot., Ex. 38 (email from Jones to Jerry Torres stating that she told another employee "to never disclose costing details to Sabre under any circumstances"); FAC ¶ 277. Finally, when Sabre began to complain that its invoices had not been paid, Jones accompanied Dyer to the meeting with Sabre personnel and thereafter sent a follow-up email stating that Torres was "fully committed to paying all of Sabre's invoices promptly[,]" which Sabre alleges was knowingly false. Opp'n to Jt. Mot. at 17 & Ex. 28; see also FAC ¶ 275.

-27-

Based on these particularized allegations and the record evidence supporting them, the Court concludes that Jones was so "closely related" to the Teaming Agreement and this dispute that she too should reasonably have anticipated being bound by the forum selection clause. As a result, she is deemed to have consented to the Court's jurisdiction as well.

### 4. Defendant Scott Torres

Scott Torres was a project manager, project coordinator, and program and security contracts manager for the TWISS program and, according to Sabre, "the primary [Torres] corporate contact for day-to-day operations on the TWISS II Program." Id. at 19. As with the others, there is evidence that he played a significant role in the contractual relationship with Sabre as well as the events giving rise to this case.

For example, two former Torres employees testified that Scott Torres did "all the pricing" for and was the individual with "de facto" day-to-day authority over the TWISS program. See Opp'n to Jt. Mot., Ex. 49 (deposition tr. of Christopher Herman at 112) [Dkt. No. 284-49]; id. Ex. 50 (deposition tr. of John Gillespie at 31) [Dkt. No. 284-50]. He was also one of the primary individuals responsible for directing Sabre to begin work on specific Task Orders, including the Task Orders in which

Sabre's prices are alleged to have been secretly reduced. See id., Exs. 24, 53, 54.

There is also evidence that Scott Torres was involved in calculating the price reductions at issue and concealing those reductions from Sabre. For example, with respect to a Task Order at Contingency Operating Site ("COS") Irbil, Jerry Torres emailed Scott Torres and asked him to review Sabre's pricing "so that we know what goes into mobilization." Id., Ex. 52. Scott Torres responded and noted that he had "adjusted a couple of the rates that looked out of line." Id. The evidence further suggests that, after Torres submitted a proposal for a Task Order at First Operating Base ("FOB") Hammer with reduced prices for Sabre's scope of the work, Scott Torres worked with Sabre executive Sumeet Mehta to develop responses to a list of follow-up questions from the Government, all while carefully concealing the fact that Sabre's prices had been reduced. See id., Ex. 20 (emails of March 24, 2010, asking Scott Torres "to go through these [questions] and get Sumeet on the phone" but not reveal "that we dropped the prices significantly"); id., Ex. 21 (email of March 25, 2010, from Scott Torres to Dyer attaching Mehta's responses to Government's questions and noting that "I need to change the pricing portion of the document so it matches our original MOB numbers").

-29-

Finally, there is evidence that, after Sabre complained to the United States Government that Torres was improperly withholding payments due under the Teaming Agreement, Scott Torres and his staff were tasked with developing a "reasonable market value" of Sabre's services for the purpose of assuring the United States Government that it had "consistently paid Sabre the proper amount for its services." Id., Ex. 17 (deposition tr. of Jerry Torres at 112) [Dkt. No. 284-17]; id., Ex. 18 (letter from Jerry Torres to Capt. John P. Turner, Administrative Contracting Officer, dated Jan. 11, 2011) [Dkt. No. 284-18].

Based on this evidence, the Court concludes that Scott Torres was so "closely related" to the Teaming Agreement and this dispute that he reasonably should have anticipated being bound by the forum selection clause. Consequently, he is also deemed to have consented to the Court's jurisdiction.

In sum, the Court concludes that it has personal jurisdiction over all of the Individual Defendants under the forum selection clause in the Teaming Agreement.[6]

---

[6] Having so concluded, Sabre's request to take jurisdictional discovery is denied as moot.

**IV. CONCLUSION**

For the foregoing reasons, the Motions to Dismiss for Lack of Personal Jurisdiction shall be **denied.** An Order shall accompany this Memorandum Opinion.

June 16, 2014

*Gladys Kessler*
Gladys Kessler
United States District Judge

**Copies to: attorneys on record via ECF**