UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SABRE INTERNATIONAL SECURITY,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Civil Action No. 11-806 (GK)** |
| : | **(sealed)** |
| **TORRES ADVANCED ENTERPRISE** : | |
| **SOLUTIONS, LLC, et al.,** : | |
| : | |
| **Defendants.** : | |
| : | |

### MEMORANDUM OPINION

Sabre International Security ("Sabre") has sued its former business partner, Torres Advanced Enterprise Solutions, LLC ("Torres") and three of its current and former officers, Jerry Torres ("Jerry Torres"), Rebekah Dyer ("Dyer"), and Kathryn Jones ("Jones") (collectively, the "Individual Defendants"), for breach of contract, tortious interference with business relations, and conversion of property.

This matter is before the Court on the Individual Defendants' Motions for Summary Judgment [Dkt. Nos. 377, 407, and 408]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 384, 431, & 432] and Replies [Dkt. Nos. 404, 435, and 436], and the entire record herein, and for the reasons set forth below, Jones' Motion shall be **granted**, and the Motions of Dyer and Jerry Torres shall be **denied**.

I.   **BACKGROUND**

A.   **Factual Background**[1]

For purposes of the instant Motions, the facts can be briefly stated. Sabre and Torres are private security contractors providing security services to various entities around the world, including the United States Government. Individual Defendant Jerry Torres is Torres' Chief Executive Officer ("CEO") and sole shareholder. Individual Defendant Dyer previously served as Torres' Vice President and Chief Operating Officer ("COO"). She left the company in 2013. Individual Defendant Jones previously served as Torres' Chief Financial Officer ("CFO"). She left the company in January 2011.

---

[1] The factual and procedural background in this case has been set forth in great detail in the Court's Memorandum Opinions of January 30, 2014 [Dkt. No. 288], June 16, 2014 [Dkt. No. 359], and August 20, 2014 [Dkt. No. 373], and the Court's Memorandum Order of August 21, 2014 [Dkt. No. 376]. See generally Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC, No. 11-806, 2014 WL 341071 (D.D.C. Jan. 30, 2014) ("Sabre III"), appeal dismissed, No. 14-7026, 2014 WL 1378771 (D.C. Cir. Apr. 3, 2014); Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC, No. 11-806, 2014 WL 3859164 (D.D.C. June 16, 2014) ("Sabre IV"); Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC, No. 11-806, 2014 WL 4162236 (D.D.C. Aug. 21, 2014) ("Sabre VI"). Familiarity with these prior decisions is assumed. The facts in this Memorandum Opinion are taken from the pleadings, the parties' briefs, and the parties' Statements of Undisputed Material Facts ("SOMFs") submitted pursuant to Local Civil Rule 7(h). The facts are undisputed unless otherwise stated.

Between 2007 and 2010, Sabre and Torres partnered as prime contractor and subcontractor to perform site-specific security contracts for the United States Government at military installations in Iraq.   Each of these security contracts was known as a "Task Order."   The parties' relationship in competing for and performing these Task Orders was governed by a series of contracts, the most relevant of which is known as the "Teaming Agreement."

On December 2, 2009, the Government awarded the Torres-Sabre Team a Task Order at Joint Security Station ("JSS") Shield in Iraq.   This Task Order had a base period of performance of one year - extending from January 1, 2010, through December 31, 2010 - and two six-month option periods.   The Government exercised both options and subsequently modified the Task Order to provide for an additional extension.   As a result of these extensions, the Team did not conclude its performance at JSS Shield until March 31, 2012.

Under the Teaming Agreement, the parties agreed that Sabre would provide "all Site materials, Site equipment, Site supplies and Site life support required for performance" of each Task Order and that, upon conclusion of each Task Order, Torres would "release and return to Member's (Sabre['s]) possession and

-3-

control all such equipment, supplies and facilities . . . in the same condition as originally provided, fair wear and tear excepted." Teaming Agreement § 6.1(B)(1) [Dkt. No. 22-2]. Pursuant to this provision, Sabre provided the Team's "life support area" ("LSA") equipment at JSS Shield.

The Court has already found in a separate Summary Judgment Opinion [Dkt. No. 373] – and for purposes of the present Motions, it appears to be undisputed – that, upon the conclusion of the JSS Shield Task Order, Torres did not return this equipment to Sabre but instead sold it to a third party named Mohammed Hussan for $150,000, and retained the proceeds. See Jones' Mot. at 4-5; Dyer's Mot. at 6; J. Torres' Mot. at 4-7.

Sabre claims that the three Individual Defendants directed, consented to, or otherwise participated in Torres' decision to sell its property to Mr. Hussan. The Individual Defendants deny any such involvement and claim that the decision to sell Sabre's property was made, without their knowledge or consent, by Robert Lewis, a Senior Program Manager working out of Torres' Virginia headquarters who left Torres' employment in January 2013. Dyer's Mot. at 6-7, 8.[2]

_____

[2] Sabre claims that Defendants never identified Lewis as a person with information about this lawsuit. Pl.'s Opp'n to Dyer's Mot. at 4 n.3. Dyer counters that Defendants were not required to

**B.    Procedural Background**

On April 29, 2011, Sabre filed this lawsuit against Torres for breach of contract and related torts.    In October 2013, Sabre filed a First Amended Complaint ("FAC") [Dkt. No. 242]. The FAC added seven new claims against Torres and the Individual Defendants, including, as relevant here, a claim for conversion of the life support equipment Sabre supplied at JSS Shield.

On January 30, 2014, the Court granted Torres' Motion to Dismiss all of the new counts asserted in the FAC except for the conversion claim.    See generally Sabre III, 2014 WL 341071, at *3-9.   On August 20, 2014, the Court granted summary judgment to Sabre against Torres on the conversion claim.    See Mem. Op., dated Aug. 20, 2014 ("Summ. J. Op.") [Dkt. No. 373].[3]   On August 21, 2014, the Court granted judgment on the pleadings for the

supplement their interrogatory responses with such information because Leggett testified about Lewis at his deposition (although he did not identify him by name).   The Court shall not address this dispute as it has not been squarely presented and its resolution is unnecessary for purposes of the present Motions.

[3] In the same Opinion, the Court granted judgment in Torres' favor on Counts 3, 4, 7, 8, and 9, which asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference with prospective economic advantage, but declined to grant judgment for either party on Sabre's breach of contract claims in Counts 2 and 5, or its claim for tortious interference with business relations in Count 10.   See generally Summ. J. Op.

Individual Defendants as to all Counts except the conversion claim. Sabre VI, 2014 WL 4162236, at *2-5.

On August 22, 2014, Jones filed her Motion for Summary Judgment on the conversion claim [Dkt. No. 377]. On September 8, 2014, Sabre filed its Opposition [Dkt. No. 384]. On September 12, 2014, Jones filed her Reply [Dkt. No. 404].

On September 18, 2014, Jerry Torres and Dyer filed their Motions for Summary Judgment on the conversion claim [Dkt. Nos. 407 and 408]. On October 6, 2014, Sabre filed its Oppositions [Dkt. Nos. 431 and 432]. On October 17, 2014, Jerry Torres and Dyer filed their Replies [Dkt. Nos. 435 and 436].

## II. LEGAL STANDARDS

### A. Standard on Summary Judgment

Summary judgment may be granted only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986)).  A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

As the Supreme Court stated in Celotex Corp. v. Catrett, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  477 U.S. 317, 322 (1986).  The Supreme Court has further explained,

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Liberty Lobby, 477 U.S. at 247-48 and Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation marks omitted)).

However, the Supreme Court has also consistently emphasized that, "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. Id. at 255.

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

### B. Standard Governing the Personal Liability of the Individual Defendants

As the Court has recently held in Sabre VI, although corporate officers are not automatically liable in their personal capacity for torts committed by the corporation in which they serve, they also "cannot avoid personal liability for wrongs committed by the corporation with their knowledge and with their consent or approval." 2014 WL 4162236, at *3 (citing

<u>Vuitch v. Furr</u>, 482 A.2d 811, 821 (D.C. 1984)). Consequently, to hold the Individual Defendants personally liable for Torres' acts of conversion, Sabre must establish that each Individual Defendant – acting with knowledge that the equipment at issue belonged to Sabre – "meaningfully participated" in Torres' decisions not to return such equipment to Sabre at the conclusion of the JSS Shield Task and to sell it instead. <u>Sabre VI</u>, 2014 WL 4162236, at *3 (citing <u>Lawlor v. Dist. of Columbia</u>, 758 A.2d 964, 977 (D.C. 2000)).

"'Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he [or she] had a share in the wrongful acts of the corporation which constitute the offense.'" <u>Harvey v. Mohammed</u>, 841 F. Supp. 2d 164, 179 (D.D.C. 2012) (quoting <u>Lawlor</u>, 758 A.2d at 977). Where such evidence exists, "the precise extent of an officer's "'participation in and responsibility for the alleged [conversion is] a quintessential question of fact'" that must be submitted to the jury. <u>Sabre VI</u>, 2014 WL 4162236, at *3 (quoting <u>Luna v. A.E. Eng'g Servs., LLC</u>, 938 A.2d 744, 748 (D.C. 2007)). Conversely, if the record, taken as a whole, could not lead a reasonable jury to conclude that each Individual Defendant "had a share of the wrongful

acts," summary judgment is appropriate.   Celotex Corp., 477 U.S.

at 322

**III. JONES' MOTION**

Jones contends that summary judgment must be granted in her

favor because Torres' conversion of the life support equipment

did not take place until mid-2012, more than one year after her

employment with Torres ended.[4]   She claims that this timeline

demonstrates that she could not have "meaningfully participated"

in Torres' tortious acts.

Sabre does not dispute that Jones' employment with Torres

ended in January 2011 or that the conversion of property did not

occur until approximately June 2012.   See Pl.'s SOMF ¶ 12 [Dkt.

No. 384-12].   It claims, however, that the sale to Mr. Hussan in

June 2012 was simply "the final act" of a long-running "scheme"

---

[4] The Individual Defendants assert that the Court previously held
that the conversion at issue first occurred in June 2012.   This
is incorrect.   The Court previously held that Torres sold the
equipment to Mr. Hussan "in or around June 2012."   Summ. J. Op.
at 61.   This conclusion was based on Torres' undisputed
Responses to Sabre's Rule 30(b)(6) Written Deposition Questions.
See Pl.'s Opp'n to J. Torres Mot. Ex. 11, at 5-6 [Dkt. No. 384-
11].   The Court has never, however, identified a precise date on
which the conversion first occurred, and it is unnecessary to do
so for purposes of the pending Motions.   What is both material
and undisputed is that the JSS Shield Task Order did not
conclude until March 31, 2012, and the conversion did not take
place until after that date.

-10-

to convert its property, which Jones allegedly "inspired" during her tenure as Torres' CFO. See generally Pl.'s Opp'n at 2-5.[5]

Sabre's sole evidence of such a "scheme" is a series of emails dated November 28, 2010, in which Jerry Torres, Dyer, and Torres' Program Manager, Jerald Barnes, discussed the life support equipment at issue in light of the Government's recent decision to extend the JSS Shield performance period for an additional six months beyond the original completion date of December 31, 2010. See Pl.'s Opp'n, Ex. 8. The impetus for this email was that Sabre – who had not yet been advised of the Government's decision – had sent an inquiry regarding the removal of its equipment from the Task Order site. In

---

[5] Jones correctly points out that she is not named as a defendant in Count 18, which is the conversion count. See Mot. at 4 n.1; FAC ¶¶ 452-457. Sabre's only attempt to plead that Jones was personally involved in the events alleged in that Count is its allegation in Count 19 that "[o]n or about early 2012, each of individual defendants Jerry Torres, Rebekah Dyer and Kathryn Jones, acting in concert and with common intent as principals and/or aiders and abetters, willfully and maliciously authorized and implemented the sale of Sabre['s] property at JSS Shield . . . fully aware that the property and proceeds belonged to Sabre." Id. ¶ 469 (emphasis added). Sabre styled Count 19, however, as a claim for "Fraud, Aiding and Abetting Fraud, [and] Unjust Enrichment," not a claim for conversion, and the Court dismissed that Count on the pleadings in Sabre VI. 2014 WL 4162236, at *4. Notwithstanding this lack of clarity in Sabre's pleadings, the parties have thus far generally proceeded on the assumption that Count 18 is asserted against the Individual Defendants. Consequently, the Court does the same.

discussing this inquiry with other Torres personnel, Jerry Torres wrote:

> If this is another option period and NOT A CONTRACT EXTENSION, THEN THE GOODS BELONG TO THE GOVERNEMNT [sic] UNTIL SHIELD IS CLOSED.
>
> Kathy [Jones] and Reb[ekah Dyer] – right?
>
> Id.

Dyer responded:

> Yes, this is the exercise of option 1. Nothing can be removed. The usg owns everything paid for under the mob[ilization] clin per the FAR [Federal Acquisition Regulations].
>
> Id.

These emails, taken alone, simply could not lead a reasonable jury to conclude that its participants were engaged in a scheme to convert Sabre's property. Neither Jerry Torres nor Dyer denied that Sabre provided the equipment at issue, nor did they suggest that, once the Task Order was completed, they intended to assert Torres' ownership over such property. To the contrary, in an earlier email in the same email string, Jerry Torres wrote that "We may just want to do this ourselves and buy the stuff from [Sabre] or buy all new stuff," id. (emphasis

added), thereby expressly acknowledging Sabre's property rights in the equipment.[6]

Moreover, Jones had no role in this exchange of emails, other than the fact that she was copied as a recipient. Her passive receipt of emails stating the uncontroversial proposition that life support equipment at Camp Shield could not be removed "UNTIL SHIELD IS CLOSED" simply does not "logically lead[] to the inference that [she] had a share" in, much less "inspired," Torres' ultimate decision, more than a year and a half later (and more than one year after she was no longer employed by Torres) to sell Sabre's equipment to a third party. Lawlor, 758 A.2d at 977.

As our Court of Appeals has repeatedly observed, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir.

---

[6] This comment appears to reflect the fact that, in October 2010, for reasons disputed by the parties and not at issue in the pending Motions, Torres took over the life support services at JSS Shield, which previously had been performed by Sabre. See Decl. of Kevin Robinson, dated Feb. 17, 2014 ("Robinson Decl. I") ¶¶ 17-18 [Dkt. No. 432-15].

2011) (citing <u>Liberty Lobby</u>, 477 U.S. at 252).[7]   Because the
November 28, 2010, email is Sabre's only evidence that Jones was
personally involved in the conversion of property at Camp
Shield,[8] and because that email could not lead a reasonable jury
to find Jones personally liable for Torres' acts of conversion,
there is no genuine issue for trial.[9]

Consequently, Jones' Motion for Summary Judgment shall be
**granted.**

---

[7] Sabre repeatedly quotes the Court's statement in <u>Sabre VI</u> that
"the precise extent of an officer's 'participation in and
responsibility for'" Torres' conversion is "a quintessential
question of fact[.]"   Pl.'s Opp'n at 1.   However, Sabre
conveniently omits the remainder of the Court's sentence, which
is that such "question[s] of fact . . . <u>cannot be answered at
the pleading stage</u>."   Sabre VI, 2014 WL 4162236, at *3 (emphasis
added).   As is well established, the standard of proof for
judgment on the pleadings is considerably different than the
standard of proof at summary judgment.

[8] Sabre has also presented an April 26, 2012, email from Sabre's
Head of Operations, Kevin Robinson, to Torres' Iraq Country
Manager, Alfred Leggett, stating that, "[t]here has never been
one comment made over the past 2 years and 6 months where Torres
have [sic] claimed ownership of Sabre TWISS stores and
equipment."   Pl.'s Opp'n Ex 9 [Dkt. No. 384-9].   This email
refutes, rather than supports, Sabre's claim of a long-running
"scheme" to convert it equipment.   Therefore, it too could not
lead a reasonable jury to find in Sabre's favor.

[9] For the same reason, there is no evidence on which a jury could
reasonably find that Jones "aided and abetted" Torres'
conversion, as Sabre alleges in the alternative.

## IV.  DYER'S MOTION

Dyer argues that summary judgment must be granted in her favor on the conversion claim because "[t]here is simply nothing in the record which a jury could rely on" to find that she meaningfully participated in Torres' conversion of property. Reply at 4 [Dkt. No. 436].  The Court disagrees.

First, unlike Jones, it is undisputed that Dyer was still employed as Torres' Vice President - one of its two highest officers - when Torres sold Sabre's equipment to Mr. Hussan in 2012.  Furthermore, Dyer testified that, as Vice President, she was intimately involved in oversight of the TWISS program.  See Pl.'s Opp'n Ex. 6 (deposition tr. of Rebekah Dyer) at 99:11-14 (Q:  Is the vice president typically on the phone with the other party . . . discuss[ing] pricing? A:  "At Torres, yes, you are. I do everything.").

Second, Leggett testified that, upon the completion of a Task Order (a process the parties refer to as "demobilization"), Dyer was generally one of the three people who instructed him as to whether equipment located at the Task Order site belonged to Sabre or Torres, so as to enable him to return any equipment belonging to Sabre.  See Pl.'s Opp'n Ex. 16 (deposition tr. of Alfred Leggett) at 288:3-21) [Dkt. No. 432-16].  Dyer argues

that this testimony pertains to a Task Order at First Operating Base Husayniyah, not JSS Shield.  The deposition excerpt cited, however, does not make reference to any specific Task Order.  In any event, the fact that Dyer advised Leggett regarding the ownership of equipment at one Task Order site may support an inference that she did so at other Task Order sites as well, including the one at JSS Shield.

Third, the November 28, 2010, emails discussed above in connection with Jones' Motion further demonstrate that disposition of Sabre's equipment at the conclusion of a Task Order site was precisely the type of matter in which Dyer was directly involved.  Moreover, the first email in that set – which was forwarded to Dyer for her input, and to which she responded - is an email from Sabre asking for a "plan of demobilization" given that the "Life Support Units have been purchased by Sabre . . . [and] we would have to send in a workforce to start dismantling [them for] removal to Basra." Pl.'s Opp'n, Ex. 10 [Dkt. No. 432-10].  This is evidence that Dyer knew specifically that Sabre claimed ownership of the life support equipment at JSS Shield.

Fourth and finally, Sabre's Head of Operations, Kevin Robinson, has submitted a Declaration stating that he visited

the JSS Shield site in May 2012 and demanded the return of Sabre's equipment, to which Leggett responded that he had instructions from Torres' "corporate headquarters" not to return any equipment that was not registered as Sabre's with the Iraqi Ministry of Interior ("MOI").   See generally Decl. of Kevin Robinson, dated Oct. 4, 2014 ("Robinson Decl. II") ¶¶ 7-9 [Dkt. No. 432-17].   Again, based on Dyer's high level position and past involvement in such matters, a jury could reasonably infer that she took part in this instruction from "corporate headquarters."[10]

Based on all of this evidence, a reasonable jury could find that Dyer consented to, approved of, or otherwise "meaningfully participated" in the events giving rise to Torres' conversion of

---

[10] Dyer objects that this Declaration is "double-hearsay and inadmissible."   See Def.'s Reply to Pl.'s Rebuttal SOMF ¶ H(14). To survive summary judgment, however, Sabre need only produce evidence that is "capable of being converted into admissible evidence."   Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (citation omitted).   The statements in Robinson's Declaration are capable of being converted into admissible, non-hearsay, evidence when he testifies at trial, as Sabre has indicated that he will do.   See Pl.'s SOMF in Opp'n to J. Torres Mot. ¶ 17 [Dkt. No. 431-27].   Consequently, Dyer is incorrect that the Declaration must be disregarded for purposes of summary judgment.

property.  Sabre VI, 2014 WL 4162236, at *3.[11]  Therefore, Dyer's

Motion for Summary Judgment shall be **denied**.

## V.   JERRY TORRES' MOTION

Last, Jerry Torres argues that summary judgment must be

granted in his favor on the conversion claim.  Like Dyer, he has

submitted a Declaration stating that he did not "participate

in," "consent to," or "approve of" the sale of property at JSS

Shield.  Mot. Ex. A (Decl. of Jerry Torres) ¶ 2-3 [Dkt. No. 408-

3].  He argues that there "is not a single fact in the record"

that contradicts these facts.  Mot. at 5.

Jerry Torres' Motion shall be **denied** for largely the same

reasons stated above in connection with Dyer's Motion.  First,

he was the highest officer at Torres and had intimate

involvement in the TWISS program, including oversight of the JSS

Shield Task Order.  See Mot., Ex. C (deposition tr. of Jerry

Torres) at 49:19-50:16 (testifying that he visited the Shield

---

[11] Dyer has submitted a Declaration stating that the decision to
sell Sabre's equipment at JSS Shield was made by former Torres
Senior Program Manager Robert Lewis, and that she neither
"directed" nor "discussed" that decision.  See generally Decl.
of Rebekah Dyer ¶¶ 3-7.  Even if a jury believed these
statements, Dyer's Declaration does not foreclose the
possibility that she had a role in the conversion.  It refers
only to the sale of the property to Mr. Hussan and is completely
silent as to her involvement in any prior decisions regarding
who owned the property and/or whether to return it to Sabre.

Task Order site and had general knowledge regarding the equipment supplied there).

Second, Leggett testified that Jerry Torres was, along with Dyer, one of the three individuals who instructed him regarding the ownership of the Team's onsite equipment at the conclusion of a Task Order. See Pl.'s Opp'n, Ex. 16 (deposition tr. of Alfred Leggett) at 288:3-21 [Dkt. No. 432-16]. Third, as discussed above, the November 28, 2010, emails – on which Jerry Torres was copied and to which he responded - demonstrate both that he knew Sabre claimed ownership of the JSS Shield equipment and that responding to such a claim was the type of matter in which he was generally involved. Fourth, Kevin Robinson, Sabre's Head of Operations, attested in his October 4, 2014, Declaration that, when he asked Leggett to identify which individual at "corporate headquarters" told him not to return Sabre's equipment, Leggett specifically identified Jerry Torres.

Jerry Torres points to Leggett's deposition testimony, in which Leggett stated that Torres' Operations Manager, rather than Jerry Torres, told him that the property belonged to Torres. See Mot. Ex. B (deposition tr. of Leggett) at 292:7-19 [Dkt. No. 408-4]. Even if Leggett's testimony is inconsistent with Robinson's October 4, 2014, Declaration, that fact would

—19—

not warrant summary judgment.   As our Court of Appeals has
repeatedly emphasized:

> 'Credibility determinations, the weighing of the
> evidence, and the drawing of legitimate inferences
> from the facts are jury functions, not those of a
> judge at summary judgment.'   Thus, [the court must]
> not 'determine the truth of the matter,' but instead
> decide only 'whether there is a genuine issue for
> trial.'

Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir.

2010) (quoting Liberty Lobby, 477 U.S. at 249).   Because Sabre

has presented evidence that Jerry Torres was directly involved

in the events related to the conversion claim, there is a

genuine issue for trial, despite the fact that contrary evidence

also exists.

Finally, Jerry Torres claims that Robinson's October 4,

2014, Declaration is inconsistent with his February 17, 2014,

Declaration and should therefore be disregarded under the "sham

affidavit rule."   Def.'s Reply at 7.   This rule "precludes a

party from creating an issue of material fact by contradicting

prior sworn testimony unless the 'shifting party can offer

persuasive reasons for believing the supposed correction' is

more accurate than the prior testimony."   Galvin v. Eli Lilly &

Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007) (citations and

quotation marks omitted).   Our Court of Appeals has made clear,

however, that "[i]f the supplemental affidavit does not contradict but instead clarifies the prior sworn statement, then it is usually considered admissible." Id. (citations omitted).

Robinson's October 4 Declaration shall not be disregarded because it is not inconsistent with his February 17 Declaration. In the later Declaration, Robinson attested that "[o]n or about Tuesday, 15 May 2012, I went to Joint Security Station (JSS) Shield to assess what of Sabre's property . . . Torres was required to return to Sabre" and observed that "[m]ost of the facilities of the Sabre camp . . . were gone." Robinson Decl. II ¶¶ 3, 6. He stated further that, when he inquired what had happened to the equipment, he was told that it "had been sold off by Torres over the previous four months[.]" Id. ¶ 6. In the earlier Declaration, Robinson attested that he learned in May 2012, that "Torres had sold the LSA and other equipment" without Sabre's consent but, "[s]ince Sabre had not been allowed on the site, I never saw the condition of this equipment." Robinson Decl. I ¶ 19.

Jerry Torres claims that these Declarations are inconsistent because in the later one, Robinson reports visiting the JSS Shield site, whereas he previously stated that Sabre had not been allowed access to the site. The Declarations can,

however, also be read, perfectly consistently, to mean that
Sabre was not allowed access to the JSS Shield site prior to May
2012, when Robinson visited and first learned that much of the
equipment had been sold. This is a plausible reading in light
of evidence that Torres shut Sabre out of the JSS Shield Task
Order during the performance period. See Robinson Decl. I
¶¶ 17-18 (attesting that, by October 2010, "Torres had
essentially taken over the LSA services at JSS Shield").
Moreover, this reading is supported by an April 26, 2012, email
from Robinson to Leggett, which stated that "[i]f you are
available on [May 5, 2012], I will travel to Shield with the
Sabre Team and we can have a face to face chast [sic] on
current/outstanding issues. It will be good to catch up."
Pl.'s Opp'n to Jones' Mot., Ex 9 [Dkt. No. 384-9]. Therefore,
because Robinson's supplemental affidavit does not clearly
"contradict but instead clarifies [his] prior sworn statement,"
it shall not be disregarded.[12]

For all of the foregoing reasons, there is a genuine issue
of fact as to whether Jerry Torres meaningfully participated in,
and thus can be held personally liable for, Torres' conversion

_____

[12] Jerry Torres also claims that the October 14, 2014,
Declaration is hearsay. The Court has addressed that objection
in connection with Dyer's Motion, above. See supra note 10.

of property.    Consequently,  his  Motion  for  Summary  Judgment

shall be **denied.**

## VI.   CONCLUSION

For  the  foregoing  reasons,  Jones'  Motion  for  Summary

Judgment  shall  be  **granted,**  Dyer's  Motion  for  Summary  Judgment

shall  be  **denied,**  and  Jerry  Torres'  Motion  for  Summary  Judgment

shall  also  be  **denied.**    An  Order  shall  accompany  this  Memorandum

Opinion.


October 30 , 2014                    *Gladys Kessler*
                                     Gladys Kessler
                                     United States District Judge




**Copies to: attorneys on record via ECF**